UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

WILLIAM C. CARLETON,

                                        Plaintiff,

                                                              9:17-CV-0245
v.                                                            (MAD/TWD)

ANTHONY ANNUCCI, et al.,

                                        Defendants.

_____

APPEARANCES:                          OF COUNSEL:

WILLIAM C. CARLETON
Plaintiff *pro se*
13461 Allis Road
Albion, New York 14411

BARBARA D. UNDERWOOD, ESQ.            OMAR J. SIDDIQI, ESQ.
Attorney General for the State of New York    Assistant Attorney General
Counsel for Defendants
The Capitol
Albany, New York 12224

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

<u>**ORDER AND REPORT- RECOMMENDATION**</u>

I.      **INTRODUCTION**

        Plaintiff William C. Carleton has commenced this *pro se* civil rights action under 42

U.S.C. § 1983 against Defendants Anthony Annucci ("Annucci"), Commissioner of the New

York State Department of Corrections and Community Supervision ("DOCCS"); Marcy

Correctional Facility ("Marcy") Sergeant Leddick; Marcy Lieutenant Cook; and John/Jane Doe.

(Dkt. No. 1.)  Claims remaining after initial review pursuant to 28 U.S.C. §§ 1915(e)(2)(B) and

1915A are: (1) Eighth Amendment failure to protect claims against Defendants Leddick, Cook, and John Doe, corrections officer on duty in C-2 housing unit at Marcy on the 11:00pm to 7:00am shift on December 24-25, 2014; and (2) claims for violation of Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131, *et seq*., and Title V of the Rehabilitation Act of 1973 ("Rehabilitation Act"), 29 U.S.C. § 794, *et seq*., against Defendant Annucci, solely in his official capacity.  (Dkt. No. 7 at 12-14.[1])

Defendants Leddick, Cook, and Annucci now move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure on the grounds that: (1) Plaintiff failed to exhaust his administrative remedies under the DOCCS Inmate Grievance Program ("IGP"); and (2) Plaintiff cannot establish a prima facie claim under the ADA or Rehabilitation Act.  (Dkt. Nos. 26; 31.)   Plaintiff has failed to respond to the motion, despite having been cautioned by the Court that his failure to respond may result in the motion being granted, and having been granted an unsolicited extension of time to respond by the Court.  (Dkt. No. 35.)  For reasons explained below, the Court recommends that Defendants Leddick, Cook, and Annucci, in his official capacity, be granted summary judgment for failure to exhaust administrative remedies, and that all claims against them be dismissed with prejudice.  The Court further recommends *sua sponte* dismissal of the action against Defendant John Doe for failure to exhaust.

## II.    FACTUAL BACKGROUND

### A.    Inmate Attacks on Plaintiff on December 24 and 25, 2014

On December 24, 2014, two weeks after he had arrived at Marcy, Plaintiff was jumped by

---

[1] Page references to documents identified by docket number are to the numbers assigned by the CM/ECF docketing system maintained by the Clerk's Office.

a group of inmates on his way back from chow.  (Dkt. Nos. 1 at 5; 27-1 at 21.)  According to

Plaintiff, he had an argument with an inmate who tried to accuse him of things that never

happened.  (Dkt. No. 27-1 at 24.)  The inmate did not like being questioned about it by Plaintiff,

and the inmate and his buddies jumped Plaintiff on the sidewalk on his way back from dinner.

*Id*. at 24-25.  One of them grabbed Plaintiff and slammed him to the ground while another one

started kicking him and a third inmate pulled Plaintiff's hood over his head so he could not see.

*Id*. at 25.  They continued hitting him pretty much everywhere for a minute and a half or two

minutes and then walked away.  *Id*. at 26.

 After hearing someone had been jumped on the walkway, corrections personnel began a

house-to-house search to locate the inmate who had been jumped.  *Id*.  They saw gravel and

pebbles embedded in Plaintiff's hands and asked him why he had not mentioned anything about

being jumped on the walkway.  *Id*.  Plaintiff stated he did not want any more problems for

himself, and based on what he had seen at Marcy he had put in a letter to be moved to another

facility.  *Id*.  Plaintiff was taken to be checked out by the nurse and then questioned by Leddick.

(Dkt. No. 1 at 5.)  According to Plaintiff, he told Leddick he was not safe in Marcy, and Leddick

told Plaintiff to "suck it up and take it like a man."  *Id*.

When Leddick told Plaintiff he was being moved to housing unit C-2, Plaintiff told

Leddick he would not be safe there, and there would be problems that night because some of the

inmates who had jumped him as well as gang related inmates were in that housing unit, and

Plaintiff or someone else was going to get hurt.[2]  (Dkt. Nos. 1 at 5; 27-1 at 26.)  Plaintiff was

---

[2]  At is deposition, Plaintiff identified the gang as the "White Pride Gang," and testified
he had hung out in the same social circle outside of prison as the inmate with whom he had the
disagreement on December 24, 2014.  (Dkt. No. 27-1 at 35-37.)

nonetheless moved to housing unit C-2 at around 7:00pm on December 24, 2014, and placed in cube confinement, which meant he had to stay in his housing area.  (Dkt. Nos. 1 at 6; 27-2 at 2; 28-1 at 27-28.)

At approximately 12:05am on December 25, 2014, a number of inmates, including inmate Cecchini who subsequently admitted to the assault, began kicking and stomping Plaintiff as he slept, smashing his face, with Plaintiff suffering multiple facial injuries.  (Dkt. Nos. 1 at 6; 27-3; 28-1 at 27-28.)  According to Plaintiff, Defendant John Doe, a young corrections officer on duty in the housing until was not at his post in the housing unit at the time of the assault on Plaintiff because he was in housing unit C-1 talking to another corrections officer.  (Dkt. No. 1 at 6.)  Plaintiff was taken to the infirmary and then sent to St. Elizabeth Hospital where it was determined that the damage to Plaintiff's face was sufficiently severe that he should be transferred to Upstate University Hospital in Syracuse, New York for treatment.  (Dkt. Nos. 27-1 at 29-30; 27-3.)  Imaging done at Upstate revealed injuries to the left side of Plaintiff's face including a minimally displaced left ZMC fracture, minimally displaced left LeFort I fracture, Right Pterygoid plate fracture, left medial orbital wall fractures, and significant overlying soft tissue swelling on the left.  (Dkt. No. 1-1 at 11.)

After the assault, Leddick recommended Plaintiff be placed in involuntary protective custody and the placement was authorized by Cook.  (Dkt. No. 27-4 at 2.)  After release from Upstate, Plaintiff was taken to the hospital boxing unit at Midstate Correctional Facility for three or four weeks and then sent to the Special Housing Unit ("SHU") in Marcy and subsequently to the SHU in Washington Correctional Facility ("Washington") where he was held in protective custody.  (Dkt. No. 27-1 at 31-32.)

### B.    Plaintiff's Vision and Dyslexia

Plaintiff testified at his deposition that he has been legally blind his entire life.  (Dkt. No. 27-1 at 33.)  According to Plaintiff, he has Buri Von Drusens disease, where the lens in the optic part of the eye dis-shapens or cracks or tears, which reduces and ultimately stops vision.  *Id*. at 34.  Plaintiff is totally blind in his left eye and has tunnel 20/400 vision in his right eye.  *Id*. Plaintiff testified at his deposition that his vision cannot be improved by wearing glasses.  *Id.* Although Defendants have described Plaintiff's statements regarding his vision as conclusory, with no supporting evidence, the review of systems in the Upstate medical records annexed to Plaintiff's complaint state that Plaintiff has "congenital blindness in left eye," and the report on Plaintiff's ophthalmology consult indicates that Plaintiff reported his legal blindness and "tunnel vision" and family history of drusen to the examining ophthalmologist.  (Dkt. No. 1-1 at 5, 12.) The records of Plaintiff's examination list Plaintiff's visual acuity for his right eye as 20/400 PH NI, with a visual field "restriction in all quadrants with central island of vision."  *Id*. at 14.  The records for Plaintiff's left eye, which was found to have congenital blindness, list his visual acuity as LP, which stands for "light perception"; the ability to distinguish light from dark.[3]  *Id*. The report on the dilated fundus examination reveals "disc drusen" in both eyes.  *Id*. at 15.

Plaintiff has also alleged he has dyslexia and claims that DOCCS should have accommodated both his vision impairment and dyslexia.  (Dkt. No. 1 at 12.)

## III.    APPLICABLE SUMMARY JUDGMENT LEGAL STANDARDS

Summary judgment may be granted only if the submissions of the parties taken together

---

[3]  *See* https://www.tsbvi.edu/instructional-resources/83-frequently-used-terms-to-express-visual-acuity (last visited on November 21, 2018).

"show that there is no genuine issue of material fact and that the moving party is entitled to

judgment as a matter of law." Fed.R.Civ.P. 56; *see Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 251-52 (1986).  The party moving for summary judgment bears the initial burden of

showing, through the production of admissible evidence, that no genuine issue of material fact

exists. *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006).  A dispute of fact is

"genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the

nonmoving party." *Anderson*, 477 U.S. at 248.

Only after the moving party has met this burden is the nonmoving party required to

produce evidence demonstrating that genuine issues of material fact exist.  *Salahuddin*, 467 F.3d

at 272-73.  The nonmoving party must do more than "rest upon the mere allegations . . . of the

[plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material

facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).

"Conclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue

of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).

A party opposing summary judgment is required to submit admissible evidence.  *See*

*Spiegel v. Schulmann*, 604 F.3d 72, 81 (2d Cir. 2010) ("It is well established that in determining

the appropriateness of a grant of summary judgment, [the court] . . . may rely only on admissible

evidence.") (citation and internal quotation marks omitted).  A plaintiff's verified complaint is to

be treated as an affidavit.[4]  *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) ("A verified

complaint is to be treated as an affidavit . . . and therefore will be considered in determining

---

[4]   The Court finds that Plaintiff's amended complaint was adequately verified under 28
U.S.C. § 1746 by Plaintiff's declaration under penalty of perjury.  (Dkt. No. 1 at 14.)

6

whether material issues of fact exist . . . .") (citations omitted).

In *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005), the Second Circuit reminded that on summary judgment motions "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff." "To defeat summary judgment, . . . nonmoving parties may not rely on conclusory allegations or unsubstantiated speculation." *Jeffreys*, 426 F.3d at 554 (citation and internal quotation marks omitted). "At the summary judgment stage, a nonmoving party must offer some hard evidence showing that its version of the events is not wholly fanciful." *Id*. (citation and internal quotation marks omitted). "[T]o satisfy Rule 56(e), affidavits must be based upon 'concrete particulars,' not conclusory allegations. "*Schwapp v. Town of Avon*, 118 F.3d 106, 111 (2d Cir. 1997) (citation omitted). "Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999).

In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). Where a party is proceeding pro se, the court is obliged to "read [the pro se party's] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994). However, "a pro se party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Cole v. Artuz*, No. 93 Civ 5981

(WHP) (JCF), 1999 WL 983876 at *3 (S.D.N.Y. Oct. 28, 1999)[5] (citing *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).

## IV.    PLAINTIFF'S FAILURE TO RESPOND

Plaintiff's failure to oppose Defendants' summary judgment motion does not mean the motion is to be granted automatically.  *See Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996) (citations and internal quotation marks omitted).  An unopposed motion for summary judgment may be granted "only if the facts as to which there is no genuine dispute show that the moving party is entitled to judgment as a matter of law."  *Champion*, 76 F.3d at 486; *see also Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) (where "the nonmoving party 'chooses the perilous path of failing to submit a response to a summary judgment motion, the district court may not grant the motion without first examining the moving party's submissions to determine if it has met its burden of demonstrating that no material issue of fact remains for trial.'")

Where, as in this case, a party has failed to respond to the movant's statement of material facts as required by  L.R. 7.1(a)(3), the L.R. provides that facts in the movant's statement will be accepted as true (1) to the extent they are supported by evidence in the record, and (2) the nonmovant if proceeding *pro se*, has been specifically advised of the possible consequences of failing to respond to the motion.[6]  *Champion*, 76 F.3d at 486.  In light of Plaintiff's failure to

---

[5]  Copies of all unpublished decisions cited herein will be provided to Plaintiff in accordance with *LeBron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

[6]  The Docket reveals that the Clerk's Office mailed the requisite Notification of the Consequences of Failing to Respond to a Summary Judgment Motion to Plaintiff on July 1, 2018.  (Dkt. No. 34 at 2.)

oppose Defendants' motion, the facts set forth in Defendants' statement of material facts

pursuant to L.R. 7.1(a)(3) (Dkt. No. 108-6) that are supported by record evidence and are

uncontroverted by nonconclusory allegations in Plaintiff's verified third amended complaint, will

be accepted as true. *See McAllister v. Call*, No. 9:10-CV-610 (FJS/CFH), 2014 WL 5475293, at

*3 (N.D.N.Y. Oct. 29, 2014) (finding allegations in plaintiff's verified complaint sufficient to

controvert facts in statement of material facts on motion for summary judgment); *Douglas v.

Perrara*, No. 9:11-CV-1353 (GTS/RFT), 2013 WL 5437617, at *3 (N.D.N.Y. Sept. 27, 2013)

("Because Plaintiff has failed to raise any question of material fact, the Court will accept the facts

as set forth in Defendants' Statement of Facts Pursuant to Rule 7.1(a)(3) . . . , supplemented by

Plaintiff's verified complaint . . ., as true.").

Although this Circuit adheres to the view that nothing in Rule 56 imposes an obligation

on a court to conduct a search and independent review of the record to find proof of a factual

dispute where a non-movant willfully fails to respond to a properly filed summary judgment

motion, *Amnesty Am. v. Town of West Hartford*, 288 F.3d 467, 470 (2d Cir. 2002), the Second

Circuit has ruled that "[a] district court has broad discretion to determine whether to overlook a

party's failure to comply with local court rules," including local rules relating to requirements

regarding the submission of and response to statements of material facts on summary judgment

motions, and to "conduct an assiduous review of the record." *Holtz v. Rockefeller & Co., Inc*.,

258 F.3d 62, 73 (2d Cir. 2001) (citation and internal quotation marks omitted). In deference to

Plaintiff's *pro se* status, the Court has opted to review the entire summary judgment record on the

Defendants' present motion as well as the record on Defendants' first summary judgment motion

in this case.

V.   **ANALYSIS**

    A.   **Exhaustion of Administrative Remedies on Plaintiff's Eighth Amendment Failure to Protect Claims Against Leddick and Cook and Plaintiff's ADA and Rehabilitation Act Claims**

Defendants Leddick and Cook seek summary judgment on Plaintiff's Eight Amendment failure to protect claims on the grounds that Plaintiff failed to exhaust his administrative remedies under the DOCCS Inmate Grievance Program ("IGP"). Annucci seeks summary judgment on Plaintiff's ADA and Rehabilitation Act claims for failure to exhaust.

    1.   <u>Legal Standard for Exhaustion for § 1983 Claims</u>

Under the PLRA, "[n]o action shall be brought with respect to prison conditions under section 1983 . . . by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see also Ross v. Blake*, __ U.S. ___, 136 S. Ct. 1850, 1854-55 (2016). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). "There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court." *Jones v. Bock*, 549 U.S. 199, 211 (2007).

The PLRA requires "proper exhaustion," which means using all steps required by the administrative review process applicable to the institution in which an inmate is confined and doing so properly. *Jones*, 549 U.S. at 218 (citing *Woodford v. Ngo*, 548 U.S. 81, 88 (2006)); *see also Amador v. Andrews*, 655 F.3d 89, 96 (2d Cir. 2011) (exhaustion necessitates "using all steps that the [government] agency holds out, and doing so properly") (internal quotations omitted).

In New York State prisons, DOCCS has a well-established three-step IGP.  N.Y. Comp. Codes R. & Regs. ("N.Y.C.R.R.") tit. 7, § 701.5.

First, an inmate must file a complaint with the facility IGP clerk within twenty-one days of the alleged occurrence.  *Id*. § 701.5(a)(1).  A representative of the facility's Inmate Grievance Resolution Committee ("IGRC") has sixteen calendar days from receipt of the grievance to informally resolve the issue.  *Id*. § 701.5(b)(1).  If there is no such informal resolution, the full IGRC conducts a hearing within sixteen calendar days of receipt of the grievance, *id*. § 701.5(b)(2), and issues a written decision within two working days of the conclusion of the hearing.  *Id*. § 701.5(b)(3).

Second, a grievant may appeal the IGRC's decision to the facility superintendent within seven calendar days of receipt of the IGRC's written decision.  *Id*. § 701.5(c)(1).  If the grievance involves an institutional issue (as opposed to a DOCCS-wide policy issue), the superintendent must issue a written decision within twenty calendar days of receipt of the grievant's appeal.  *Id*. § 701.5(c)(3)(ii).  Grievances regarding DOCCS-wide policy issues are forwarded directly to the Central Office Review Committee ("CORC") for a decision under the process applicable to the third step.  *Id*. § 701.5(c)(3)(i).

Third, a grievant may appeal to CORC within seven working days of receipt of the superintendent's written decision.  *Id*. § 701.5(d)(1)(i).  CORC is to render a written decision within thirty calendar days of receipt of the appeal.  *Id*. § 701.5(d)(3)(ii).

There are special procedures that may be used when, as in this case, the relevant grievances are code 49 involving staff misconduct.  *Id*. § 701.8.  A grievance alleging staff misconduct, once it is given a number and recorded, must be sent directly to the superintendent,

11

and the superintendent must issue a decision within twenty-five days. *Id.* § 701.8(f).   If the grievant wishes to appeal a decision by the Superintendent to CORC, he must file a notice of decision to appeal with the inmate grievance clerk at the bottom of the Superintendent's decision within seven days of receipt of the decision. *Id.* § 701.8(h).  CORC is required to render a written decision within thirty calendar days of receipt of the appeal. *Id.* § 701.8(i) (incorporating § 701.5).

As set forth above, at each step of the IGP, a decision must be rendered within a specified time period.  "Where the IGRC and/or superintendent do not timely respond, an inmate must appeal 'to the next step,'" assuming there is another step in the IGP. *Eleby v. Smith*, No. 9:15-CV-0281 (TJM/DEP), 2017 WL 986123, at *4 (N.D.N.Y. Jan. 9, 2017) (quoting 7 N.Y.C.R.R. § 701.6(g)(2)); *see also Smith v. Kelly*, 985 F. Supp. 2d 275, 281 (N.D.N.Y. 2013) ("[A]ny failure by the IGRC or the superintendent to timely respond to a grievance . . . can   and must   be appealed to the next level . . . to complete the grievance process.").

Generally, if a plaintiff fails to follow each of the required steps of the IGP, including receipt of a decision from CORC, prior to commencing litigation, he has failed to exhaust his administrative remedies as required under the PLRA. *See Ruggiero v. Cnty. of Orange*, 467 F.3d 170, 176 (2d Cir. 2006) ("[T]he PLRA requires proper exhaustion, which means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits.") (internal quotations and citations omitted)).

While the PLRA mandates exhaustion of administrative remedies, it also "contains its own, textual exception to mandatory exhaustion." *Ross*, 136 S. Ct. at 1858.  More specifically, section 1997e(a) provides that only those administrative remedies that "are available" must first

be exhausted.  42 U.S.C. § 1997e(a); *see also Ross*, 136 S. Ct. at 1858 ("[T]he exhaustion

requirement hinges on the availability of administrative remedies[.]" (quotations and citations

omitted).  In the PLRA context, the Supreme Court has determined that "availability" means that

"an inmate is required to exhaust those, but only those, grievance procedures that are capable of

use to obtain some relief for the action complained of." *Ross*, 136 S. Ct. at 1859 (quotations and

internal citations omitted).

The *Ross* Court identified three circumstances in which a court may find that internal

administrative remedies are not available to prisoners under the PLRA. *Id*. at 1859-60.  First, "an

administrative procedure is unavailable when (despite what regulations or guidance materials

may promise) it operates as a simple dead end    with officers unable or consistently unwilling to

provide any relief to aggrieved inmates." *Id*. at 1859.  "Next, an administrative scheme might be

so opaque that it becomes, practically speaking, incapable of use." *Id*.  Finally, an administrative

remedy is not "available" when "prison administrators thwart inmates from taking advantage of a

grievance process through machination, misrepresentation, or intimidation." *Id*. at 1860.

In *Williams v. Corr. Officer Priatno*, 829 F.3d 118, 123 n.2 (2d Cir. 2016), the Second

Circuit noted that, "the three circumstances discussed in *Ross* do not appear to be exhaustive[.]"

The illustrations of unavailability in *Ross* nonetheless guide the Court's inquiry. *See Mena v.*

*City of New York*, No. 13-CV-2430 (RJS), 2016 WL 3948100, at *4 (S.D.N.Y. July 19, 2016).

Because non-exhaustion is an affirmative defense, defendants bear the burden of showing

that a prisoner has failed to satisfy the exhaustion requirements. *See Jones,* 549 U.S. at 216;

*Johnson v. Testman*, 380 F.3d 691, 695 (2d Cir. 2004).  Plaintiff must then establish that the IGP

grievance procedure was unavailable to him under *Ross*. *Jones*, 549 U.S. at 216.

13

2. <u>Plaintiff's Eighth Amendment Failure to Protect Claim Against Leddick and Cook</u>

Erin Pfendler ("Pfendler"), DOCCS IGP supervisor at Marcy, submitted a declaration in which she states that Marcy retains all grievance related documents for a period of four years and has on file documents from January 1, 2014, to the present.  (Dkt. No. 30 at ¶¶ 1, 14.[7])  Pfendler conducted a search of the IGP files at Marcy for any grievance filed by Plaintiff regarding Leddick and Cook's failure to protect him in connection with the December 25, 2014, assault.  *Id*. at ¶ 21.  Pfendler's search confirmed that Plaintiff had not filed any grievance related to the failure to protect claim against Leddick and Cook, nor had he filed any grievances while at Marcy.  *Id*. at ¶¶ 20, 21.

Rachel Seguin, Assistant Director of the DOCCS IGP, states in her declaration that she is Assistant Director of the DOCCS IGP and is custodian of records maintained by CORC.  (Dkt. No. 29 at ¶¶ 1, 4.)  On June 19, 2018, Seguin conducted a search for appeals received by CORC from Plaintiff and discovered that CORC had no record of receiving any appeals of facility-level grievances from Plaintiff during his entire period of incarceration.  *Id*. at ¶¶ 9-11.  Moreover, CORC has no record of receiving any correspondence from Plaintiff between 2010 and 2017 regarding any grievance related matters.  *Id*. at ¶ 12.

The Court finds that Leddick and Cook have satisfied their burden of showing that Plaintiff failed to exhaust his administrative remedies under the IGP with regard to his Eighth Amendment failure to protect claim against them.  Moreover, Plaintiff has not claimed, nor has he submitted any evidence that the IGP was not available to him or that he was in any way

---

[7] Paragraph numbers are used where documents identified by the CM/ECF docket number contain consecutively numbered paragraphs.

prevented from filing a grievance.  When asked at his deposition whether he had written any type

of letter or complaint to Annucci regarding the December 25, 2014, incident, Plaintiff testified he

did not remember.  (Dkt. No. 27-1 at 53.)  The only action Plaintiff testified to taking regarding

the incident was his unsuccessful attempt to pursue a state court action and commencing this

federal lawsuit.  *Id*.  at 52-53.

Based on the foregoing, the Court recommends that Defendants Leddick and Cook be

granted summary judgment on the ground that Plaintiff has failed to exhaust his administrative

remedies with regard to his Eighth Amendment failure to protect claim against the two

Defendants.[8]

### 3.    ADA and Rehabilitation Act Claims Against Annucci in his Official Capacity

Plaintiff alleges in his complaint that "because of his crime and conviction, which is

frowned upon by the general inmate population, and with plaintiff's disabilities with reading,

writing, comprehending, dyslexic and blind in one eye and [20/400] tunnel vision in the other

that the NYDOCCS should have had accommodation that would adequately assist the plaintiff in

his disabilities. . . ."  (Dkt. No. 1 at 12.)  He has asserted claims for violation of the ADA and

Rehabilitation Act based largely upon that allegation.  *Id*. at 14.  Defendants argue that Plaintiff

---

[8]  Plaintiff has also asserted an Eighth Amendment failure to protect claim against the as yet unidentified the John Doe Defendant, who was supposed to be working in housing unit C-1, but was instead in housing unit C-2 talking to another corrections officer at the time of the December 25, 2014, assault on Plaintiff.  (Dkt. No. 1 at 6,14.)  Inasmuch as Defendants have established that Plaintiff filed no grievances during his time at Marcy and filed no appeals with CORC during the entire period of his incarceration, and Plaintiff was given an opportunity to be heard on the question of exhaustion on this motion, the Court recommends *sua sponte* dismissal of the action against John Doe for failure to exhaust.  *See Snider v. Melindez*, 199 F.3d 108, 112 (2d Cir. 1999) (court's inherent authority to *sua sponte* dismiss a claim for failure to exhaust may properly be exercised where the failure to exhaust is readily apparent, and plaintiff has been given an opportunity to be heard on the issue of exhaustion).

failed to exhaust his administrative remedies with regard to his ADA and Rehabilitation Act claims.

Claims under the ADA and Rehabilitation Act are subject to the PLRA's exhaustion requirements. *See Colón v. New York State Department of Corrections and Community Supervision,* No. 15 Civ. 7432 (NSR), 2017 WL 4157372, at *4 (S.D.N.Y. Sept. 15, 2017); *Carlson v. Parry*, No. 06-CV-6621P, 2012 WL 1067866, at *12 (W.D.N.Y. Mar. 29, 2012) (under the PLRA, ADA and Rehabilitation Act claims must be exhausted prior to raising them in federal court); *see also O'Guinn v. Lovelock Corr. Center*, 502 F.3d 1056, 1061-62 (9th Cir. 2007) (The ADA and Rehabilitation Act are subject to the exhaustion requirements of the PLRA).

Pfendler has established that Plaintiff did not file a grievance for violation of his rights under the ADA and Rehabilitation Act while he was at Marcy.  (Dkt. No. 30 at ¶¶ 19-21.) Although  Plaintiff's complaint might be liberally construed to allege violations of the ADA and Rehabilitation Act during his incarceration at Washington, Defendants have not submitted evidence with regard to whether Plaintiff filed a grievance at Washington.  However, Sequin has established in her declaration that CORC has no record of receiving any appeal from Plaintiff of a facility level grievance during his entire period of incarceration.  (Dkt. No. 29 at ¶ 11.) Therefore, the Court finds that Defendants have satisfied their burden of establishing that Plaintiff failed to exhaust his administrative remedies under the DOCCS IGP before commencing this action and recommends that Defendant Annucci be granted summary judgment on Plaintiff's ADA and Rehabilitation claims for failure to exhaust administrative remedies under the DOCCS IGP.

16

4.       Dismissal with Prejudice

Dismissal without prejudice on a failure to exhaust administrative remedies grant of summary judgment is appropriate when "a prisoner who brings suit without having exhausted these remedies can cure the defect simply by exhausting them and then reinstituting his suit." *Berry v. Kerik*, 366 F.3d 85, 87 (2d Cir. 2004) (*Snider v. Melindez*, 199 F.3d 108, 111-12 (2d Cir. 1999)).  Conversely, dismissal with prejudice is appropriate "where a plaintiff is effectively barred from administrative exhaustion." *McCoy v. Goord*, 255 F. Supp. 2d 233, 252 (S.D.N.Y. 2003); *see also Berry*, 366 F.3d at 88.  Here it is impossible for Plaintiff to exhaust his administrative remedies under the DOCCS IGP, as he was required to file his grievances regarding the Eighth Amendment failure to protect against Leddick and Cook, and violation of the ADA and Rehabilitation Act against Annucci in his official capacity with the facility IGP clerk within twenty-one days of the alleged occurrence.  *See* 7 N.Y.C.R.R. § 701.5(a)(1). Because Plaintiff's failure to exhaust is at this point an incurable grievance, the Court recommends that the District Court grant Defendants summary judgment for failure to exhaust administrative remedies, and that the dismissal be with prejudice.

**B.       Prima Facie Claim under the ADA or Rehabilitation Act**

Defendant Annucci also seeks summary judgment on the grounds that Plaintiff cannot establish a prima facie claim for violation of the ADA and Rehabilitation Act.  Because the Court is recommending summary judgment with prejudice in Defendants' favor on failure to exhaust administrative remedies grounds, the Court finds it unnecessary to address Defendants' motion for summary judgment in Annucci's favor on the ground that Plaintiff cannot state a prima facie claim.

**ACCORDINGLY**, it is hereby

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 26) be

**GRANTED** for failure to exhaust administrative remedies, and that the action be **DISMISSED**

with prejudice against Defendants Leddick, Cook, and Annucci; and it is further

**RECOMMENDED** that the action be *sua sponte* dismissed with prejudice against

Defendant John Doe for failure to exhaust administrative remedies; and it is hereby

**ORDERED** that the Clerk provide Plaintiff with a copy of this Order and Report-

Recommendation, along with copies of the unpublished decisions cited herein in accordance with

the Second Circuit decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (*per curiam*).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file

written objections to the foregoing report.[9]  Such objections shall be filed with the Clerk of the

Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL**

**PRECLUDE APPELLATE REVIEW**.  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing

*Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. §

636(b)(1); Fed. R. Civ. P. 72.


Dated:  November 21, 2018
     Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge

---

[9]  If you are proceeding pro se and are served with this Order and Report-
Recommendation by mail, three additional days will be added to the fourteen-day period,
meaning that you have seventeen days from the date the Order and Report-Recommendation was
mailed to you to serve and file objections.  Fed. R. Civ. P. 6(d).  If the last day of that prescribed
period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of
the next day that is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ. 6(a)(1)(C).

🚩 KeyCite Yellow Flag - Negative Treatment
Distinguished by Miles v. Walawender, W.D.N.Y., May 7, 2013

2012 WL 1067866
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

Mark Alan CARLSON, Plaintiff,
v.
Jamieson PARRY, New York State
Department of Correctional Services,
Superintendent Cully, Lieutenant Yonkers,
Brian Clifford, and Steve Smith, Defendants.

No. 06–CV–6621P.
|
March 29, 2012.

**Attorneys and Law Firms**

David A. Johns, Pultneyville, NY, for Plaintiff.

*DECISION & ORDER*

MARIAN W. PAYSON, United States Magistrate Judge.

*PRELIMINARY STATEMENT*

 **\*1** In December 2006, plaintiff Mark Alan Carlson ("Carlson") filed this action against the New York State Department of Correctional Services ("DOCS") and certain of its officers at Livingston Correctional Facility, alleging that defendants violated his rights under the First, Eighth, and Fourteenth Amendments, as well as his rights under the Americans with Disabilities Act and the Rehabilitation Act. (Docket # 1). Carlson retained counsel in March 2008. (Docket # 15). Carlson has amended his complaint four times, the last time on March 18, 2009. (Docket4, 9, 23, 33).

Currently pending before the Court is defendants' motion for summary judgment. (Docket # 43). For the reasons discussed below, defendants' motion for summary judgment is granted as to all of Carlson's claims except his Eighth Amendment claims against defendant Parry.

*FACTUAL BACKGROUND*

The following facts are undisputed except where otherwise noted.

**I.** *Carlson's Programming Assignments*

In 1996, Carlson's right leg was partially amputated below the knee; since then he has used a prosthetic leg. (Docket # 43–2 at ¶ 2). In March 2005, Carlson was incarcerated pursuant to a felony conviction of driving while intoxicated and eventually was sent to DOCS's Gowanda Correctional Facility. (*Id.* at ¶ 12; Docket # 33 at 16).

According to Carlson, on May 28, 2005, the foot of his prosthetic leg broke off, and thereafter he was unable to wear the prosthesis or walk. (Docket # 56 at ¶¶ 18–19). Three days later, on May 31, 2005, he fell down some stairs and tore his rotator cuff. (*Id.* at ¶¶ 29–30; Docket # 43–2 at ¶ 44). On June 27, 2005, Carlson received a new prosthesis, but it did not fit properly and needed adjustment. (Docket # 56 at ¶ 33). On August 10, 2005, Carlson filed a Notice of Intent to File a Claim against New York State regarding the May 31st incident, and he subsequently filed suit in the New York State Court of Claims. (Docket # 44, Ex. F).

On July 14, 2005, Carlson was transferred to Livingston Correctional Facility, a facility designated for inmates with medical and mobility issues, and was evaluated by the Livingston medical unit upon arrival. (Docket # 43–2 at ¶¶ 45–47). Carlson testified that he told the Livingston medical staff that he was still adjusting to his new prosthesis and that he was suffering from six or seven different blister-like "hot spots" and abrasions that made walking uncomfortable. (Docket # 44, Ex. A at 81–83). The medical unit issued a "Program Clearance" indicating that Carlson could not climb stairs, jump, bend or reach "normally" or play contact sports, but was eligible to work in the mess hall. (Docket # 43–2 at ¶ 66).

Carlson subsequently met with defendant Senior Corrections Counselor Jamieson Parry ("Parry") to determine his program assignment. [1] (*Id.* at ¶ 61). Parry advised Carlson that he was required to attend alcohol counseling, known as Alcohol and Substance Abuse Treatment ("ASAT") because he had been incarcerated for an alcohol-related offense. (*Id.*). The parties dispute

whether Parry also told Carlson that he was required to attend Alcoholics Anonymous ("AA") and Narcotics Anonymous ("NA") meetings. (Docket33 at 4; 43–2 at ¶ 71). According to Parry, he encouraged Carlson to attend those meetings, but did not order it because he did not have the authority to do so. (Docket # 45 at ¶ 27).

**\*2** Parry assigned Carlson to work in the mess hall in accordance with the program clearance from the medical unit. (Docket # 43–2 at ¶ 63). Carlson objected to the assignment and explained to Parry that his disability would hinder his ability to work in the mess hall. (*Id.* at ¶ 64). According to Carlson, he told Parry that his prosthesis was broken, he could not stand for long periods of time and could not walk any significant distance. (Docket # 56 at ¶¶ 42–43). In addition, Carlson told Parry that he had injured his shoulder and could not lift any significant weight. (*Id.*). Carlson showed Parry his residual limb by removing the prosthesis. (Docket # 44, Ex. A at 90).

Carlson contends that Parry responded as follows:

> I must be getting soft as I get older because I'm willing to give you 30 days to get your medical bullshit 'straightened away.' But ... I want you to know that I expect to see your name on every attendance sheet for AA and NA meetings for the next 30 days, because if I don't see your name, believe me when I tell you, I will stick so many programs so far up your ass that you won't be able to sit down and visit with your mama when she comes to visit you!

(*Id.* at ¶ 44). Parry denies making any such statement. (Docket # 43–2 at ¶ 69). It is undisputed, however, that Carlson was not assigned to any program other than ASAT for the next thirty days. (*Id.* at ¶ 75).

Carlson contends that from July 24, 2005 until mid-August 2005, he attended AA and NA meetings four nights a week. (*Id.* at ¶¶ 45, 50). According to Carlson, he walked 1400 yards, or 4/5 of a mile, round-trip in order to attend the meetings. (*Id.* at ¶ 49). By mid-August, the walking had so aggravated the injuries to his residual limb that he could no longer walk to the meetings. (*Id.* at ¶¶ 49–50). Specifically, Carlson testified that during August

2005 his tibia broke through the skin of his residual limb and the area became filled with pus. (Docket # 44, Ex. A at 84–85).

According to Carlson, on or about September 1, 2005, he saw Parry, who asked him if he had been attending the AA and NA meetings. (Docket # 56 at ¶¶ 51–52). Carlson told Parry that he "was trying to heal some wounds on the end of [his] stump and as soon as they were healed [he] would continue with the meetings." (*Id.* at ¶ 52). According to Carlson, Parry responded sarcastically that he would be getting a "nice cushy" job assignment in the mail the next day. (*Id.* at ¶ 53). The next day, Carlson was assigned to work on the "Utility Gang," a vocational program in which inmates perform outdoor work in "various assignments, including mowing lawns, as well as outdoor cleanup and snow removal." (Docket56 at ¶ 56; 43–2 at ¶¶ 80–83).

Carlson initially alleged that his assignment on the Utility Gang required him to "push[ ] a lawnmower all afternoon," which caused "further trauma and injury" to his leg and that "the tibia in his leg broke through the skin ... and became infected." (Docket # 33 at ¶¶ 39, 43). He later testified at his deposition, however, that he only worked on the Utility Gang for three days and never mowed any lawns. (Docket # 44, Ex. A at 101). Instead, on the first day Carlson "swept up a little bit"; on the second he "played cards"; and, on the third day he received a medical release from the Utility Gang. (*Id.* at 101–102; Docket # 43–2 at ¶¶ 87–90). Carlson further testified that he suffered no injury from his assignment to the Utility Gang.[2] (Docket # 44, Ex. A at 103).

## II. *Conviction at Disciplinary Hearing*

**\*3** Pursuant to DOCS policy, inmates are prohibited from helping other inmates with their legal work or possessing other inmates' legal documents. (Docket # 43–2 at ¶¶ 157, 159). In early June 2007, Carlson's cube was searched by DOCS officers based on an anonymous tip that he was assisting other inmates with their legal work without permission. (*Id.* at ¶¶ 169, 174, 176). Legal documents belonging to other inmates, specifically inmates Sanford Bell and George Rogner, were seized during the search. (*Id.* at ¶ 191). In addition, correspondence from Carlson's lawyer referring to inmates McKenna and Crump was also confiscated. (Docket43–2 at ¶¶ 192–93; 49, Ex. A at 2, 21–22).

Following the search, Carlson was issued a misbehavior report for possessing other inmates' crime and sentencing information and providing legal assistance without approval. (Docket # 43–2 at ¶ 196).

On June 14, 2007, defendant Vocational Supervisor Steve Smith ("Smith") conducted a Tier III disciplinary hearing, found Carlson guilty of two of three charges and sentenced him to serve sixty-three days in the Special Housing Unit ("SITU"). (Id. at ¶ 203; Docket # 56 at ¶ 98). Carlson appealed this conviction and, on January 25, 2008, it was reversed. (Docket # 43–2 at ¶ 222). By that time, Carlson had completed his SITU sentence. (Docket # 56 at ¶ 118).

At the hearing, Smith notified Carlson of the charges against him, as well as his right to defend himself and to present witnesses and documentary evidence. (Docket # 43–2 at ¶ 205). Carlson testified at the hearing that he had sought written permission from the Deputy Superintendent for Programming ("DSP") to assist both Bell and Rogner with their legal work, but that he had only received permission to help Bell. (Id. at ¶¶ 163–64, 166–67). Carlson further testified that during a casual conversation with an officer named "Lieutenant Bob" ("Lt.Bob") and Rogner, he had obtained verbal permission to assist Rogner. (Docket # 56 at ¶ 76). Carlson also admitted to possessing the letters from his attorney referring to inmates McKenna and Crump. (Docket # 43–2 at ¶ 210).

At the hearing, Carlson requested that Smith call four witnesses, including Rogner and Lt. Bob. (Id. at ¶¶ 213, 216). Two of the witnesses testified, but Smith did not call either Rogner or Lt. Bob. Smith explained that he decided not to call Rogner, who had been transferred from Livingston, because his testimony would be irrelevant in view of Carlson's admission that he had not received written permission from the DSP to assist him, as DOCS's policy required. (Id. at ¶ 216; Docket # 57). With respect to his decision not to call Lt. Bob, Smith explained at the hearing that he did not "feel that [Lt. Bob's] testimony [wa]s going to have any bearing on [Carlson's] guilt or innocence." (Docket43–2 at ¶¶ 213–14; 49, Ex. A at 29, 30). Smith has further affirmed that, in denying Carlson's request, he had assumed that "what inmate Carlson had told me about his conversation with Lt. Bob was true." (Docket # 49 at ¶ 24).

**\*4** At the conclusion of the hearing, Smith found Carlson guilty of providing legal assistance without approval and

possessing crime and sentence information pertaining to other inmates.[3] Smith's written disposition noted that Carlson had not obtained approval from the DSP to perform legal work for three of the four inmates whose work had been found in Carlson's cube. (Docket # 49, ¶ 28, Ex. B).

### III. *Conditions in the Special Housing Unit*

Carlson spent his first week in SHU at Orleans Correctional Facility and served the rest at Lakeview Correctional Facility. (Docket # 44, Ex. A at 122). He was allowed use of his wheelchair at Orleans, but not at Lakeview. (Id. at 124). Otherwise, the conditions of his confinement at both facilities were the same. (Id. at 122). Specifically, he was locked in his cell for twenty-three hours a day, was permitted to shower only two days a week and had no access to the library, gym, commissary or AA meetings. (Docket # 56 at ¶¶ 103, 111). In addition, Carlson alleges that he was not permitted to clean his residual limb and gel liners on a daily basis as required. (Id. at ¶¶ 114–115).

### IV. *Requests for Accommodation under the ADA*

On May 16, 2005, pursuant to the Americans with Disabilities Act ("ADA"), Carlson requested a transfer from Gowanda to a "flat facility" with no stairs. (Docket # 44–2 at ¶¶ 35, 38). On May 19, 2005, his transfer request was granted. (Id. at ¶ 42). As discussed above, he was transferred to Livingston on July 14, 2005.

On April 7, 2006, Carlson made a second request for an accommodation under the ADA.[4] (Docket # 44–2 at ¶ 112). Specifically, Carlson requested that he be transferred "to a facility more able to meet [his] needs." (Id. at ¶ 115). His request was made on a DOCS Form No. 2614 entitled "Request for Reasonable Accommodation" and was accompanied by a four-page letter to the Superintendent in which he expressed dissatisfaction with his medical treatment, stated that he did not wish to be assigned a mobility assistant, requested new shower chairs and suggested structural changes to be made at Livingston. (Id. at ¶¶ 118–23; Docket # 50, Exs. A, B). On May 8, 2006, after it was discussed with DOCS's ADA Coordinator, Carlson's request for a transfer was denied by the Deputy Superintendent for Administrative Services, J. McAnany. (Id. at ¶ 141; Docket # 46, Ex. A). In his denial, McAnany noted that a new shower chair had been purchased,

a mobility assistant was available and Livingston was designated as a "handicap facility." (Docket # 46 at Ex. A). Carlson wrote a letter to McAnany stating that he disagreed with the denial. (*Id.*). He did not appeal the determination through the grievance program. (Docket # 43–2 at ¶ 146).

Defendants have submitted the affidavit of Robert F. Raymond, a former DOCS ADA Coordinator. (Docket # 50 at ¶ 2). According to Raymond, in order for an inmate to seek review of a denial of a requested ADA accommodation, he must file an appeal through the grievance program. (*Id.* at ¶ 17). The DOCS form for requesting ADA accommodations, which Carlson used to make both of his requests, advises the inmate of his right to appeal the denial through the grievance program. (Docket # 50, Ex. B).

### *DISCUSSION*

**\*5** Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). In making this determination, the court must assess whether there are any disputed material facts and, in so doing, must resolve all ambiguities and draw all reasonable inferences against the moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248–49, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Coach Leatherware Co., Inc. v. AnnTaylor, Inc.,* 933 F.2d 162, 166–67 (2d Cir.1991). A fact is "material" only if it has some effect on the outcome of the suit. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 248; *Konikoff v. Prudential Ins. Co. of Am.,* 234 F.3d 92, 97 (2d Cir.2000). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248; *see also Konikoff v. Prudential Ins. Co. of Am.,* 234 F.3d at 97.

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact, after which the non-moving party must come forward with sufficient evidence to support a jury verdict in its favor; the motion will not be defeated based upon conjecture, surmise or the existence of "metaphysical doubt" concerning the facts. *Bryant v. Maffucci,* 923 F.2d 979, 982 (2d Cir.1991) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct.

1348, 89 L.Ed.2d 538 (1986)). The party seeking to avoid summary judgment "must do more than make broad factual allegations and invoke the appropriate statute. The [party] must also show, by affidavits or as otherwise provided in Rule 56 ..., that there are specific factual issues that can only be resolved at trial." *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995); *see also Driscoll v. Townsend,* 60 F.Supp.2d 78, 80 (W.D.N.Y.1999).

As the Second Circuit has explained:

> [T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution .... [I]t must be kept in mind that only by reference to the substantive law can it be determined whether a disputed fact is material to the resolution of the dispute.

*Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1224 (2d Cir.1994).

### I. *Claims As To Which Carlson Concedes Dismissal*

At oral argument on this motion, Carlson's counsel conceded that summary judgment is proper on several of the claims. I address those first.

I turn first to Carlson's claims that Livingston's Superintendent Malcolm Cully violated his rights under the First, Eighth and Fourteenth Amendments as alleged in Count Two of his complaint. At oral argument on this motion, counsel conceded that Carlson's complaint fails to allege that Cully was personally involved in any of the alleged violations and that the claims against him should be dismissed. *See Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under Section 1983). Accordingly, defendants' motion for summary judgment on the claims against Cully is granted.

**\*6** In addition, counsel also conceded that summary judgment must be granted on Carlson's Section 1983

claims against DOCS because DOCS is immune from suit under the Eleventh Amendment. *Davis v. New York,* 316 F.3d 93, 101–02 (2d Cir.2002). Both parties agree, however, that Carlson's claims against DOCS under the ADA and the Rehabilitation Act remain. *See Tennessee v. Lane,* 541 U.S. 509, 124 S.Ct. 1978, 158 L.Ed.2d 820 (2004).

Finally, Carlson's complaint asserts various constitutional violations based on the search of his cube. At oral argument, however, counsel conceded that these claims do not fall within the scope of Section 1983 and should be dismissed. Accordingly, this Court grants summary judgment on Carlson's claims against defendants Smith, Clifford and Yonkers regarding the search of his cube.

As a result, the following claims remain: (1) that Parry violated the Eighth Amendment by (a) requiring Carlson to attend AA and NA meetings which entailed a substantial amount of walking and (b) assigning him to work on the Utility Gang; (2) that Parry made these assignments in retaliation for Carlson's filing of a Notice of Claim against New York State; (3) that Smith denied him due process at the Tier III disciplinary hearing; and finally, (4) that DOCS failed to accommodate his disability under the ADA and Rehabilitation Act. I address each claim in turn below.

## II. *Eighth Amendment Claims Against Parry*

Carlson's complaint asserts claims that Parry acted with deliberate indifference to his safety as an amputee when Parry (1) directed Carlson to attend AA and NA meetings, which required him to walk nearly one mile round-trip in order to attend, and (2) assigned Carlson to the Utility Gang, a program that required inmates to perform outdoor physical labor, such as mowing lawns.[5] Parry argues that he is entitled to summary judgment on these Eighth Amendment claims.

Under the Eighth Amendment, inmates are protected from punishments that "involve the unnecessary and wanton infliction of pain," *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994), *cert. denied,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995), which include actions that "transgress today's 'broad and idealistic concepts of dignity, civilized standards, humanity, and decency,' " *Hutto v. Finney,* 437 U.S. 678, 685, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978) (quoting *Estelle v. Gamble,* 429

U.S. 97, 102, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)). The Eighth Amendment further requires prison officials to take reasonable measures to guarantee the safety of inmates in their custody. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).

Prison officials are thus liable under Section 1983 "for harm incurred by an inmate if the officials acted with 'deliberate indifference' to the safety of the inmate." *Hayes v. New York City Dep't of Corr.,* 84 F.3d 614, 620 (2d Cir.1996) (quoting *Morales v. New York State Dep't of Corr.,* 842 F.2d 27, 30 (2d Cir.1988)). Determining whether a prison official's actions rise to the level of deliberate indifference requires consideration of a two-part test:

> **\*7** First, the plaintiff must demonstrate that he is incarcerated under conditions posing a substantial risk of serious harm. Second, the plaintiff must demonstrate that the defendant prison officials possessed sufficient culpable intent. The second prong of the deliberate indifference test, culpable intent, in turn, involves a two-tier inquiry. Specifically, a prison official has sufficient culpable intent if he has knowledge that an inmate faces a substantial risk of serious harm and he disregards that risk by failing to take reasonable measures to abate the harm.

*Hawkins v. Nassau Cnty. Corr. Facility,* 781 F.Supp.2d 107, 112 (E.D.N.Y.2011) (quoting *Hayes v. New York City Dep't of Corr.,* 84 F.3d at 620)); *see also Phelps v. Kapnolas,* 308 F.3d 180, 185–86 (2d Cir.2002).

As to the first prong, a claim for deliberate indifference may lie where a prison official compels an inmate to perform physical labor that is beyond his strength, endangers his life or health or causes undue pain. *See, e.g., Ambrose v. Young,* 474 F.3d 1070, 1078 (8th Cir.2007) (objective component satisfied where corrections officer ordered prisoners to extinguish non-threatening fire within reach of downed power line); *Morgan v. Morgensen,* 465 F.3d 1041, 1045 (9th Cir.2006) (prison must take "reasonable measures to guarantee [inmate's] safety" in work assignments); *Jackson v. Cain,*

2012 WL 1067866

864 F.2d 1235, 1247 (5th Cir.1989) (summary judgment for defendants improperly granted on Eighth Amendment claim by prisoner that defendants' requirement that he perform heavy labor aggravated his medical condition); *Gill v. Mooney,* 824 F.2d 192, 195 (2d Cir.1987) (finding colorable Eighth Amendment claim where inmate fell from ladder after warning corrections officer that ladder was unsafe).

An Eighth Amendment claim may also be asserted where prison officials deliberately disregard the unique needs of a disabled inmate. *See, e.g., Frost v. Agnos,* 152 F.3d 1124, 1129 (9th Cir.1998) (denying summary judgment where disabled prisoner on crutches alleged that slippery shower floors created substantial risk to his safety); *Allen v. Morris,* 2010 WL 1382112, *5 (E.D.Ark.) (denying summary judgment where amputee-inmate alleged that jail showers posed risk to his safety and he was injured as a result of slipping and falling in the shower), *report and recommendation adopted by* 2010 WL 1382116 (E.D.Ark.2010); *Muhammad v. Dep't of Corr.,* 645 F.Supp.2d 299, 317 (D.N.J.2008) (denying summary judgment on Eighth Amendment claim brought by amputee-inmate who was assigned to an upper bunk and whose cell was located far from handicapped-accessible shower); *Lamzot v. Phillips,* 2006 WL 686578, *5 (S.D.N.Y.2006) (disabled inmate met objective prong of test where he alleged that he was denied access to a handicapped-accessible bathroom).

Based on the above-cited authority, I easily conclude that Carlson's allegations raise a triable issue of fact whether the conditions of his confinement—specifically, the requirements that he walk nearly one mile daily to attend AA and NA meetings and work on the Utility Gang—posed a substantial risk to Carlson's safety.[6]

**\*8** A closer question is whether an issue of fact exists as to the subjective prong of the test, which requires the court to consider whether the prison official had "knowledge that an inmate faces a substantial risk of serious harm *and* ... disregard[ed] that risk by failing to take reasonable measures to abate the harm." *Hayes,* 84 F.3d at 620 (emphasis added). The official must be aware of facts giving rise to an inference that a substantial risk of serious harm exists, and he must also draw that inference. *Id.* The subjective component requires more than a showing of mere negligence. *Farmer v. Brennan,* 511 U.S. at 835.

Construing the facts in favor of Carlson as I must on this motion, they show the following. When Carlson arrived at Livingston, he was suffering from six or seven fluid-filled hot spots on his residual limb. Soon after his arrival, Carlson met with Parry and advised him that he could not work in the mess hall because his prosthesis was broken, could not stand for long periods of time and could not walk any significant distance. Carlson even removed his residual limb from his prosthesis and showed it to Parry. Finally, Carlson told Parry that he had injured his shoulder and could not lift any significant weight. Parry responded by directing Carlson to attend daily AA or NA meetings, which were held in a building approximately 700 yards from Carlson's dormitory. According to Carlson, when he saw Parry a month later, Parry asked whether he had been attending AA and NA meetings. Carlson told him that he was in too much pain to walk the long distance to the meetings and had stopped attending. Parry responded that he would be receiving a "nice cushy" job assignment, and the next day Parry assigned him to the Utility Gang.

Drawing all reasonable inferences in favor of Carlson, I find that an issue of fact exists whether Parry knew, and unreasonably disregarded the risk, that an assignment involving walking nearly a mile daily and performing manual labor would pose a substantial risk to Carlson's safety and health as an amputee. Considering Carlson's conversation with Parry when he arrived at Livingston about his physical limitations and medical condition, questions of fact plainly exist as to the extent of Parry's knowledge of both and the risks posed by walking long distances and performing manual labor.[7] *See, e.g., Jackson v. Cain,* 864 F.2d at 1247 (denying summary judgment where inmate alleged that he had notified medical personnel that his condition required special treatment and his work assignment was causing him injury); *Walker v. Dep't of Corr. Serv.,* 2012 WL 527210, *2 (S.D.N.Y.2012) (claim for deliberate indifference may be supported by allegation that plaintiff "informed [defendant] as to his alleged medical problem, and that [defendant] understood the condition to necessitate allowances or accommodations that [defendant] purposely withheld from plaintiff"); *Allen v. Morris,* 2010 WL 1382112 at *5 (denying summary judgment where amputee-inmate alleged that he told jail officials that he needed a shower chair but his request was denied); *Lamzot v. Phillips,* 2006 WL 686578 at *6 (denying summary judgment where inmate alleged

that he twice advised defendant officer that using a non-handicapped bathroom was dangerous, but officer ordered him to use it anyway). Accordingly, I deny summary judgment on Carlson's Eighth Amendment claims against Parry.

### III. *Retaliation Claim Against Parry*

**\*9** I turn next to Carlson's claim that Parry assigned him to the Utility Gang in retaliation for filing a Notice of Intent to sue the State. Specifically, Carlson claims "upon information and belief" that Parry knew of his Notice of Intent and that Parry's conduct was "at least partly in retaliation for [p]laintiff's exercise of constitutionally guaranteed rights." (Docket # 33 at ¶¶ 53–54). In addition, a fair reading of Carlson's complaint reveals a claim that Parry assigned him to the Utility Gang in retaliation for Carlson's decision to stop attending AA and NA meetings. (*Id.* at ¶¶ 27, 37–39).

Courts examine prisoner retaliation claims "with skepticism and particular care" because they are easily fabricated. *Davis v. Goord,* 320 F.3d 346, 352 (2d Cir.2003); *Smith v. Napoli,* 2007 WL 4180708, \*3 (W.D.N.Y.2007). To establish a First Amendment retaliation claim, a plaintiff must demonstrate that (1) the conduct at issue was protected; (2) the defendant took adverse action against the plaintiff; and (3) there was a causal connection between the protected activity and the adverse action. *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004). Within the prison context, a common form of constitutionally protected speech is the filing of a lawsuit or inmate grievance. *See, e.g., Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003) (neither party disputes that prosecution of a lawsuit and the filing of grievances are constitutionally protected activities); *Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir.1996) ( "[t]he right to petition government for redress of grievances— in both judicial and administrative forums—is among the most precious of the liberties safeguarded by the Bill of Rights") (internal quotation omitted); *Colon v. Coughlin,* 58 F.3d at 872.

First, no question exists that Carlson's filing of a Notice of Intent qualifies as activity protected under the First Amendment. His decision to stop attending AA and NA meetings, however, is not protected activity. Second, considering his condition as an amputee, Carlson's assignment to an outdoor work crew may be considered an adverse action. *See Davis v. Goord,* 320 F.3d at 353 ("[o]nly

retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation"). This leaves the third question of the causal connection between Carlson's filing of the Notice of Intent and his assignment to the Utility Gang. On this issue, the allegations must be "sufficient to support the inference that the speech played a substantial part in the adverse action." *Id.* at 354 (internal quotation omitted).

Although conclusory allegations of a retaliatory motive are insufficient to survive a motion for summary judgment, *Webster v. Fischer,* 694 F.Supp.2d 163, 183 (N.D.N.Y.), *aff'd,* 398 F. App'x 683 (2d Cir.2010), the temporal proximity between the protected conduct and the adverse action may reasonably support an inference of a retaliatory motive, *id; Davis,* 320 F.3d at 354. The Second Circuit has declined to draw "a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action," preferring instead that a district court exercise its judgment "about the permissible inferences that can be drawn from temporal proximity in the context of particular cases." *Espinal v. Goord,* 558 F.3d 119, 129 (2d Cir.2009) (internal quotation omitted). In the exercise of that judgment, courts frequently have concluded that evidence of a close temporal proximity, without more, is insufficient to raise a triable issue of fact. *Roseboro v. Gillespie,* 791 F.Supp.2d 353, 371 (S.D.N.Y.2011) (temporal proximity in combination with plaintiff's good prison record insufficient to defeat summary judgment); *Webster v. Fischer,* 694 F.Supp.2d at 183–84 (proximity of two months between complaints and misbehavior reports insufficient where plaintiff did not have favorable disciplinary record); *Williams v. Goord,* 111 F.Supp.2d 280, 290 (S.D.N.Y.2000) (fact that misbehavior report was filed three days after filing grievance did not raise triable issue of fact on retaliation claim).

**\*10** In this case, Carlson filed his Notice of Intent on August 15, 2005. Approximately two weeks later, on September 2, 2005, Carlson learned that he had been assigned to the Utility Gang. Carlson has failed, however, to offer any direct or other circumstantial evidence that Parry knew of, let alone was motivated by, Carlson's filing of the Notice of Intent. *Cf. Colon,* 58 F.3d at 873 (plaintiff alleged that defendant had admitted a retaliatory scheme).

Indeed, the Notice of Intent did not name Parry, but named the State of New York, and related to an incident that had occurred in a different facility from the one in which Parry worked. (Docket # 44, Ex. F). On this record, I find that Carlson has failed to adduce any facts or credible inferences that Parry even knew about Carlson's filing when he assigned Carlson to the Utility Gang. *Compare Colon,* 58 F.3d at 873 ("if ... circumstantial evidence [of temporal proximity] represented the sum total of [prisoner-plaintiff's] proof, we might be inclined to affirm the grant of summary judgment based on the weakness of [his] case") *and Brown v. Graham,* 2010 WL 6428251, *18–19 (N.D.N.Y.2010) (denying summary judgment where sole evidence consisted of temporal proximity and no evidence that defendant was aware of plaintiff's grievance), *report and recommendation adopted by* 2011 WL 1213482 (N.D.N.Y.2011), *aff'd,* 2012 WL 933993 (2d Cir.2012) *with Solman v. Manzi,* 2010 WL 3829149, *1 (D.Conn.2010) (granting motion to reconsider dismissal of retaliation claim where inmate alleged that officer filed misbehavior report two weeks after he filed grievance about the same officer); *and Zaire v. Doe,* 2006 WL 1994848, *5 (N.D.N.Y.2006) (denying summary judgment where officer was aware of plaintiff's favorable verdict in lawsuit and officer filed false misbehavior reports two weeks after verdict).

Accordingly, I grant Parry's motion for summary judgment on Carlson's retaliation claim. [8]

### IV. *Due Process Claims Against Smith*

To survive a motion for summary judgment on a claim of denial of due process in connection with a disciplinary hearing, the inmate must establish that his punishment was sufficiently severe to implicate a liberty interest. *Palmer v. Richards,* 364 F.3d 60, 64 (2d Cir.2004) (plaintiff "had 'no right to due process [at his hearing] *unless* a liberty interest' was infringed as a result") (quoting *Scott v. Albury,* 156 F.3d 283, 287 (2d Cir.1998)) (emphasis in original); *Sims v. Artuz,* 230 F.3d 14, 22 (2d Cir.2000). A prisoner's liberty interest is implicated by a disciplinary sentence to SHU confinement only where the confinement "imposes an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Palmer v. Richards,* 364 F.3d at 64 (quoting *Sandin v. Conner,* 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995)). Of course, where an inmate was afforded all the process he was due, the issue of whether a liberty interest is

implicated is immaterial. *See id.* at 64, n. 1. For the reasons discussed below, I find that Carlson was afforded all the process he was due at his disciplinary hearing; accordingly, I do not address whether his sixty-three day sentence in SITU implicated a liberty interest. [9]

**\*11** In order to satisfy due process requirements, a prison disciplinary proceeding must afford the prisoner: notice of the charges; the opportunity to call witnesses and present documentary evidence; and, a written statement from the fact finder as to the evidence relied upon and the reasons for the disciplinary action taken. *Wolff v. McDonnell,* 418 U.S. 539, 563–66, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). Here, Carlson contends that Smith deprived him of the right to counsel, to confront witnesses, to call witnesses and to review the evidence against him. (Docket # 33 at ¶ 96). Because the Constitution does not require the right to counsel in a prison disciplinary hearing, I grant summary judgment to defendants on that claim. [10] *See Silva v. Casey,* 992 F.2d 20, 22 (2d Cir.1993) (inmate entitled to "some assistance" in marshaling his defense under certain circumstances, but not entitled to obtain counsel); *Loving v. Selsky,* 2009 WL 87452, *1–2 (W.D.N.Y.2009) (inmate's right to assistance during disciplinary hearing "fall [s] far short of the right to counsel that the Sixth Amendment guarantees to criminal defendants").

### A. *Denial of Witnesses*

Carlson alleges that Smith's failure to call Rogner and Lt. Bob as witnesses at the disciplinary hearing violated his right to due process under the Fourteenth Amendment.

"[T]he prisoner's right to call witnesses and present evidence in disciplinary hearings [may] be denied if granting the request would be 'unduly hazardous to institutional safety or correctional goals.' " *Freeman v. Rideout,* 808 F.2d 949, 953 (2d Cir.1986) (quoting *Ponte v. Real,* 471 U.S. 491, 105 S.Ct. 2192, 85 L.Ed.2d 553 (1985)). A hearing officer may also refuse to call witnesses if their testimony would be insufficiently exculpatory, immaterial or cumulative. *E.g., Scott v. Kelly,* 962 F.2d 145, 146–47 (2d Cir.1992) (prisoner's request for witness may be denied on grounds of relevancy); *Kingsley v. Bureau of Prisons,* 937 F.2d 26, 30 (2d Cir.1991) (inmate's right to call witnesses and present evidence at disciplinary hearing may be denied if requested evidence would be irrelevant or unnecessary). A hearing officer may not, however, deny such a request without a finding that the witness's

testimony would be unnecessary or would jeopardize institutional goals. *Walker v. Bates,* 23 F.3d 652, 659 (2d Cir.1994), *cert. denied,* 515 U.S. 1157, 115 S.Ct. 2608, 132 L.Ed.2d 852 (1995).

Here, Smith has affirmed that, in denying Carlson's requests to call the two witnesses, he credited Carlson's testimony about his conversation with Lt. Bob and Rogner. Carlson was nonetheless found guilty of assisting other inmates because Carlson had not obtained permission from the DSP, as DOCS policy required. Because Smith credited Carlson's version of his conversation with Lt. Bob and Rogner, their testimony would have been cumulative and immaterial to the question of whether Carlson had obtained permission from the DSP. Thus, Smith did not violate due process by denying Carlson's request that Lt. Bob and Rogner be called as witnesses.

### B. *Opportunity to See Documentary Evidence*

**\*12** Carlson's complaint also alleges he was not permitted to see the evidence presented against him —specifically, the material that was inventoried as "objectionable content" on his misbehavior report. (Docket33 at ¶¶ 84, 96; 56 at ¶ 89).

Due process considerations entitle an inmate to view evidence critical to his guilt or innocence of disciplinary charges. *See, e.g., Young v. Lynch,* 846 F.2d 960, 963 (4th Cir.1988) (due process may require production of evidence "when it is the dispositive item of proof, it is critical to the inmate's defense, it is in the custody of prison officials, and it could be produced without impairing institutional concerns"). In this case, however, Carlson admitted to possessing the material giving rise to the disciplinary charges. (Docket43–2 at ¶¶ 209–10; 57 at ¶¶ 209–10). Carlson's sole defense was Lt. Bob's alleged verbal permission. Under these circumstances, no due process violation occurred.

### C. *Sufficiency of the Evidence*

Finally, I reject Carlson's challenge that his disciplinary conviction violates due process. (*See* Docket # 33 at ¶¶ 118–120). Under the due process clause, the results of a hearing must be supported by reliable evidence in the record. *See Superintendent, Mass. Corr. Inst., Walpole v. Hill,* 472 U.S. 445, 454, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985) (disciplinary decision must be

supported by "some evidence in the record"); *Luna v. Pico,* 356 F.3d 481, 489 (2d Cir.2004) (interpreting *Hill* to require "reliable evidence"). Here, the hearing record included evidence that Carlson admitted possessing legal materials relating to four inmates, three of whom he had not obtained permission from the DSP to assist. The hearing officer's determination of guilt was supported by "reliable evidence" in the record and thus does not violate due process.

## V. *ADA and the Rehabilitation Act Claims Against DOCS*

Finally, I address Carlson's claims under the ADA and the Rehabilitation Act in Counts Three and Four of his complaint, alleging that he was denied reasonable accommodations, such as ramps and accessible facilities.[11] (*See* Docket # 33). Defendants contend that summary judgment is warranted because Carlson failed to exhaust his administrative remedies before filing suit.

The Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e, provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Exhaustion is required for "all inmate suits about prison life, whether they involve general circumstances or particular episodes." *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002).

"The ADA falls within the rubric of 'any other federal law.' " *Carrasquillo v. City of New York,* 324 F.Supp.2d 428, 442 (S.D.N.Y.2004). Thus, under the PLRA, ADA and Rehabilitation Act claims must be exhausted administratively prior to raising them in federal court. *Pacheco v. Zurlo,* 2011 WL 1103102, *2 (N.D.N.Y.), *report and recommendation adopted by,* 2011 WL 1102769 (N.D.N.Y.2011); *Alster v. Goord,* 745 F.Supp.2d 317, 322 (S.D.N.Y.2010); *Arce v. O'Connell,* 427 F.Supp.2d 435, 440 (S.D.N.Y.2006).

**\*13** To properly exhaust a claim, a prisoner must comply with the prison's grievance procedure. *Jones v. Bock,* 549 U.S. 199, 218, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007). An inmate must exhaust all available remedies, even where the inmate seeks relief that is unavailable in

Case 9:17-cv-00245-MAD-TWD Document 36 Filed 11/21/18 Page 28 of 69
Carlson v. Parry, Not Reported in F.Supp.2d (2012)
2012 WL 1067866

grievance proceedings, including money damages. *Booth v. Churner,* 532 U.S. 731, 741, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001). It is undisputed that DOCS has an established grievance procedure through which prisoners may complain about prison conditions, including the denial of requested disability accommodations. (Docket # 50 at ¶ 17, Ex. A). *See Reyes v. Punzal,* 206 F.Supp.2d 431, 432 (W.D.N.Y.2002); *Pacheco v. Zurlo,* 2011 WL 1103102 at *3–5 (inmate who did not complete DOCS's three-tier grievance process before filing complaint under the ADA failed to exhaust administrative remedies).

Here, Carlson filed two requests for reasonable accommodations while he was incarcerated. The first was granted, [12] and the second was denied. Carlson did not appeal the denial of his second request through the grievance process. There is no evidence in the record that he was prevented from doing so. Although, as discussed above, Carlson alleged that he was afraid to grieve Parry's actions, he has made no such allegation regarding filing grievances related to his ADA and Rehabilitation Act claims.

To the extent that Carlson's complaint attempts to base an ADA or Rehabilitation Act claim on issues other than those raised in his two accommodation requests —such as, the requirement that he climb and descend stairs, walk long distances and "do vigorous physical labor" on an ill-fitting prosthesis (Docket # 60 at 16–17)

—the record demonstrates that he failed to pursue those issues administratively. Thus, having failed to exhaust his administrative remedies, Carlson is barred from seeking judicial relief. *See Jones v. Bock,* 549 U.S. at 211 ("[t]here is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court") (internal citations omitted).

Accordingly, because no issue of fact exists that Carlson failed to exhaust his administrative remedies, summary judgment is granted to defendants on Carlson's claims under the ADA and Rehabilitation Act.

## *CONCLUSION*

For the reasons stated above, defendants' motion for summary judgment **(Docket # 43)** is **GRANTED in PART** and **DENIED in PART**. Specifically, summary judgment is granted on all claims except Carlson's Eighth Amendment claims against Parry. A *telephone conference* shall be held on **May 2, 2012,** at **11:30 a.m.,** to set a trial date.

## IT IS SO ORDERED.

## All Citations

Not Reported in F.Supp.2d, 2012 WL 1067866

---

Footnotes

1    According to defendants, DOCS requires inmates to participate in "programs," which consist of therapeutic, education or vocational activities. (Docket # 43–2 at ¶ 49). "The purpose of programs is to facilitat[e] inmates' appropriate conduct within the facility ..., keep inmates involved in productive tasks, and prepare them for their eventual reintegration with society upon their release." (*Id.* at ¶ 50).

2    This Court rejects Carlson's allegation of injury made in his affidavit opposing this motion because "[i]t is well-settled in this circuit that a party's affidavit which contradicts his own prior deposition testimony should be disregarded on a motion for summary judgment." *E.E. O.C. v. Johnson & Higgins, Inc.,* 1998 WL 778369, *7 (S.D.N.Y.1998) (quoting *Mack v. United States,* 814 F.2d 120, 124 (2d Cir.1987)). *See also Rule v. Brine, Inc.,* 85 F.3d 1002, 1011 (2d Cir.1996) ("a party does not show a triable issue of fact merely by submitting an affidavit that disputes his own prior sworn testimony").

3    Smith found Carlson not guilty of possession of an altered item. (Docket # 49 at ¶ 28, Ex. B).

4    Both parties agree that Carlson's request is erroneously dated "6/7/06," but actually was submitted on "4/7/06." (Docket # 44–2 at ¶ 114).

5    Carlson has admitted that he did not file a grievance complaining about Parry's actions, claiming that he did not do so because he was "fearful of further more severe, retaliation." (Docket # 33 at ¶ 52). Although the exhaustion requirement is generally mandatory, an inmate's failure to exhaust may be excused in some circumstances if an inmate demonstrates that threats or intimidation either "rendered all administrative remedies unavailable ... [or that] some procedures that would ordinarily be available were effectively unavailable." *Hemphill v. New York,* 380 F.3d 680, 687 (2d Cir.2004). Whether remedies were unavailable is an objective inquiry, asking whether "a similarly situated individual of ordinary

2012 WL 1067866

firmness have deemed them available." *Id.* at 688 (internal quotation omitted). "[M]ere allegation[s] of a generalized fear of retaliation [are] insufficient" to excuse a failure to file a grievance. *Brown v. Napoli,* 687 F.Supp.2d 295, 297 (W.D.N.Y.2009) (collecting cases). In addition, the failure to allege that the inmate was specifically threatened regarding the grievance procedures may lead to the conclusion that a similarly-situated individual may have not considered the administrative remedies unavailable. *Snyder v. Whittier,* 428 F. App'x 89, 91 (2d Cir.2011).

Defendants do not seek summary judgment on this ground, however, although they have asserted failure to exhaust administrative remedies as an affirmative defense in their answer. (Docket # 34 at ¶ 19). Accordingly, I do not address whether Carlson's allegation of fear is sufficient to excuse his failure to grieve Parry's actions.

6    Carlson does not argue that his rights were violated when he was removed from the Utility Gang; therefore, this is not a case where an inmate attempts to assert a right to a particular job assignment. *See, e.g., Frazier v. Coughlin,* 81 F.3d 313, 318 (2d Cir.1996) ("prisoner has no protected liberty interest in a particular job assignment"). Rather, the issue is whether Parry violated Carlson's Eighth Amendment rights by giving Carlson a work assignment that was beyond his physical capabilities.

7    Although Carlson performed minimal manual labor while assigned to the Utility Gang, the absence of physical injury does not warrant summary judgment, but may limit Carlson's available damages. *See Thompson v. Carter,* 284 F.3d 411, 418 (2d Cir.2002) (under Section 1997e(e) of the PLRA, an inmate cannot "recover for damages for mental or emotional injury for a constitutional violation in the absence of a showing of actual physical injury"; for this reason, where no physical injury is alleged, an inmate's damages are limited to nominal or punitive damages); *Hill v. Washburn,* 2011 WL 846558, *8 (W.D.N.Y.2011) (Section 1997e(e) does not limit the availability of nominal damages). A review of Carlson's complaint reveals that he has asserted a claim for punitive damages against Parry. (Docket # 33 at ¶ 56).

8    To the extent that Carlson's complaint may be read to include claims of retaliation for requesting ADA accommodations, those claims are defeated by Carlson's admission during his deposition that he was not retaliated against for those reasons. (Docket # 44, Ex. A at 76).

9    In this case, the liberty interest issue would involve consideration of Carlson's claims that he was denied use of a wheelchair and was not permitted to clean his limb and gel liners on a daily basis as he required. *See Palmer,* 364 F.3d at 65 ("SITU confinements of fewer than 101 days could constitute atypical and significant hardships if the conditions were more severe than the normal SITU conditions ... or a more fully developed record showed that even relatively brief confinements under normal SITU conditions were, in fact, atypical").

10    At the hearing, Smith advised Carlson that he was not entitled to a hearing assistant because he was not in SITU or keeplock confinement. (Docket # 43–2 at ¶ 206).

11    Although there are "subtle differences" between the ADA and the Rehabilitation Act, claims brought under those statutes are to be treated "identically" unless one of the distinctions is relevant to the case. *Henrietta D. v. Bloomberg,* 331 F.3d 261, 272 (2d Cir.2003) (considering together claims regarding reasonable accommodations under the ADA and Rehabilitation Act) (citing *Weixel v. Bd. of Educ. of City of New York,* 287 F.3d 138, 146 n. 6 (2d Cir.2002)), *cert. denied,* 541 U.S. 936 (2004).

12    Carlson argues that even though his first accommodation request was granted, the delay in transfer from Gowanda to Livingston amounted to a *de facto* denial of that request. A delay in implementing an accommodation does not violate the ADA, however, unless the delay was unreasonable or plaintiff has provided evidence of discriminatory intent. *Lyman v. City of New York,* 2003 WL 22171518, *6 (S.D.N.Y.2003); *Powers v. Polygram Holding, Inc.,* 40 F.Supp.2d 195, 202 (S.D.N.Y.1999). Here, Carlson has admitted defendants' assertion that Carlson "was required to be housed in a facility in the same geographic region as Gowanda (known as the "Wende hub") [and] it took some time to coordinate the transfer." (Docket # 57 at ¶ 43). The record simply contains no evidence of any purposeful delay or discriminatory intent.

---

End of Document    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

1999 WL 983876
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Craig COLE, Plaintiff,

v.

Christopher P. ARTUZ, Superintendent, Green
Haven Correctional Facility, R. Pflueger, A.
Glemmon, Sgt. Stevens, Lt. Haubert, Capt.
W.M. Watford, Capt. T. Healey, and John
Doe # 1–5, all as individuals, Defendants.

No. 93 Civ. 5981(WHP) JCF.
|
Oct. 28, 1999.

**Attorneys and Law Firms**

Mr. Craig Cole, Bare Hill Correctional Facility, Malone,
New York, Legal Mail, Plaintiff, pro se.

William Toran, Assistant Attorney General, Office of the
Attorney General of the State of New York, New York,
New York, for Defendant.

*MEMORANDUM & ORDER*

PAULEY, J.

 *1  The remaining defendant in this action, Correction
Officer Richard Pflueger, having moved for an order,
pursuant to Fed.R.Civ.P. 56, granting him summary
judgment and dismissing the amended complaint, and
United States Magistrate Judge James C. Francis IV
having issued a report and recommendation, dated
August 20, 1999, recommending that the motion
be granted, and upon review of that report and
recommendation together with plaintiff's letter to this
Court, dated August 28, 1999, stating that plaintiff does
"not contest the dismissal of this action", it is

ORDERED that the attached report and
recommendation of United States Magistrate Judge
James C. Francis IV, dated August 20, 1999, is adopted in
its entirety; and it is further

ORDERED that defendant Pflueger's motion for
summary judgment is granted, and the amended
complaint is dismissed; and it is further

ORDERED that the Clerk of the Court shall enter
judgment accordingly and close this case.

*REPORT AND RECOMMENDATION*

FRANCIS, Magistrate J.

The plaintiff, Craig Cole, an inmate at the Green Haven
Correctional Facility, brings this action pursuant to 42
U.S.C. § 1983. Mr. Cole alleges that the defendant
Richard Pflueger, a corrections officer, violated his First
Amendment rights by refusing to allow him to attend
religious services. The defendant now moves for summary
judgment pursuant to Rule 56 of the Federal Rules of Civil
Procedure. For the reasons set forth below, I recommend
that the defendant's motion be granted.

*Background*

During the relevant time period, Mr. Cole was an
inmate in the custody the New York State Department
of Correctional Services ("DOCS"), incarcerated at the
Green Haven Correctional Facility. (First Amended
Complaint ("Am.Compl.") ¶ 3). From June 21, 1993 to
July 15, 1993, the plaintiff was in keeplock because of
an altercation with prison guards. (Am.Compl.¶¶ 17–
25). An inmate in keeplock is confined to his cell for
twenty-three hours a day with one hour for recreation.
(Affidavit of Anthony Annucci dated Dec. 1, 1994 ¶
5). Pursuant to DOCS policy, inmates in keeplock must
apply for written permission to attend regularly scheduled
religious services. (Reply Affidavit of George Schneider
in Further Support of Defendants' Motion for Summary
Judgment dated September 9, 1996 ("Schneider Aff.") ¶
3). Permission is granted unless prison officials determine
that the inmate's presence at the service would create
a threat to the safety of employees or other inmates.
(Schneider Aff. ¶ 3). The standard procedure at Green
Haven is for the captain's office to review all requests
by inmates in keeplock to attend religious services.
(Schneider Aff. ¶ 3). Written approval is provided to the
inmate if authorization is granted. (Affidavit of Richard
Pflueger dated April 26, 1999 ("Pflueger Aff.") ¶ 5). The
inmate must then present the appropriate form to the

gate officer before being released to attend the services. (Pflueger Aff. ¶ 5).

**\*2** On June 28, 1993, the plaintiff submitted a request to attend the Muslim services on July 2, 1993. (Request to Attend Scheduled Religious Services by Keep–Locked Inmate dated June 28, 1993 ("Request to Attend Services"), attached as Exh. B to Schneider Aff.) On June 30, 1993, a supervisor identified as Captain Warford signed the request form, indicating that the plaintiff had received permission to attend the services. (Request to Attend Services). Shortly before 1:00 p.m. on July 2, 1993, the plaintiff requested that Officer Pflueger, who was on duty at the gate, release him so that he could proceed to the Muslim services. (Pflueger Aff. ¶ 3). However, Officer Pflueger refused because Mr. Cole had not presented the required permission form. (Pflueger Aff. ¶ 3). The plaintiff admits that it is likely that he did not receive written approval until some time thereafter. (Deposition of Craig Cole dated February 28, 1999 at 33–35, 38).

On August 25, 1993, the plaintiff filed suit alleging that prison officials had violated his procedural due process rights. On December 4, 1995, the defendants moved for summary judgment. (Notice of Defendants' Motion for Summary Judgment dated December 4, 1995). The Honorable Kimba M. Wood, U.S.D.J., granted the motion and dismissed the complaint on the grounds that the plaintiff failed to show that he had been deprived of a protected liberty interest, but she granted the plaintiff leave to amend. (Order dated April 5, 1997). On May 30, 1997, the plaintiff filed an amended complaint, alleging five claims against several officials at the Green Haven Correctional Facility. (Am.Compl.) On November 16, 1998, Judge Wood dismissed all but one of these claims because the plaintiff had failed to state a cause of action or because the statute of limitations had elapsed. (Order dated Nov. 16, 1998). The plaintiff's sole remaining claim is that Officer Pflueger violated his First Amendment rights by denying him access to religious services on July 2, 1993. The defendant now moves for summary judgment on this issue, arguing that the plaintiff has presented no evidence that his First Amendment rights were violated. In addition, Officer Pflueger contends that he is entitled to qualified immunity. (Defendants' Memorandum of Law in Support of Their Second Motion for Summary Judgment).

A. *Standard for Summary Judgment*

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Tomka v. Seiler Corp.,* 66 F.3d 1295, 1304 (2d Cir.1995); *Richardson v. Selsky,* 5 F.3d 616, 621 (2d Cir.1993). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Where the movant meets that burden, the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute concerning material facts. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). In assessing the record to determine whether there is a genuine issue of material fact, the court must resolve all ambiguities and draw all factual inferences in favor of the nonmoving party. *Anderson,* 477 U.S. at 255; *Vann v. City of New York,* 72 F.3d 1040, 1048–49 (2d Cir.1995). But the court must inquire whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party" and grant summary judgment where the nonmovant's evidence is conclusory, speculative, or not significantly probative. *Anderson,* 477 U.S. at 249–50 (citation omitted). "The litigant opposing summary judgment may not rest upon mere conclusory allegations or denials, but must bring forward some affirmative indication that his version of relevant events is not fanciful." *Podell v. Citicorp Diners Club, Inc.,* 112 F.3d 98, 101 (2d Cir.1997) (citation and internal quotation omitted); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986) (a non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts"); *Goenaga v. March of Dimes Birth Defects Foundation,* 51 F.3d 14, 18 (2d Cir.1995) (nonmovant "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible") ((citations omitted)). In sum, if the court determines that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' " *Matsushita Electric Industrial Co.,* 475 U.S. at 587 (quoting *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 288 (1968)); *Montana v. First Federal Savings & Loan Association,* 869 F.2d 100, 103 (2d Cir.1989).

WESTLAW © 2018 Thomson Reuters. No claim to original U.S. Government Works.

**\*3** Where a litigant is *pro se,* his pleadings should be read liberally and interpreted "to raise the strongest arguments that they suggest." *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)). Nevertheless, proceeding *pro se* does not otherwise relieve a litigant from the usual requirements of summary judgment, and a *pro se* party's "bald assertion," unsupported by evidence, is not sufficient to overcome a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991); *Gittens v. Garlocks Sealing Technologies,* 19 F.Supp.2d 104, 110 (W.D.N.Y.1998); *Howard Johnson International, Inc. v. HBS Family, Inc.,* No. 96 Civ. 7687, 1998 WL 411334, at \*3 (S.D .N.Y. July 22, 1998); *Kadosh v. TRW, Inc.,* No. 91 Civ. 5080, 1994 WL 681763, at \*5 (S.D.N.Y. Dec. 5, 1994) ("the work product of *pro se* litigants should be generously and liberally construed, but [the *pro se'* s] failure to allege either specific facts or particular laws that have been violated renders this attempt to oppose defendants' motion ineffectual"); *Stinson v. Sheriff's Department,* 499 F.Supp. 259, 262 (S.D.N.Y.1980) (holding that the liberal standard accorded to *pro se* pleadings "is not without limits, and all normal rules of pleading are not absolutely suspended").

B. *Constitutional Claim*

It is well established that prisoners have a constitutional right to participate in congregate religious services even when confined in keeplock. *Salahuddin v. Coughlin,* 993 F.2d 306, 308 (2d Cir.1993); *Young v. Coughlin,* 866 F.2d 567, 570 (2d Cir1989). However, this right is not absolute. *See Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.1990) (right to free exercise balanced against interests of prison officials). Prison officials can institute measures that limit the practice of religion under a "reasonableness" test that is less restrictive than that which is ordinarily applied to the alleged infringement of fundamental constitutional rights. *O'Lone v. Estate of Shaabazz,* 482 U.S. 342, 349 (1986). In *O'Lone,* the Court held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 349 (quoting *Turner v. Safley,* 482 U.S. 78, 89 (1987)). The evaluation of what is an appropriate and reasonable penological objective is left to the discretion of the administrative officers operating the prison. *O'Lone,* 482 U.S. at 349. Prison administrators are "accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish,* 441 U.S. 520, 547 (1979).

The policy at issue here satisfies the requirement that a limitation on an inmate's access to religious services be reasonable. The practice at Green Haven was to require inmates in keeplock to present written approval to the prison gate officer before being released to attend religious services. This policy both accommodates an inmate's right to practice religion and allows prison administrators to prevent prisoners posing an active threat to security from being released. The procedure is not overbroad since it does not permanently bar any inmate from attending religious services. Rather, each request is decided on a case-by-case basis by a high ranking prison official and denied only for good cause.

**\*4** Furthermore, in order to state a claim under § 1983, the plaintiff must demonstrate that the defendant acted with deliberate or callous indifference toward the plaintiff's fundamental rights. *See Davidson v. Cannon* 474 U.S. 344, 347–48 (1986) (plaintiff must show abusive conduct by government officials rather than mere negligence). Here, there is no evidence that the defendant was reckless or even negligent in his conduct toward the plaintiff or that he intended to violate the plaintiff's rights. Officer Pflueger's responsibility as a prison gate officer was simply to follow a previously instituted policy. His authority was limited to granting access to religious services to those inmates with the required written permission. Since Mr. Cole acknowledges that he did not present the necessary paperwork to Officer Pflueger on July 2, 1993, the defendant did nothing improper in denying him access to the religious services. Although it is unfortunate that the written approval apparently did not reach the plaintiff until after the services were over, his constitutional rights were not violated. [1]

*Conclusion*

For the reasons set forth above, I recommend that the defendant's motion for summary judgment be granted and judgment be entered dismissing the complaint. Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(e) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days to file written objections to this report and recommendation. Such objections shall be filed with

the Clerk of the Court, with extra copies delivered to the chambers of the Honorable William H. Pauley III, Room 234, 40 Foley Square, and to the Chambers of the undersigned, Room 1960, 500 Pearl Street, New York, New York 10007. Failure to file timely objections will preclude appellate review.

Respectfully submitted,

**All Citations**

Not Reported in F.Supp.2d, 1999 WL 983876

Footnotes

1    In light of this finding, there is no need to consider the defendant's qualified immunity argument.

---

**End of Document**                                              © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2017 WL 4157372
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Armando COLÓN, Plaintiff,

v.

NEW YORK STATE DEPARTMENT OF
CORRECTIONS AND COMMUNITY
SUPERVISION; Wladyslaw Sidorowicz, Sullivan
Correctional Facility Medical Director; Sullivan
Corrections Officers "John and/or Jane Does" 1,
2, 3, etc.; Sullivan Correctional Facility Medical
Officials "John and/or Jane Does" 1, 2, 3, etc.; Ashit
Patel, M.D., all of whom are sued in their individual
capacities, and Albany Medical Center, Defendants.

No. 15 Civ. 7432 (NSR)
|
Signed 09/15/2017

Attorneys and Law Firms

Keith Michael Szczepanski, Beldock Levine & Hoffman
LLP, New York, NY, for Plaintiff.

Adam T. Mandell, Maynard O'Connor Smith &
Catalinotto, LLP, Saugerties, NY, Kacie Alina Lally,
Office of the Attorney General, New York, NY, for
Defendants.

OPINION & ORDER

NELSON S. ROMÁN, United States District Judge

*1 Plaintiff Armando Colón brings this action pursuant
to 42 U.S.C. § 1983, Title II of the Americans
with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101
et seq., the Rehabilitation Act of 1973 ("RA"), 29
U.S.C. §§ 701 et seq., and New York state tort law,
against the New York State Department of Corrections
and Community Supervision ("DOCCS"), Sullivan
Correctional Facility ("Sullivan") Medical Director
Wladyslaw Sidorowicz, unknown "John or Jane Doe"
Sullivan Correctional Officers ("Sullivan CO Does"),
and unknown "John or Jane Doe" Sullivan Medical
Officials ("Sullivan Medical Does") (collectively, "State
Defendants"); Albany Medical Center ("AMC"), and

Ashit Patel, M.D. (collectively, "Medical Defendants").
Specifically, Plaintiff alleges (1) violations of his Eighth
and Fourteenth Amendment Rights by Sidorowicz and
the Sullivan Does; (2) violations of the ADA and the RA
by DOCCS; (3) medical malpractice and (4) negligence
by Sidorowicz, the Sullivan Medical Does, AMC, and
Patel. Thus, Plaintiff's federal claims involve only the State
Defendants, while his state law claims implicate both the
State Defendants and the Medical Defendants.

Pursuant to Federal Rules of Civil Procedure 12(b)(1) and
12(b)(6), all Defendants have moved to partially dismiss
the Amended Complaint. For the following reasons,
Defendants' motions to dismiss are GRANTED in part
and DENIED in part.

BACKGROUND

I. Factual Allegations [1]
Plaintiff, a 75 year-old visually-impaired incarcerated
inmate at Sullivan Correctional Facility, claims that on
September 22, 2013, he was assaulted by an unknown
inmate as he was being escorted from his cell in the
Sensorial Disabled Unit to the Sullivan infirmary. (Am.
Compl. ("AC") ¶ 2.) At the time of the incident, Plaintiff,
who is legally blind, was being escorted by Sullivan
Corrections Officer Juan Martinez and an inmate at
Sullivan, Martin Hodge, who "assisted visually impaired
inmates through the facility." (Id.) As Plaintiff was being
escorted to the infirmary, he was "approached, punched,
and knocked unconscious by an unknown incarcerated
person." (Id. ¶ 25.)

At the time of the incident, Plaintiff was in "keeplock
status," which is designed to serve as a "form of
punishment where incarcerated people are confined to
their cells for approximately 23 hours a day and lose
certain privileges." (Id. ¶ 22.) Plaintiff alleges that DOCCS
has implemented a policy of making inmates face the
wall whenever an inmate assigned to other in-prison
punishment programs, such as the Special Housing Unit
("SHU") or Correctional Alternatives Program ("CAR"),
is being transported through the facility. (Id. ¶¶ 19-20.) But
because Plaintiff was "keeplock status," rather than in the
SHU or CAR, he was not afforded that same benefit while
being transported. (Id. ¶¶ 21-23.) Thus, Plaintiff contends
that "[b]ut for DOCCS failing to establish a policy
assuring the safe transportation of visually impaired

incarcerated people on keeplock status, Plaintiff would not have been assaulted by the unknown inmate," making "Defendants' failure to accommodate Plaintiff's disability [] the proximate cause of [Plaintiff's] injury." (*Id.* ¶¶ 63-64.)

**\*2** As a result of the attack, Plaintiff sustained a number of injuries, including multiple facial fractures, and was taken to Catskill General Hospital ("Catskill"). (*Id.* ¶¶ 26-28.) After receiving a CT scan at Catskill, Plaintiff was subsequently transferred to Defendant Albany Medical Center. (*Id.* ¶ 29.) Doctors at AMC informed Plaintiff that his injuries would require surgery, but the surgery could not be performed until the swelling to his face was reduced. (*Id.* ¶ 31.) He was then transferred back to Sullivan.

Plaintiff returned to AMC on September 27, 2013, five days after the incident, so that Defendant Patel could perform facial reconstructive surgery. (*Id.* ¶ 34.) The reconstructive surgery included "implantation in Plaintiff's right eye-socket and right cheekbone." (*Id.*) The following day, Plaintiff was discharged from AMC and returned to the Sullivan infirmary, where he stayed for an extended period of time. (*Id.* ¶ 35.)

Plaintiff alleges that he complained to Defendant Sidorowicz several weeks after the surgery about "excruciating pain on the right side of his face, swelling to the right side of his face, and difficulty chewing food on the right side of his mouth." (*Id.* ¶ 37.) Nevertheless, not until two months after his surgery, in December 2013, was Plaintiff transferred to Coxsackie Correctional Facility's Regional Medical Unit to be examined by Dr. Richard Agag. (*Id.* ¶¶ 39-40.) During that examination, Dr. Agag discovered that the metallic hardware installed by Patel in Plaintiff's cheekbone "had ripped through the upper right side of Plaintiff's mouth." (*Id.* ¶ 41.) Dr. Agag then recommended an emergency surgery in order to remove the protruding hardware. (*Id.* ¶ 42.)

On January 29, 2014, Defendant Patel performed a second surgery to remove the hardware. (*Id.* ¶ 43.) After that surgery, Plaintiff contends that he continued to complain to Sullivan Corrections Officers and Medical Officers, including Defendant Sidorowicz, about "excruciating pain on the right side of his face, swelling to the right side of his face, and difficulty chewing food on the right side of his mouth." (*Id.* ¶ 45.) In April 2014, again months later, Plaintiff returned to AMC where he received a CT scan and, allegedly, was informed by Defendant Sidorowicz

that a bone inside his mouth was "exposed and had become infected." (*Id.* ¶¶ 47-48.)

Thereafter, on May 10, 2014, a third surgery was performed by Defendant Patel where he covered the exposed bone inside Plaintiff's mouth with a skin graft. (*Id.* ¶ 50.) Several days later, Plaintiff was discharged and returned to Sullivan. (*Id.* ¶ 51.) After the May 2014 surgery, Plaintiff underwent two additional oral surgeries in order to remove excessive and overlapping tissue inside of his mouth. (*Id.* ¶ 52.)

Plaintiff alleges that to this day he continues to "experience extreme pain on the right side of his face and has difficulty chewing food on the right side of his mouth." (*Id.* ¶ 53.)

**II. Procedural History**

Plaintiff commenced this lawsuit *in forma pauperis* and *pro se* on September 18, 2015. (*See* Compl., ECF No. 2.) Counsel appeared on his behalf on February 16, 2016. (ECF No. 34.) Plaintiff, assisted by counsel, amended his complaint on August 15, 2016. (*See* Am. Compl., ECF No. 41.) Each set of Defendants has moved to dismiss that complaint pursuant to Rules 12(b)(1) or 12(b)(6). (*See* ECF Nos. 58 (State Defendants), 68 (Medical Defendants).) [2]

**STANDARD ON A MOTION TO DISMISS**

**\*3** Under Rule 12(b)(6) or 12(c) motions to dismiss, the inquiry is whether the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *accord Hayden v. Paterson*, 594 F.3d 150, 160 (2d Cir. 2010) (applying same standard to Rule 12(c) motions). "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* at 679. To survive a motion to dismiss, a complaint must supply "factual allegations sufficient 'to raise a right to relief above the speculative level.' " *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 555). The Court must take all material factual allegations as true and draw reasonable inferences in the non-moving party's favor, but the Court is " 'not bound to accept as true a legal

conclusion couched as a factual allegation,' " or to credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action." *Iqbal,* 556 U.S. at 678 (quoting *Twombly,* 550 U.S. at 555).

In determining whether a complaint states a plausible claim for relief, a district court must consider the context and "draw on its judicial experience and common sense." *Iqbal,* 556 U.S. at 679. It is important to note that "pleading is not an interactive game in which plaintiffs file a complaint, and then bat it back and forth with the Court over a rhetorical net until a viable complaint emerges." *In re Merrill Lynch Ltd. P'ships Litig,* 7 F. Supp. 2d 256, 276 (S.D.N.Y. 1997). The court's "duty to liberally construe a plaintiff's complaint [is not] the equivalent of a duty to re-write it." *Geldzahler v. New York Medical College,* 663 F. Supp. 2d 379, 387 (S.D.N.Y. 2009) (internal citations and quotation marks omitted). A claim is facially plausible when the factual content pleaded allows a court "to draw a reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 556 U.S. at 678.

As to a motion brought under Rule 12(b)(1), "[a] case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States,* 201 F.3d 110, 113 (2d Cir. 2000). "A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Id.*; *but see John v. Whole Foods Mkt. Grp., Inc.,* 858 F.3d 732, 736 (2d Cir. 2017) (where the 12(b)(1) motion is "facial, *i.e.,* based solely on the allegations of the complaint or the complaint and exhibits attached to it," and challenges the plaintiff's standing to bring suit, "at the pleading stage, 'general factual allegations of injury resulting from the defendant's conduct may suffice,' " since "the plaintiff has no evidentiary burden" in that scenario) (citation omitted). Where a defendant comes forward with affidavits "reveal[ing] the existence of factual problems" in the assertion of jurisdiction, the plaintiff must "come forward with evidence of [his or her] own to controvert that presented by the defendant[.]" *Carter v. HealthPort Techs., LLC,* 822 F.3d 47, 57 (2d Cir. 2016) (quoting *Exchange National Bank of Chicago v. Touche Ross & Co.,* 544 F.2d 1126, 1131 (2d Cir. 1976)).

"In resolving a motion to dismiss under Rule 12(b)(1), the district court must take all uncontroverted facts in the complaint (or petition) as true, and draw all reasonable inferences in favor of the party asserting jurisdiction." *Tandon v. Captain's Cove Marina of Bridgeport, Inc.,* 752 F.3d 239, 243 (2d Cir. 2014). "[T]he court may resolve the disputed jurisdictional fact issues by referring to evidence outside of the pleadings, such as affidavits, and if necessary, hold an evidentiary hearing." *Zappia Middle E. Constr. Co. v. Emirate of Abu Dhabi,* 215 F.3d 247, 253 (2d Cir. 2000). Though a court "may consider affidavits and other materials beyond the pleadings to resolve the jurisdictional issue, [it] may not rely on conclusory or hearsay statements contained in the affidavits." *Id.*

## DISCUSSION

**\*4** In sum, Plaintiff alleges he was not kept safe from harm at the prison and was discriminated against on the basis of his disability, which ultimately led to severe and painful injury, causing further suffering as a result of Defendants' negligence and medical malpractice. The Court will address the claims alleged against the various sets of Defendants starting with the federal causes of action. The Court notes that at this time the State Defendants do not seek to dismiss the Eighth Amendment claims brought against them relating to events occurring in or after May 2014. (*See* State Mem. at 1 n.1.) They do, however, seek to dismiss Plaintiff's ADA and RA claims, and all claims based on acts occurring prior to May 2014, on the basis of exhaustion. (*Id.* at 6-9.)

Therefore, no matter the resolution of Defendants' partial motions to dismiss, aspects of Plaintiff's Section 1983 claims will remain at this juncture. Given the apparent relationship between those claims and Plaintiff's repeated transfer to AMC for medical treatment, if Plaintiff's negligence and medical malpractice claims are plausibly alleged, then the exercise of supplemental jurisdiction over Plaintiff's state law claims will be appropriate. [3]

### I. Federal Claims
Plaintiff's federal claims under § 1983, the ADA, and the RA, must first be exhausted through the prison grievance process prior to bringing a suit in federal court. Additionally, the Court must consider the issue of sovereign immunity with regard to Plaintiff's claims against the State Defendants pursuant to the ADA.

#### a. Exhaustion

Under the Prison Litigation Reform Act of 1995 ("PLRA"), "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. § 1983] or any other federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "The PLRA's exhaustion requirement 'applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong.' " *Giano v. Goord*, 380 F.3d 670, 675 (2d Cir. 2004) (quoting *Porter v. Nussle*, 534 U.S. 516, 532, (2002)).

Exhausting all remedies "means using all steps that the agency holds out, and doing so properly (so that the agency addresses the issues on the merits)." *Washington v. Chaboty*, No. 09 Civ. 9199, 2015 WL 1439348, at *6 (S.D.N.Y. Mar. 30, 2015) (quoting *Hernandez v. Coffey*, 582 F.3d 303, 305 (2d Cir. 2009)) (internal quotation marks and citations omitted). "[B]ecause 'it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion[,] ... [t]he exhaustion inquiry ... requires that [the court] look at the state prison procedures and the prisoner's grievance to determine whether the prisoner has complied with those procedures.' " *Espinal v. Goord*, 558 F.3d 119, 124 (2d Cir. 2009) (quoting *Jones v. Bock*, 549 U.S. 199, 218 (2007)). A plaintiff must invoke all available administrative mechanisms, including appeals, "through the highest level for each claim." *Varela v. Demmon*, 491 F. Supp. 2d 442, 447 (S.D.N.Y. 2007).

It is the Defendants' burden to demonstrate that Plaintiff's claim is not exhausted. *Key v. Toussaint*, 660 F. Supp. 2d 518, 523 (S.D.N.Y. 2009). Where a prisoner has failed to exhaust some, but not all, of the claims included in the complaint, the PLRA does not require dismissal of the entire complaint. *Tafari v. Hues*, 539 F. Supp. 2d 694, 697 (S.D.N.Y. 2008) (citing *Jones*, 549 U.S. at 219-24); *see also Arnold v. Goetz*, 245 F. Supp. 2d 527, 531 (S.D.N.Y. 2003) ("the PLRA's exhaustion requirement is not jurisdictional in nature"); *accord Richardson v. Goord*, 347 F.3d 431, 434 (2d Cir. 2003). Instead, the court dismisses the unexhausted claims and proceeds to adjudicate the ones that are exhausted. *Jones*, 549 U.S. at 224. Nevertheless, a motion to dismiss pursuant to Rule 12(b)(6) for failure to exhaust under the PLRA should be granted only "if it is clear on the face of the complaint that

the plaintiff did not satisfy the [ ] exhaustion requirement." *Williams v. Correction Officer Priatno*, 829 F.3d 118, 122 (2d Cir. 2016); *see also Sloane v. Mazzuca*, No. 04 Civ. 8266, 2006 WL 3096031, at *4 (S.D.N.Y. Oct. 31, 2006) ("[B]y characterizing non-exhaustion as an affirmative defense, the Second Circuit suggests that the issue of exhaustion is generally not amenable to resolution by way of motion to dismiss.") (internal quotation marks omitted).

**\*5** A person detained or incarcerated at a DOCCS facility must exhaust all of the steps of the Inmate Grievance Resolution ("IGR") Program ("IGRP"). *See Robinson v. Henschel*, No. 10 Civ. 6212, 2014 WL 1257287, at *10 (S.D.N.Y. Mar. 26, 2014) ("the PLRA requires complete exhaustion") (internal quotation marks and citations omitted). The IGRP provides a three-tiered process for adjudicating inmate complaints: (1) the prisoner files a grievance with the IGR committee ("IGRC"), (2) the prisoner may appeal an adverse decision by the IGRC to the superintendent of the facility, and (3) the prisoner then may appeal an adverse decision by the superintendent to the Central Office Review Committee ("CORC"). *See Espinal*, 558 F.3d at 125; *see also* 7 N.Y. Comp. Codes R. & Regs. § 701.5; *but see Williams*, 829 F.3d at 126 ("the process to appeal an unfiled and unanswered grievance is prohibitively opaque, such that no inmate could actually make use of it," making that portion of the process, "practically speaking, incapable of use" pursuant to the Supreme Court's guidance in *Ross v. Blake*, 136 S. Ct. 1850, 1859 (2016)).

State Defendants argue that Plaintiff's ADA and Rehabilitation Act claims,[4] as well as any claims relating to medical treatment occurring prior to May 2014, should be dismissed for failure to exhaust. In support of this argument, State Defendants provide a declaration from the Assistant Director of the Inmate Grievance Program at DOCCS, Jeffery Hale, along with three exhibits. (*See* Hale Decl.) While there are numerous instances in which courts take notice of records outside of the pleadings to determine whether a plaintiff has exhausted his administrative remedies, in those cases the complaint a) was the standard *pro se* form complaint that has a check-box regarding exhaustion, b) contained allegations clearly stating that the inmate had exhausted his administrative remedies, or c) clearly pointed to the fact that the inmate had, in fact, not exhausted.[5] Here,

in contrast, Plaintiff's operative complaint does not assert that he exhausted his administrative remedies—it is silent on that front. *See Jones,* 549 U.S. at 216 ("[I]nmates are not required to specially plead or demonstrate exhaustion in their complaints."); *Williams,* 829 F.3d at 122.

The Court, therefore, will not consider State Defendants' documentary evidence at this juncture. While it is imperative to resolve the issue of exhaustion as early as possible, if "it is not clear from the face of the complaint whether the plaintiff exhausted, a Rule 12(b)(6) motion is not the proper vehicle." *McCoy v. Goord,* 255 F. Supp. 2d 233, 249 (S.D.N.Y. 2003). [6]

**b. Sovereign Immunity**

**\*6** Under the Eleventh Amendment, suits in federal courts against state governments are barred unless the State waives its immunity or Congress validly abrogates that immunity. *Bd. of Trs. of the Univ. of Ala. v. Garrett,* 531 U.S. 356, 363 (2001). Congress can abrogate a State's sovereign immunity if it seeks to enforce the "substantive guarantees" of the Fourteenth Amendment. *Tennessee v. Lane,* 541 U.S. 509, 518 (2004). With regard to the ADA, in *United States v. Georgia,* the Supreme Court held that "insofar as Title II creates a private cause of action for damages against the States for conduct that *actually* violates the Fourteenth Amendment, Title II [of the ADA] validly abrogates state sovereign immunity." 546 U.S. 151, 159 (2006) (emphasis in original). [7] The *Georgia* decision essentially holds that Title II of the ADA abrogates a State's sovereign immunity *if* there was also a corresponding Fourteenth Amendment violation, but it "left open the question on whether Congress may validly abrogate sovereign immunity with respect to a particular class of misconduct that violates Title II but does not violate the Fourteenth Amendment." *Dean v. Univ. at Buffalo Sch. of Med. & Biomedical Sci.,* 804 F.3d 178, 194 (2d Cir. 2015).

At this stage of litigation, the Court must take all of the facts in the Amended Complaint as true and, under the *Georgia* standard, it must determine "on a claim-by-claim basis, (1) which aspects of the State's alleged conduct violated Title II; (2) to what extent such misconduct also violated the Fourteenth Amendment; and (3) insofar as much misconduct violated Title II but did not violate the Fourteenth Amendment, whether Congress's purported abrogation of sovereign immunity as to that class of

conduct is nevertheless valid." *Georgia,* 546 U.S. at 159. If Plaintiff's allegations satisfy the first two inquiries under *Georgia,* then the Eleventh Amendment does not bar a suit for monetary damages under the ADA against DOCCS. *See Degrafinreid v. Ricks,* 417 F. Supp. 2d 403, 411 (S.D.N.Y. 2006). If Plaintiff plausibly alleges violations of Title II (the first inquiry) that do not violate the Fourteenth Amendment (the second inquiry), then the Court must consider the third *Georgia* inquiry regarding abrogation of sovereign immunity. But if Plaintiff fails to allege an actionable ADA violation at the outset, then questions of sovereign immunity are irrelevant.

**i. Alleged Violations of Title II of the ADA** [8]

Title II of the ADA mandates that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. To establish a *prima facie* claim under the ADA, a plaintiff must allege that: "(1) that he is a 'qualified individual' with a disability; (2) that the defendants are subject to the ADA and/or Rehabilitation Act; and (3) that the plaintiff was 'denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or [was] otherwise discriminated against by defendants, *by reason of [his] disabilit[y].*'" *Andino v. Fischer,* 698 F. Supp. 2d 362, 378 (S.D.N.Y. 2010) (citing *Henrietta D. v. Bloomberg,* 331 F.3d 261, 272 (2d Cir. 2003); *Powell v. Nat'l Bd. of Med. Exam'rs,* 364 F.3d 79, 85 (2d Cir. 2004)). *See also Disabled in Action v. Bd. of Elections in City of N.Y.,* 752 F.3d 189, 196-97 (2d Cir. 2014) (Section 504 of the RA and Title II of the ADA continue to have the same standards).

**\*7** While a plaintiff must "prove a disability by offering evidence that the extent of the limitation in terms of their own experience, as in loss of depth perception and visual field, is substantial," *Albertson's, Inc. v. Kirkingburg,* 527 U.S. 555, 567 (1999), here Plaintiff alleges he is legally blind and requires assistance traversing the prison. Thus, he has plausibly alleged that he is a qualified individual because his visual disability "substantially limits one or more of [his] major life activities," *Heilweil v. Mount Sinai Hosp.,* 32 F.3d 718, 722 (2d Cir. 1994): "seeing." 42 U.S.C. § 12102. Furthermore, the Supreme Court has explained that the statutory language of the ADA "unmistakably

includes State Prisons and prisoners within its coverage," *Pennsylvania Department of Corrections v. Yeskey,* 524 U.S. 206, 209 (1998), subjecting DOCCS to the ADA's mandates.

But, in order to satisfy the last factor, a plaintiff must show that he was denied the opportunity to participate in or benefit from the State Defendants' services, programs, or activities, or was otherwise discriminated against by Defendants, as a result of his disability. *See* 42 U.S.C. § 12132. "A qualified individual can base a discrimination claim on any of three available theories: (1) intentional discrimination (disparate treatment); (2) disparate impact; and (3) failure to make a reasonable accommodation." *Fulton v. Goord,* 591 F.3d 37, 43 (2d Cir. 2009). The complaint specifically mentions, and the alleged facts suggest, that Plaintiff's ADA claim is based on a failure to make a reasonable accommodation on the part of DOCCS.

Yet, Plaintiff does not allege that he requested the accommodation he now claims should have been provided, nor that he was denied the benefits extended to inmates in the SHU or CAR on the basis of his disability. Moreover, "[a]lthough a public entity must make 'reasonable accommodations,' it does not have to provide a disabled individual with every accommodation he requests or the accommodation of his choice." *McElwee v. Cty. of Orange,* 700 F.3d 635, 641 (2d Cir. 2012). Plaintiff has ultimately failed to allege why the accommodation he seeks is more reasonable for blind prisoners—and legally required—when compared with the accommodations he already received, namely the guard and prisoner escorts. Though this Court sympathizes with the fact that he was attacked while travelling through the prison, it cannot infer any linkage between that attack and his disability or infer a relationship between DOCCS decision to implement certain safety prerogatives for inmates in SHU and CAR, but not keeplock prisoners, and Plaintiff's visual impairment.

Because the Court determines that Plaintiff has failed to allege a Title II violation, the *Georgia* inquiry is concluded, and the issue of sovereign immunity is inapplicable. Instead, Plaintiff's claims under the ADA and RA are dismissed for failing to state a claim. [9]

**II. New York State Law Claims**

Plaintiff's state law claims of negligence and medical malpractice must be analyzed with respect to each set of Defendants, because as explained below the defenses and procedures for suing state employees differs from those available to private medical professionals.

**a. Claims Against DOCCS and Sidorowicz**

State Defendants argue that Plaintiff's claims for negligence and medical malpractice, the third and fourth causes of action in the Amended Complaint, against Sidorowicz should be dismissed pursuant to New York Correction Law § 24(2). (State Mem. at 5.) Plaintiff opposes the application of § 24 by claiming that its application in this context would be an unconstitutional restriction on federal courts' exercise of their supplemental jurisdiction. The contested New York statute, as relevant to this case, provides that:

> **\*8** 1. No civil action shall be brought in any court ... against any officer or employee *of the department* ... in his or her personal capacity, for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties by such officer or employee.
>
> 2. Any claim for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties of any officer or employee of the department *shall be brought and maintained in the court of claims* as a claim against the state.

N.Y. Corr. Law § 24(1) & (2) (emphasis added). The Second Circuit has long-held that § 24 precludes a plaintiff from raising state law claims in federal court against state officers in their personal capacities for alleged actions arising within the scope of their employment. *Baker v. Coughlin*, 77 F.3d 12, 16 (2d Cir. 1996) ("Appellants are entitled to invoke the benefits of § 24 irrespective of the forum in which [plaintiff] chooses to pursue her claims. Because a New York court would have dismissed [the] claims against [the defendants] pursuant to § 24, the district court should have done so."). Even after the Supreme Court's decision in *Haywood v. Drown*—where the Court held that Correction Law § 24 "is not at liberty to shut the courthouse door to federal claims," like § 1983 claims, "that it considers at odds with its local policy," 556 U.S. 729, 740 (2009)—§ 24 continues to bar *state* law claims against DOCCS officers that are not brought to

the Court of Claims unless the individuals acted outside their scope of employment. *See, e.g., Hassell v. Fischer,* 96 F. Supp. 3d 370, 385 (S.D.N.Y. 2015) ("Because such claims would be barred in New York state courts, this Court equally lacks jurisdiction over the claims.").

State Defendants admit that Sidorowicz was a DOCCS employee at the time of the alleged incident, [10] therefore the only question that remains is whether he acted within his scope of employment. An employee's actions are deemed to fall within the scope of their employment if "the act was done while the servant was doing his master's work, no matter how irregularly, or with what disregard of instructions." *Ierardi v. Sisco,* 119 F.3d 183, 187 (2d Cir. 1997) (internal citations and quotation marks omitted). To determine whether an employee's actions fall within his scope of employment, courts in the Second Circuit have relied on:

> [T]he connection between the time, place and occasion for the act; the history of the relationship between employer and employee as spelled out in actual practice; whether the act is one commonly done by any employee; the extent of departure from normal methods of performance; and whether the specific act was one that the employer could reasonably have anticipated.

*Id.* (internal citations and quotation marks omitted). Upon careful review, there are no alleged facts in the Amended Complaint that suggest that Sidorowicz or any other DOCCS staff[11] acted outside of the scope of their traditional employment duties. Therefore, pursuant to Correction Law § 24, Plaintiff's state law claims for negligence and medical malpractice as alleged against Sidorowicz, the John and/or Jane Does, and DOCCS must be dismissed for lack of subject-matter jurisdiction.

### b. Claims Against AMC and Patel

**\*9** The Medical Defendants argue that they, too, fall under the protective umbrella of Correction Law § 24. (Med. Mem. at 4.) Neither the plain text of the statute, nor its legislative history, clearly indicate, however, that AMC and Patel would qualify "employees" of DOCCS. To come with the ambit of § 24, the Medical Defendants point

to their contract with DOCCS.[12] Taking the contract under consideration, the Court first evaluates what it actually provides:

> Pursuant to Correction Law Section 24-a and Public Officers Law Section 17, the State shall *defend* and *indemnify* any person holding a license to practice a profession ... who is rendering or has rendered professional services authorized under such license while acting at the request of DOCCS or a facility of DOCCS in providing health care and treatment or professional consultation to inmates of correctional facilities, without regard to whether such health care and treatment or professional consultation is provided within or without a correction facility. *The duty to defend and indemnify* is conditioned upon (1) delivery by the aforementioned licensed health care professional to the Attorney General at the appropriate regional office of the Department of Law of the original or a copy of any summons, complaint, process, notice, demand or pleading within five days after being served with such document together with a written request that representation be provided; and (2) the full cooperation of the aforementioned licensed health care professional in the defense of such action or proceeding.

(Masta Aff., Ex. A at 8-9 (emphasis added).) This provision provides AMC, along with its health care providers, with indemnification by DOCCS. *See, e.g., Simpson v. Rodas,* No. 10 Civ. 6670, 2012 WL 4354832, at *1 (S.D.N.Y. Sept. 21, 2012) (noting that defendant, a private physician, was entitled to representation under Correction Law § 24-a); *Wright v. Genovese,* 694 F. Supp. 2d 137, 152 n.10 (N.D.N.Y. 2010) ("[t]he indemnity provisions of the AMC contract with [DOCCS] appear to extend, to medical professionals who provide medical services at AMC to inmates at the request of [DOCCS],

the protections afforded by N.Y. Correction Law § 24-a and Public Officers Law § 17, which would indemnify the professionals as to any claims of negligence by the inmate.").

Thus, while there can be no debate that the Medical Defendants are indeed entitled to indemnification by the State of New York, the novel proposition that the Medical Defendants propose is that the entitlement to defense and indemnification, under Correction Law § 24-a, extends to them the statutory protections of § 24. They argue that the state legislature intended to afford such individuals with the protections of both § 24-a and § 24—thus requiring Plaintiff to bring his claims against them to the New York Court of Claims as discussed above. As a matter of statutory interpretation, the Medical Defendants contend that Correction Law § 24 and § 24-a, along with Public Officers Law § 17, [13] should be read together.

*10 But there is no indication, upon reviewing the 1978 Bill Jacket for the amendments to the Correction Law that added § 24-a, that New York's legislature intended to silently combine the provisions. The clear intent of the amendment was "[t]o provide indemnification and defense of State officers in defending suits, claims and demands, and in satisfying judgments resulting from suits brought against them personally for negligent acts or omissions within the scope of their employment." July 7, 1978 Mem. in Governor's Bill Jacket to 1978 N.Y. Laws 466; see Office of the Attorney General of the State of New York, Formal Opinion by Robert Abrams, 1980 N.Y. Op. Atty. Gen. 40 (July 1, 1980) (discussing only indemnification, noting "th[e] bill extends the benefits of Public Officers Law § 17 to non-employee health professionals of both the Department of Correction and the Department of Mental Hygiene who render professional care at the request of those agencies").

Moreover, the Medical Defendants rely on several cases in which courts have extended Correction Law § 24 immunity to other state agents working on-behalf of DOCCS. See, e.g., Hall v. N.Y.S. DOCCS, No. 12 Civ. 377, 2015 WL 901010, at *11 (N.D.N.Y. Mar. 3, 2015); Brown v. N.Y.S. DOCCS, No. 09 Civ. 949, 2011 WL 2182775, at *8 (W.D.N.Y. June 2, 2011). But unlike the case at hand, the defendants in these cases were employees within the Office of Mental Health ("OMH"), a New York State agency. Extending § 24 to other state agencies is quite different from extending it to private health providers.

Instead, the legislature provided these private entities with indemnification to protect against liability.

Having considered the Medical Defendants' arguments and the legislative history of § 24-a, the Court concludes that § 24-a does not convey the same rights as § 24—and the fact that an entity falls within § 24-a does not similarly render § 24 applicable. Therefore, the Court may, and does, exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) over Plaintiff's state law claims against the Medical Defendants. The Court must now determine whether Plaintiff has plausibly alleged negligence independent of the allegations of medical malpractice, and a plausible basis for seeking punitive damages, given that the Medical Defendants argue there is no basis for either of those claims. In contrast, the Medical Defendants do not seek to dismiss the medical malpractice claims at this juncture. (Med. Mem. at 2.)

### i. Negligence or Medical Malpractice

"It is settled that [in New York] a negligent act or omission 'that constitutes medical treatment or bears a substantial relationship to the rendition of medical treatment by a licensed physician constitutes malpractice.' " B.F. v. Reprod. Med. Assocs. of New York, LLP, 136 A.D.3d 73, 80 (1st Dep't 2015); Scott v. Uljanov, 74 N.Y.2d 673, 674, 541 N.E.2d 398, 399 (1989) ("medical malpractice is simply a form of negligence, [and] no rigid analytical line separates the two"). The method for distinguishing between situations of "simple negligence" and "the more particularized medical malpractice standard" has been described as follows:

> negligence rules are applicable in those situations where the issue relating to the exercise of due care may be 'easily discernible by a jury on common knowledge'[;] ... [but] where the directions given or treatment received by a patient is in issue, this requires consideration of the professional skill and knowledge of the practitioner or the medical facility and the more specialized theory of medical malpractice applies.

Coursen v. New York Hosp.-Cornell Med. Ctr., 114 A.D.2d 254, 256 (1st Dep't 1986) (citations omitted). After reviewing Plaintiff's allegations against the Medical Defendants, the Court must agree with Defendants that there are no specific, non-conclusory allegations regarding failings by AMC or Patel that relate to hospital procedures

or regulations as opposed to actual medical treatment. (*See* Med. Reply at 8.) Indeed, the portions of the complaint Plaintiff quotes in opposition to Defendant's motion, (*see* Pl. Opp'n Med. at 14), either concern the "medical attention" he was provided (AC ¶ 72(b)) or are simply conclusory statements suggesting the Medical Defendants acted unreasonably (AC ¶ 71; *see also id.* ¶¶ 72(c), 74 (relating to the injuries he sustained)).

**\*11** Therefore, Plaintiff's negligence claims must be dismissed as duplicative of the medical malpractice claims.

### ii. Punitive Damages

Punitive damages in the medical malpractice context may be recoverable where the treating physician's actions "were so 'intentional, malicious, outrageous, or otherwise aggravated beyond mere negligence' as to support [such] an award." *Graham v. Columbia-Presbyterian Med. Ctr.,* 185 A.D.2d 753, 754 (1st Dep't 1992). However, "allegations of mere negligence" that "do not rise to [that] level of moral culpability" will not "support a claim for punitive damages." *Aronis v. TLC Vision Centers, Inc.,* 49 A.D.3d 576, 578 (2d Dep't 2008). In certain cases, allegations of egregious malpractice—the variety that could affect other patients in addition to the plaintiff—will suffice. *See, e.g.,* *B.F.,* 136 A.D.3d at 82 ("allegations that fragile X is a common cause of mental retardation for which donor candidates could easily have been tested, and given that defendants' failure to screen for fragile X potentially affected many patients other than plaintiffs," sufficient allegations were present to claim punitive damages).

At this stage, Plaintiff's allegations, which include malpractice that resulted in metal protruding into his mouth, infected bone, and repeated surgeries to correct the problems, show the potential for malpractice that is "aggravated beyond mere negligence." *Graham,* 185 A.D.2d at 754. But aside from Plaintiff's conclusory allegations that the Medical Defendants acted maliciously, recklessly, and intentionally, (*see, e.g.,* AC ¶¶ 72(c), 73), the complaint does not set forth a strong basis for finding "moral culpability." *Aronis,* 49 A.D.3d at 578. The claim for punitive damages is, thus, razor-thin. But, in the absence of a factual record regarding

both the actual steps taken to treat Plaintiff, the degree to which that treatment deviated from standards of care, and the state of mind of the treating physicians, the Court cannot conclude that the injuries Plaintiff allegedly suffered were the result of mere negligence. Therefore, drawing all reasonable inferences in favor of Plaintiff, an inference of gross negligence is plausible based on the facts alleged, and the Court will not dismiss the claim for punitive damages at this time.

### CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss are GRANTED in part and DENIED in part. With regard to the claims alleged against the State Defendants, Plaintiff's federal claims brought pursuant to the ADA and RA are dismissed without prejudice for failure to state a claim, but the § 1983 claims remain in their entirety. Furthermore, Plaintiff's state law claims asserted against the State Defendants are dismissed without prejudice pursuant to New York Correction Law § 24 for lack of subject-matter jurisdiction. As for the claims alleged against the Medical Defendants, the claim for ordinary negligence is dismissed without prejudice as duplicative of the medical malpractice claim, but the medical malpractice claim and request for punitive damages remain at this time.

The Clerk of the Court is respectfully directed to terminate the motions at ECF No. 58 & No. 68. The State and Medical Defendants are directed to file their respective answers, if any, to the Amended Complaint on or before October 16, 2017. The parties are directed to appear for an initial conference on October 20, 2017 at 11:30 a.m. Furthermore, given Plaintiff's recent correspondence (ECF No. 78), Plaintiff's counsel is directed to respond to Plaintiff's inquiry in writing by October 2, 2017, answering whether they continue to represent him in this action and to provide a copy of such correspondence to the Court.

**\*12** SO ORDERED.

### All Citations

Slip Copy, 2017 WL 4157372

Footnotes

1    The following facts are taken from the operative complaint, (Am. Compl., ECF No. 41), and are accepted as true for the purposes of considering a motion to dismiss. *See Harris v. Mills,* 572 F.3d 66, 72 (2d Cir. 2009).

2    Briefing of the motions was complete as of January 17, 2017. (*See* State Defs. Mem. in Supp. Mot. ("State Mem."), ECF No. 59; Decl. Jeffery Hale in Supp. Mot. ("Hale Decl."), ECF No. 60; Pl. Mem. in Opp'n State Mot. ("Pl. Opp'n State"), ECF No. 62; State Mem. in Reply to Pl. Opp'n ("State Reply"), ECF No. 61; Medical Defs. Mem. in Supp. Mot. ("Med. Mem."), ECF Nos. 71-72; Aff. Adam T. Mandell, Esq. in Supp. Mot. ("Mandell Aff."), ECF No. 69; Aff. Vickey Masta in Supp. Mot. ("Masta Aff."), ECF No. 70; Pl. Mem. in Opp'n Med. Mot. ("Pl. Opp'n Med."), ECF No. 77; Med. Defs. Mem. in Reply to Pl. Opp'n ("Med. Reply"), ECF No. 75.)

3    "The Court's supplemental jurisdiction, 28 U.S.C. § 1367(a), is available for [such related] common law claims." *Case v. Anderson,* No. 16 Civ. 983 (NSR), 2017 WL 3701863, at *7 n.7 (S.D.N.Y. Aug. 25, 2017).

4    Considering the plain language of the PLRA, district courts in this circuit have "concluded that '[t]he ADA falls within the rubric of any other federal law.' " *Manon v. Albany Cty.,* No. 11 Civ. 1190, 2012 WL 6202987, at *3 (S.D.N.Y. Oct. 9, 2012) (quoting *Carrasquillo v. City of New York,* 324 F. Supp. 2d 428, 442 (S.D.N.Y. 2004)) (internal quotation marks omitted). Therefore, "under the PLRA, ADA and Rehabilitation Act claims must be exhausted administratively prior to raising them in federal court." *Carlson v. Parry,* No. 06 Civ. 6621, 2012 WL 1067866, at *12 (S.D.N.Y. Mar. 29, 2012).

5    *See, e.g., Robinson v. Clark,* No. 15 Civ. 8434, 2017 WL 775813, at *5 (S.D.N.Y. Feb. 27, 2017) (acknowledging documents that point to the fact that defendant did not exhaust); *Artis v. Velardo,* No. 14 Civ. 833, 2016 WL 154122, at *3 n.1 (S.D.N.Y. Jan. 12, 2016) (taking judicial notice of the records submitted by defendants to prove plaintiff had not exhausted); *Zappulla v. Fischer,* No. 11 Civ. 6733, 2013 WL 1387033, at *1 (S.D.N.Y. Apr. 5, 2013) (taking judicial notice of documents that contradicted the plaintiff's assertion that he had exhausted).

6    The Court acknowledges that in Plaintiff's original, *pro se,* complaint, he stated that he had exhausted his administrative remedies. Nonetheless, once he obtained counsel he amended the complaint, which now does not mention exhaustion. *See Lucente v. Int'l Bus. Machines Corp.,* 310 F.3d 243, 260 (2d Cir. 2002) ("an amended complaint ordinarily renders the original complaint of no legal effect"). The Court assumes the amended complaint falls within the guidelines of Rule 11, and therefore awaits resolution of this issue after discovery.

    Defendants may request that discovery commence with issues such as the identity of the Doe Defendants and exhaustion, and they may request to move for summary judgment on that discrete latter issue, should such a motion be non-frivolous, once completing that portion of the discovery process.

7    The sovereign immunity analysis is different for claims brought under the Rehabilitation Act, which derives its power from the Spending Clause rather than the Fourteenth Amendment. *See Garcia v. S.U.N.Y. Health Scis. Ctr. of Brooklyn,* 280 F.3d 98, 113 (2d Cir. 2001). Post-*Garrett,* "New York's continued acceptance of federal funds on behalf of [DOCCS] constitutes a waiver of sovereign immunity as to all ... Rehabilitation Act claims." *Degrafinreid v. Ricks,* 417 F. Supp. 2d 403, 414 (S.D.N.Y. 2006).

8    Disability discrimination under the ADA and the RA are evaluated using the same standards. *See Camarillo v. Carrols Corp.,* 518 F.3d 153, 158 (2d Cir. 2008).

9    The Court notes that Plaintiff's attorney did not oppose the application of sovereign immunity to the ADA and RA claims. (*See generally* Pls. Opp'n State.)

10    Plaintiff asserted in his Amended Complaint that Sidorowicz was a DOCCS employee at that time, (AC ¶ 3), and State Defendants admit as much. (State Mem. at 5.)

11    This includes the Sullivan Medical Does and Sullivan CO Does.

12    When considering a Rule 12(b)(1) motion, the Court may refer "evidence outside of the pleadings" in order to resolve the issue of subject-matter jurisdiction. *Pyskaty v. Wide World of Cars, LLC,* 856 F.3d 216, 223 (2d Cir. 2017) (internal citation and quotation marks omitted).

13    This statute requires the State to indemnify its employees for judgments against them arising out of their negligence while acting in the course of employment. *See* N.Y. Pub. Off. Law § 17.

---

**End of Document**                                  © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 5437617
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

David DOUGLAS, Sr., Plaintiff,
v.
PERRARA, Corr. Officer, Great Meadow
C.F.; Lawrence, Corr. Officer, Great
Meadow C.F.; Whittier, Corr. Officer, Great
Meadow C.F.; Mulligan, Corr. Officer,
Great Meadow C.F.; Deluca, Corr. Sergeant,
Great Meadow C.F.; and Russel, Deputy
Superintendent, Great Meadow C.F, Defendants.

No. 9:11–CV–1353 (GTS/RFT).
|
Sept. 27, 2013.

**Attorneys and Law Firms**

David Douglas, Sr., Liverpool, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General for
the State of New York, Colleen D. Galligan, Esq.,
Assistant Attorney General, of Counsel, Albany, NY, for
Defendants.

## DECISION and ORDER

GLENN T. SUDDABY, District Judge.

**\*1** Currently before the Court, in this *pro se* civil rights
action filed by David Douglas, Sr., ("Plaintiff") against
the six above-captioned New York State correctional
employees, are the following: (1) Defendants' motion
for partial summary judgment (requesting the dismissal
of Plaintiff's claims against Defendant Russell, and
his claims against the remaining Defendants in their
official capacities); and (2) United States Magistrate
Judge Randolph F. Treece's Report–Recommendation
recommending that Defendants' motion be granted.
(Dkt.Nos.70, 80.) Neither party filed an objection to
the Report–Recommendation, and the deadline by which
to do so has expired. (*See generally* Docket Sheet.)
After carefully reviewing the relevant filings in this
action, the Court can find no clear error in the Report–
Recommendation: Magistrate Judge Treece employed

the proper standards, accurately recited the facts, and
reasonably applied the law to those facts. As a result, the
Court accepts and adopts the Report–Recommendation
for the reasons stated therein. (Dkt. No. 80.)

**ACCORDINGLY,** it is

**ORDERED** that Magistrate Judge Treece's Report–
Recommendation (Dkt. No. 80) is ***ACCEPTED*** and
***ADOPTED*** in its entirety; and it is further

**ORDERED** that Defendants' motion for partial summary
judgment (Dkt. No. 70) is ***GRANTED;*** and it is further

**ORDERED** that the following claims are ***DISMISSED***
from this action: (a) all claims asserted against Defendant
Russell, and (b) all claims asserted against Defendants
in their official capacities only. The Clerk is directed to
terminate Defendant Russell from this action; and it is
further

**ORDERED** that the following claims ***REMAIN
PENDING*** in this action: (a) Plaintiff's claim that
Defendants Whittier, Mulligan, Perrara and/or Lawrence
subjected him to inadequate prison conditions by
depriving him of his meals for approximately five consecutive
days in December 2009, in violation of the Eighth
Amendment; (b) Plaintiff's claim that Defendants
Whittier, Mulligan, Perrara and Lawrence used excessive
force against him, and that Defendant Deluca failed
to protect him from the use of that excessive force, in
violation of the Eighth Amendment and New York State
common law; and (c) Plaintiff's claim that Defendant
Deluca was deliberately indifferent to Plaintiff's serious
medical needs (following the assaults) in violation of the
Eighth Amendment; and it is further

**ORDERED** that Pro Bono Counsel be appointed for the
Plaintiff for purposes of trial only; any appeal shall remain
the responsibility of the plaintiff alone unless a motion for
appointment of counsel for an appeal is granted; and it is
further

**ORDERED** that upon assignment of Pro Bono Counsel,
a final pretrial conference with counsel will be scheduled
in this action before the undersigned, at which time the
Court will schedule a jury trial for Plaintiff's remaining
claims as set forth above against Defendants Whittier,
Mulligan, Perrara, Lawrence and DeLuca. Counsel are

directed to appear at the final pretrial conference with settlement authority from the parties.

### *REPORT–RECOMMENDATION and ORDER*

RANDOLPH F. TREECE, United States Magistrate Judge.

**\*2** *Pro se* Plaintiff David Douglas brought a civil rights Complaint, pursuant to 42 U.S.C. § 1983, asserting that Defendants violated his constitutional rights while he was in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS") and housed in the Great Meadow Correctional Facility. Specifically, Plaintiff alleges that in early December 2009, he wrote a letter to Defendant Eileen Russell[1] complaining that he had been denied meals for several days. *See* Dkt. No. 1, Compl. at ¶¶ 8, 64, & 66. Plaintiff further alleges that the remaining Defendants violated his constitutional rights when they used excessive force against him on several occasions and denied him medical care in order to treat the injuries he sustained therewith. *See generally id.* And, according to Plaintiff, Defendant Russell's failure to take disciplinary action against these individuals and curtail their "known pattern of physical abuse of inmates" renders her liable for violating his constitutional rights. *Id.* at ¶ 66.

Presently pending is Defendants' Motion for Partial Summary Judgment whereby they seek dismissal of Defendant Russell from this action as well as dismissal of all claims against the remaining Defendants in their official capacities. Dkt. No. 70. A response to that Motion was due on February 22, 2013. To date, the Court has not received a response from Plaintiff.

### I. DISCUSSION

#### A. Standard of Review

Pursuant to FED. R. CIV. P. 56(a), summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with

[ ] affidavits, if any," that there is no genuine issue of material fact. *F.D.I. C. v. Giammettei*, 34 F.3d 51, 54 (2d Cir.1994) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "When a party has moved for summary judgment on the basis of asserted facts supported by required by [Federal Rule of Civil Procedure 56(e) ] and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be deemed admitted unless properly controverted by the nonmoving party." *Glazer v. Formica Corp.*, 964 F.2d 149, 154 (2d Cir.1992).

To defeat a motion for summary judgment, the non-movant must set out specific facts showing that there is a genuine issue for trial, and cannot rest merely on allegations or denials of the facts submitted by the movant. FED. R. CIV. P. 56(c); *see also Scott v. Coughlin*, 344 F.3d 282, 287 (2d Cir.2003) ( "Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525–26 (2d Cir.1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard ... they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin*, 344 F.3d at 289 (citing *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir.1983) and *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir.1995)).

**\*3** When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 164 F.3d 736, 742 (2d Cir.1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir.1994). Furthermore, where a party is proceeding *pro se,* the court must "read [his or her] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir.1994), *accord, Soto v. Walker*, 44 F.3d 169, 173

(2d Cir.1995). Nonetheless, mere conclusory allegations, unsupported by the record, are insufficient to defeat a motion for summary judgment. *See Carey v. Crescenzi, 923 F.2d 18, 21 (2d Cir.1991).* Summary judgment is appropriate "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).*

Pursuant to the Local Rules of Practice for the Northern District of New York, "[w]here a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers ... shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause is shown." N.D.N.Y.L.R. 7.1(b)(3). "The fact that there has been no response to a summary judgment motion does not, of course, mean that the motion is to be granted automatically." *Champion v. Artuz, 76 F.3d 483, 486 (2d Cir.1996).* Even in the absence of a response, Defendants are entitled to summary judgment only if the material facts demonstrate their entitlement to judgment as a matter of law. *Id.; FED. R. CIV. P. 56(c).* Because Plaintiff has failed to raise any question of material fact, the Court will accept the facts as set forth in Defendants' Statement Pursuant to Rule 7.1(a)(3) (Dkt. No. 70–2), supplemented by Plaintiffs' verified Complaint (Dkt. No. 1), as true. *See Lopez v. Reynolds, 998 F.Supp. 252, 256 (W.D.N.Y.1997).*

**B. Personal Involvement**

As noted above, Plaintiff brings this civil rights action for alleged violations of his constitutional rights during his incarceration in December 2009 at Great Meadow Correctional Facility. Plaintiff claims that in early December 2009, he was subjected to threats and harassment by other inmates and correctional officers. Compl. at ¶ 1. Plaintiff alleges that beginning on December 11, 2009, he was denied several meals for several consecutive days by unnamed individuals, prompting him to file grievances and write two letters to Defendant Russell. *Id.* at ¶¶ 2–8. [2] Thereafter, on December 16, 2009, Plaintiff's meals were delivered to him and, on the following date, he was moved to protective custody. *Id.* at ¶¶ 9–10. The remainder of Plaintiff's Complaint describes a series of events wherein the remaining Defendants are accused of using excessive physical force against him and denying him medical attention.

**\*4** With regard to the pending, unopposed Motion, the Court notes that there is a paucity of factual allegations contained in the Complaint concerning Defendant Russell. In fact, the only factual allegation that this Court can point to is that Plaintiff wrote two letters to Defendant Russell complaining about being denied meals. Defendant Russell is not named nor referenced throughout the remainder of the Complaint. Nevertheless, in the section of the Complaint where Plaintiff lists his causes of action, he seemingly seeks to hold Defendant Russell liable for her alleged failure to intervene and take disciplinary action against the Defendants in order to curb their known pattern of physical abuse against inmates. *Id.* at ¶¶ 64 & 66.

According to Defendants' uncontroverted submissions, Defendant Eileen Russell is employed by DOCCS and worked at Great Meadow in 2006 as the Assistant Deputy Superintendent for Special Housing assigned to the Behavioral Health Unit. Dkt. No. 70–3, Eileen Russell Decl., dated Feb. 4, 2013, at ¶¶ 1, 3, & 4. During her tenure in that position, Plaintiff neither worked nor was housed as a patient in the Behavioral Health Unit. Russell Decl. at ¶ 11. Russell did not have any responsibilities related to delivery of meals to inmates nor does she have any recollection of speaking with Plaintiff or seeing any correspondence from him. *Id.* at ¶ 13. Furthermore, at no time was she made aware of any assault against Plaintiff by any DOCCS employee. *Id.* at ¶ 15.

The Second Circuit has held that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith, 21 F.3d 496, 501 (2d Cir.1994)* (citations omitted). Moreover, "the doctrine of *respondeat superior* cannot be applied to section 1983 actions to satisfy the prerequisite of personal involvement." *Kinch v. Artuz, 1997 WL 576038, at \*2 (S.D.N.Y. Sept. 15, 1997)* (citing *Colon v. Coughlin, 58 F.3d 865, 874 (2d Cir.1995)* & *Wright v. Smith, 21 F.3d at 501)* (further citations omitted)). Thus, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the constitution." *Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009).*

It appears that Plaintiff seeks to hold Defendant Russell liable due to her employment as a supervisor at Great Meadow. The Second Circuit has stated that a supervisory defendant may have been personally involved in a constitutional deprivation within the meaning of § 1983 if she: (1) directly participated in the alleged infraction; (2) after learning of the violation, failed to remedy the wrong; (3) created a policy or custom under which unconstitutional practices occurred or allowed such policy or custom to continue; (4) was grossly negligent in managing subordinates who caused the unlawful condition or event; or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring. [3] *Colon v. Coughlin,* 58 F.3d at 873 (citations omitted); *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986) (citations omitted).

**\*5** Here, the evidence shows that Defendant Russell did not directly participate in any constitutional wrongdoing, she was not aware that Plaintiff had been experiencing any problems with other inmates and staff, in her assignment to the Behavioral Health Unit she did not come into contact with the Plaintiff, and, she was not responsible for creating policies or customs nor for rectifying any of the alleged constitutional infirmities Plaintiff is alleged to have been subjected to. Because Plaintiff failed to respond to Defendants' Motion, he has not created any material issue of fact regarding Russell's non-involvement in any constitutional wrongdoing. Thus, based upon the record before the Court, we find that Defendant Russell was not personally involved in any wrongdoing and should be **dismissed** from this action. *See Wright v. Smith,* 21 F.3d at 501 (defendant may not be held liable simply because he holds a high position of authority).

### C. Eleventh Amendment

By their Motion, Defendants seek dismissal of claims brought against them in their official capacities. Dkt. No. 70. In making this request, the Defendants note that during the pendency of this action, Plaintiff was released from DOCCS's custody, thereby rendering moot any request he has made for injunctive relief. Dkt. No. 70–4, Defs.' Mem. of Law, at pp. 7–8. After reviewing the Complaint, the Court notes that Plaintiff primarily seeks monetary compensation for both compensatory and punitive damages. *See* Compl. at Relief Requested. In addition, he seeks a declaratory judgment that his rights have been violated, but does not seek other injunctive relief. *Id.*

The Eleventh Amendment states, "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. amend. XI. Although by its terms, the amendment bars suit by citizens of one state against another state, the Supreme Court has held that such amendment similarly bars suits against a state by its own citizens. *Hans v. Louisiana,* 134 U.S. 1 (1890). "The Eleventh Amendment thus 'affirm[s] that the fundamental principle of sovereign immunity limits the grant of judicial authority in Art. III.' " *Richardson v. New York State Dep't of Corr. Servs.,* 180 F.3d 426, 447–48 (2d Cir.1999) (citing *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 98 (1984)). Thus, sovereign immunity provided for in the Eleventh Amendment prohibits suits against the state, including a state agency in federal court. *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. at 98–101; *Severino v. Negron,* 996 F.2d 1439, 1441 (2d Cir.1993); *Daisernia v. State of New York,* 582 F.Supp. 792, 796 (N.D.N.Y.1984). To the extent a state official is sued for damages in his or her official capacity, "such a suit is deemed to be a suit against the state, and the official is entitled to invoke the eleventh amendment immunity belonging to the state." *Rourke v. New York State Dep't. of Corr. Servs.,* 915 F.Supp. 525, 539 (N.D.N.Y.1995) (citing *Berman Enters., Inc. v. Jorling,* 3 F.3d 602, 606 (2d Cir.), *cert. denied,* 510 U.S. 1073 (1994); *Ying Jing Gan v. City of New York,* 996 F.2d 522, 529 (2d Cir.1993)); *see also Mathie v. Fries,* 121 F.3d 808, 818 (2d Cir.1997) ("A claim against a government officer in his official capacity is, and should be treated as, a claim against the entity that employs the officer ....").

**\*6** However, whether state officials sued in their official capacities are entitled to Eleventh Amendment immunity depends also upon the relief sought in the complaint. The Second Circuit has held that in accordance with *Ex parte Young,* 209 U.S. 123 (1908), "acts of state officials that violate federal constitutional rights are deemed not to be acts of the state and may be subject of injunctive or declaratory relief in federal court." *Berman Enters., Inc. v. Jorling,* 3 F.3d at 606 (citations omitted); *see also Rourke v. New York State Dep't of Corr. Servs.,* 915 F.Supp. at 540. While much of the relief sought herein is compensatory

and punitive monetary relief, to the extent Plaintiff seeks some form of declaratory relief, such claims against the Defendants in their official capacities could go forward insofar as the Plaintiff seeks prospective relief. However, in light of his release from DOCCS's custody, the Court finds that any request for prospective injunctive relief is moot and the claims against the remaining Defendants in their official capacities should be **dismissed**. *Khalil v. Laird,* 353 F. App'x 620 (2d Cir.2009) (citing *Muhammad v. City of New York Dep't of Corr.,* 126 F.3d 119, 123 (2d Cir.1997)).

## II. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED,** that Defendants' Motion for Partial Summary Judgment (Dkt. No. 70) be **GRANTED** and all claims against Defendant Russell be **DISMISSED** and claims against the remaining Defendants in their official capacities be **DISMISSED;** and it is further

**RECOMMENDED,** that if the above recommendations are accepted, this case be set down for a final pre-trial conference with the parties to assess whether this matter is trial ready; and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report–Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW. Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs .,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72 & 6(a).

## All Citations

Not Reported in F.Supp.2d, 2013 WL 5437617

---

### Footnotes

1   Although Plaintiff spells this Defendant's name as "Russel," it is clear from Defendants' submissions that the correct spelling of this individual's name is "Russell" and the Court will refer to her accordingly. Compl. at ¶ 8; Dkt. Nos. 10 & 70–3.

2   Plaintiff alleges that in addition to filing several grievances he submitted sick call requests and sent letters to the Inspector General, all explaining how his Eighth Amendment rights were being violated. Compl. at ¶¶ 5–8.

3   The Second Circuit has yet to address the impact of *Ashcroft v. Iqbal,* 556 U.S. 662 (2009), upon the categories of supervisory liability under *Colon v. Coughlin,* 58 F.3d 865 (2d Cir.1995). *See Grullon v. City of NewHaven,* 720 F.3d 133 (2d Cir.2013) (noting that the Court's decision in *Iqbal* "may have heightened the requirements for showing a supervisor's personal involvement," but declining to resolve the issue). Lower courts have struggled with this issue, specifically whether *Iqbal* effectively calls into question certain prongs of the *Colon* five-part test for supervisory liability. *See, e.g., Sash v. United States,* 674 F.Supp.2d 531, 543 (S.D.N.Y.2009). While some courts have taken the position that only the first and third of the five *Colon* categories remain viable and can support a finding of supervisory liability, *see, e.g., Bellamy v. Mount Vernon Hosp.,* 2009 WL1835939, at *6 (S.D.N.Y. June 26, 2009), *aff'd,* 387 F. App'x 55 (2d Cir.2010), others disagree and conclude that whether any of the five categories apply in any particular cases depends upon the particular violations alleged and the supervisor's participatory role, *see, e.g., D'Olimpio v. Crisafi,* 718 F.Supp.2d 340, 347 (S.D.N.Y.2010). Nevertheless, this Court, until instructed to the contrary, continues to apply the entirety of the five-factor *Colon* test.

---

**End of Document**                                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

Eleby v. Smith, Not Reported in Fed. Supp. (2017)

2017 WL 986123

2017 WL 986123
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Terrell K. ELEBY, Plaintiff,

v.

G. SMITH and N. Vevone, Defendants.

Civil Action No. 9:15-CV-0281 (TJM/DEP)
|
Signed January 9, 2016
|
Filed 01/09/2017

**Attorneys and Law Firms**

TERRELL K. ELEBY, 86-A-0908, Sing Sing
Correctional Facility, 354 Hunter Street, Ossining, NY
10562, Pro Se.

FOR DEFENDANTS: ERIC T. SCHNEIDERMAN,
New York State Attorney General, OF COUNSEL:
CHRISTOPHER J. HUMMEL, ESQ., Assistant
Attorney General, The Capitol, Albany, NY 12224.

### REPORT AND RECOMMENDATION

DAVID E. PEEBLES, CHIEF U.S. MAGISTRATE
JUDGE

**\*1** This is a civil rights action brought by *pro se*
plaintiff Terrell Eleby against three individuals employed
by the New York State Department of Corrections and
Community Supervision ("DOCCS"), one of whom has
since been dismissed from the action, pursuant to 42
U.S.C. § 1983. In his complaint, plaintiff alleges that two
of the defendants assaulted him in violation of his Eighth
Amendment rights, and the third defendant violated his
Fourteenth Amendment rights by issuing an allegedly
false misbehavior report against him and confining him in
the special housing unit ("SHU") at the prison facility in
which he was housed.

Currently pending before the court is a motion brought
by the remaining two defendants seeking the entry of
summary judgment in their favor based upon plaintiff's
alleged failure to exhaust available administrative

remedies before filing suit. For the reasons set forth below,
I recommend that the defendants' motion be granted.

### I. BACKGROUND [1]

Plaintiff is a prison inmate currently held in the custody
of the DOCCS. *See, e.g.,* Dkt. No. 29-2 at 13. Although
plaintiff is now confined elsewhere, at the times relevant
to this action he was housed in the Auburn Correctional
Facility ("Auburn") located in Auburn, New York. *Id.* at
18.

In his complaint, plaintiff alleges that on January 14, 2015,
he was waiting in one of Auburn's hospital dormitory
rooms to be escorted to an outside facility for a medical
examination. Dkt. No. 1 at 4; Dkt. No. 29-2 at 54. At
approximately 10:00AM, defendants Smith and Vevone,
both of whom are corrections officers, arrived at plaintiff's
room to escort him on the medical trip. Dkt. No. 1 at
4. While plaintiff was attempting to remove his clothes
for a mandatory strip search, defendant Smith "violently
and physically attacked [him]." *Id.*; *see also* Dkt. No. 29-2
at 58. According to plaintiff, both defendants Smith and
Vevone "jumped on [his] back," and defendant Smith
punched him repeatedly in the eye, head, neck, back, and
ribs. Dkt. No. 29-2 at 58, 62-63. After approximately five
minutes Sergeant Cudla, who is not a named defendant
in the action, arrived at plaintiff's dorm, physically
intervened, and ordered defendants Smith and Vevone to
cease the assault and leave the room. Dkt. No. 1 at 4-5;
Dkt. No. 29-2 at 58-59, 64. As a result of the alleged
assault, plaintiff suffered various injuries, including a
bloody and swollen eye, swelling and redness to his neck,
and sore ribs. Dkt. No. 1 at 5; Dkt. No. 29-2 at 62-63, 67.

Following the use-of-force incident, defendants Smith and
Vevone issued plaintiff a misbehavior report accusing
him of violating six prison rules. Dkt. No. 22 at 9; Dkt.
No. 29-2 at 72. Following a superintendent's hearing to
address the charges, plaintiff was found guilty on four
of the six counts. Dkt. No. 22 at 13; Dkt. No. 29-2 at
72. As a result of that finding, plaintiff was sentenced
to serve thirty days of disciplinary SHU confinement,
with a corresponding loss of commissary, package, and
telephone privileges. Dkt. No. 22 at 13; Dkt. No. 29-2 at
73-72.

### II. PROCEDURAL HISTORY

**\*2** Plaintiff commenced this action on or about March 12, 2015, with the filing of a complaint and accompanied by an application to proceed *in forma pauperis* ("IFP"). Dkt. Nos. 1, 2. On May 12, 2015, Senior District Judge Thomas J. McAvoy issued a decision and order granting plaintiff's IFP application and accepting his complaint for filing, with the exception of one cause of action. [2] Dkt. No. 11. In his third cause of action, plaintiff asserted a Fourteenth Amendment claim against defendant Lieutenant Quinn based on the allegation that defendant Quinn "conspire[d] and aided ... in writing a false [misbehavior] report after ascertaining the facts [sic] that [defendants Smith and Vevone] were in the wrong." Dkt. No. 1 at 6. Judge McAvoy dismissed that cause of action for failure to state a cognizable claim pursuant to 28 U.S.C. §§ 1915(e), 1915A. Dkt. No. 11 at 9-12.

Following the close of discovery, defendants Smith and Vevone filed the currently pending motion for summary judgment seeking dismissal of plaintiff's complaint, arguing that plaintiff failed to fully exhaust available administrative remedies before filing this action. Dkt. No. 29-5. Plaintiff has filed a response in opposition to defendants' motion, which is now fully briefed, and has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See* Fed. R. Civ. P. 72(b).

## III. DISCUSSION

### A. Legal Standard Governing Summary Judgment

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004). A fact is "material" for purposes of this inquiry if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of N.Y.*, 426 F.3d 549, 553 (2d Cir. 2005). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson*, 477 U.S. at 250 n.4; *Sec. Ins. Co.*, 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the non-moving party. *Anderson*, 477 U.S. at 255; *Jeffreys*, 426 F.3d at 553; *Wright v. Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998). The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Employers' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d Cir. 2002); *see also Anderson*, 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

### B. Plaintiff's Exhaustion of Administrative Remedies

**\*3** In their motion, defendants contend that plaintiff's complaint is subject to dismissal because plaintiff has failed to exhaust available administrative remedies as required under the Prison Litigation Reform Act of 1996 ("PLRA"), Pub. L. No. 104-134, 110 Stat. 1321 (1996), prior to commencing this action. *See generally* Dkt. No. 29-5 at 2.

### 1. Legal Principles Governing Exhaustion Under the PLRA

The PLRA, which imposes several restrictions on the ability of prisoners to maintain federal civil rights actions, expressly provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see also Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016). Section 1997e(a)'s exhaustion provision is "mandatory" and applies to all inmate lawsuits regarding the conditions of their confinement. *Ross*, 136

Eleby v. Smith, Not Reported in Fed. Supp. (2017)

2017 WL 986123

S. Ct. at 1856; *Woodford v. Ngo*, 548 U.S. 81, 84 (2006); *Porter v. Nussle*, 534 U.S. 516, 524, 532 (2002); *Williams v. Corr. Officer Priatno*, 829 F.3d 118, 122 (2d Cir. 2016). In the event a defendant establishes that the inmate-plaintiff failed fully comply with the administrative process prior to commencing an action in federal court, the plaintiff's complaint is subject to dismissal. *See Woodford*, 548 U.S. at 93 ("[W]e are persuaded that the PLRA exhaustion requirement requires proper exhaustion."); *Wilson v. McKenna*, —— Fed.Appx. ——, No. 15-3496, 2016 WL 5791558, at *1 (2d Cir. Oct. 4, 2016). "Proper exhaustion" requires a plaintiff to procedurally exhaust his claims by "compl[ying] with the system's critical procedural rules." [3] *Woodford*, 548 U.S. at 95; *accord, Macias v. Zenk*, 495 F.3d 37, 43 (2d Cir. 2007).

New York affords state prison inmates the opportunity to seek redress of complaints regarding prison conditions through a grievance procedure that is designated as the Inmate Grievance Program ("IGP"). *Williams*, 829 F.3d at 119. The IGP is comprised of three steps that inmates must satisfy when they have a grievance regarding prison conditions. 7 N.Y.C.R.R. §§ 701.1, 701.5; *Williams*, 829 F.3d at 119. The IGP requires that an inmate first file a grievance with "the clerk" within twenty-one days of the alleged occurrence giving rise to his complaint. 7 N.Y.C.R.R. § 701.5(a)(1). "The complaint may only be filed at the facility where the inmate is housed even if it pertains to another facility." *Id.* Representatives of the inmate grievance resolution committee ("IGRC") [4] have up to sixteen days after the grievance is filed to informally resolve the issue. *Id.* at § 701.5(b)(1). If there is no such informal resolution, then the full IGRC conducts a hearing within sixteen days after receipt of the grievance. *Id.* at § 701.5(b)(2).

A grievant may then appeal the IGRC's decision to the facility's superintendent within seven days after receipt of the IGRC's written decision. 7 N.Y.C.R.R. § 701.5(c). The superintendent must issue a written decision within a certain number of days after receipt of the grievant's appeal. [5] *Id.* at § 701.5(c)(3)(i), (ii).

**\*4** The third and final step of the IGP involves an appeal to the DOCCS Central Office Review Committee ("CORC"), which must be taken within seven days after an inmate receives the superintendent's written decision. 7 N.Y.C.R.R. § 701.5(d)(1)(i). The CORC is required to

render a written decision within thirty days of receipt of an appeal. *Id.* at § 701.5(d)(2)(i).

It is worth noting that, as in this case, where an inmate complains of harassment or other misconduct by corrections officers or prison employees, the IGP provides for an expedited review process. 7 N.Y.C.R.R. § 701.8. In particular, the IGP requires inmates "who wish[ ] to file a grievance complaint that alleges employee harassment [to] follow the procedures set forth in [7 N.Y.C.R.R §] 701.5(a)[.]" *Id.* at § 701.8(a). As was noted above, section 701.5(a)(1) provides that, *inter alia*, the inmate shall submit his grievance to the clerk within twenty-one days of the incident of which he complains. *Id.* at § 701.5(a)(1). On the same day the clerk receives a grievance complaining of employee harassment, he must forward it "to the superintendent by the close of business." *Id.* at § 701.8(b).

As can be seen, at each step of the IGP process, a decision must be rendered within a specified time period. 7 N.Y.C.R.R. § 701.5. Where the IGRC and/ or superintendent do not timely respond, an inmate must appeal "to the next step." *Id.* at § 701.6(g)(2); *Smith v. Kelly*, 985 F. Supp. 2d 275, 281 (N.D.N.Y. 2013) (Suddaby, J.) ("[A]ny failure by the IGRC or the superintendent to timely respond to a grievance ... can—and must—be appealed to the next level ... to complete the grievance process."). Generally, if a plaintiff fails to follow each of the required three steps of the above-described IGP prior to commencing litigation, he has failed to exhaust his administrative remedies as required under the PLRA. *See Ruggerio v. Cnty. of Orange*, 467 F.3d 170, 176 (2d Cir. 2006) ("[T]he PLRA requires proper exhaustion, which means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits).") (quotation marks omitted)).

While the PLRA mandates exhaustion of available administrative remedies, it also "contains its own, textual exception to mandatory exhaustion." *Ross*, 136 S. Ct. at 1858. More specifically, section 1997e(a) provides that only those administrative remedies that "are available" must first be exhausted. 42 U.S.C. § 1997e(a); *see also Ross*, 136 S. Ct. at 1858 ("[T]he exhaustion requirement hinges on the availability of administrative remedies." (quotation marks omitted)). In the PLRA context, the Supreme Court has determined that "availability" means that "an inmate is required to

Case 9:17-cv-00245-MAD-TWD   Document 36   Filed 11/21/18   Page 52 of 69

Eleby v. Smith, Not Reported in Fed. Supp. (2017)

2017 WL 986123

exhaust those, but only those, grievance procedures that are capable of use to obtain some relief for the action complained of." *Ross*, 136 S. Ct. at 1859 (quotation marks omitted).

In *Ross*, the Supreme Court identified three circumstances in which a court could find that internal administrative remedies are not available to prisoners under the PLRA. [6] *Ross*, 136 S. Ct. at 1859-60. Under the first, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* at 1859. In addition, "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." *Id.* The Court explained that, "[i]n this situation, some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it." *Id.* The third scenario in which administrative remedies are deemed unavailable to prisoners is when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1860.

## 2. Analysis

**\*5** The record now before the court firmly establishes that plaintiff did not exhaust the available administrative remedies in accordance with the PLRA before commencing this action. According to plaintiff, following the alleged assault, he submitted a (1) grievance, [7] (2) letter to the superintendent at Auburn, (3) memorandum to the IGP supervisor at Auburn, and (4) letter to the New York State Inspector General ("IG") complaining of the alleged assault by defendants Smith and Vevone. [8] Dkt. No. 29-2 at 25-26, 39-40, 46-47, 50, 94-99, 104. Plaintiff did not receive any written response to any of his correspondence. Dkt. No. 29-2 at 40-42, 48-49, 51-53. He claims, however, that an officer stationed at Auburn, Sergeant Cudla, conducted an in-person interview of him on January 22, 2015, in connection with the grievance allegedly filed, and the IG's office conducted an investigation that included an interview of plaintiff in or about April 2015. *Id.* at 40-42, 48-49, 51-53. He also contends that he spoke directly to Deputy Robisson, the Deputy of Superintendent for Security at Auburn, regarding the assault. *Id.* at 31-32, 47-48, 100.

Notwithstanding the fact that he did not receive a written response to any of his correspondence regarding the alleged assault, plaintiff admittedly neglected to appeal the lack of a response to the next level of the IGP. *Id.* at 48-51. Because the IGP has been interpreted by courts in this circuit as requiring inmates to appeal to the next level when they do not receive a timely response to their grievance, plaintiff should have appealed to the superintendent and/or the CORC when he failed to receive a written response to the grievance he allegedly filed. *See* 7 N.Y.C.R.R. § 701.6(g)(2) ("[M]atters not decided within the time limits may be appealed to the next step."); *Dabney v. Pegano*, 604 Fed.Appx. 1, 4-5 (2d Cir. 2015) (citing section 701.6(g) and concluding that, based on that provision, the plaintiff had "an unimpeded path to the CORC, notwithstanding his claims that the Great Meadow grievance clerk failed to process his complaint and that the Clinton superintendent ignored his appeal"); *Hyliger v. Gebler*, 624 Fed.Appx. 780, 782 (2d Cir. 2015) ("Under the regulations ..., if at any step of the grievance process[ ] an inmate did not receive a response within the specified timeframe, he was nonetheless permitted to appeal to the next step. Thus, when [the plaintiff] did not receive a written response from the IGRC, appeal to the superintendent was still an available administrative remedy." (quotation marks, alteration, citation, and footnote omitted)). The record in this case shows, without contradiction, that while plaintiff appealed other grievance denials to the CORC, he did not do so in connection with defendants' alleged assault. Dkt. No. 29-3 at 4. This default constitutes a failure to exhaust available administrative remedies for purposes of the PLRA.

Liberally construing plaintiff's response to defendants' pending motion, he contends that he fully exhausted administrative remedies before commencing this action because his grievance involved allegations of employee harassment, and, consequently, by sending his letter directly to the superintendent he satisfied the requirements of the IGP. Dkt. No. 31 at 5. The IGP, however, clearly mandates that even those grievances complaining of employee harassment must be filed with the IGP clerk, who then must forward the grievance to the superintendent on the day of receipt. 7 N.Y.C.R.R. § 701.8(a). Writing and sending a letter directly to a superintendent does not satisfy the IGP. *See Dabney*, 604 Fed.Appx. at 3 ("The IGP also has an expedited

Eleby v. Smith, Not Reported in Fed. Supp. (2017)

2017 WL 986123

Case 9:17-cv-00245-MAD-TWD   Document 36   Filed 11/21/18   Page 53 of 69

process for harassment grievances, which pertains to employee conduct meant to annoy, intimidate, or harm an inmate. These grievances go directly to a superintendent." (quotation marks, citations omitted)); *see also Lopez v. Bushey*, No. 11-CV-0418, 2014 WL 2807532, at *9 (N.D.N.Y. Apr. 7, 2014) (Dancks, M.J.) ("If the grievance involves a claim of misconduct by staff, harassment or discrimination, it receives a code of 49.... [T]he grievance is handled expeditiously by passing through the IGRC and going directly to the superintendent of the facility.").

**\*6** Plaintiff next argues that he appealed the disciplinary hearing determination related to the misbehavior report he was issued, following the alleged assault by defendants Smith and Vevone, on January 14, 2015. Dkt. No. 31 at 3. Appealing a disciplinary hearing determination, however, is no substitute for filing and pursuing to completion a grievance through the IGP. [9] *See, e.g., McCoy v. Goord*, 255 F. Supp. 2d 233, 256 (S.D.N.Y. 2003).

Plaintiff also "asserts ... that the defendants hinder[ed] [his] complaint from reaching the CORC and from being properly filed with the IGRC." Dkt. No. 31 at 5. While I am mindful of my obligation to draw all inferences in favor of the non-moving party on summary judgment, *Terry*, 336 F.3d at 137, this conclusory allegation is not supported by any record evidence. Indeed, plaintiff sets forth this contention in an unsworn memorandum of law, which is decidedly not evidence. *See Giannullo v. City of N.Y.*, 322 F.3d 139, 142 (2d Cir. 2003) ("In support of the assertion that the police had received complaints of drug activity in the area, the district court cited, not to admissible evidence, but to the defendants' memorandum of law, which is not evidence at all."). In any event, even assuming plaintiff's contention constitutes competent evidence, "a party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony." *Hayes v. N.Y.C. Dep't of Corrs.*, 84 F.3d 614, 619 (2d Cir. 1996). At his deposition in this matter, plaintiff unequivocally testified that he did not file an appeal of his grievance to the CORC. Dkt. No. 29-2 at 49-51. He now attempts to create a dispute of fact by arguing that defendants thwarted his appeal from reaching the CORC. Dkt. No. 31 at 5. This he cannot do. *Hayes*, 84 F.3d at 619.

Finally, to the extent plaintiff contends that his letter to the IG and any subsequent investigation constitutes exhaustion under the PLRA, plaintiff is incorrect. *See, e.g., Goodson v. Silver*, No. 09-CV-0494, 2012 WL 4449937, at *9 (N.D.N.Y. Sept. 25, 2012) (Suddaby, C.J.) ("[A]n IG's investigation of a matter and conclusion that it is unsubstantiated does not satisfy the exhaustion requirement[.]" (citing cases)).

In summary, because plaintiff admittedly failed to pursue a grievance filed under the IGP to completion by filing an appeal to the CORC, and because he has failed to set forth any evidence that the IGP was rendered unavailable to him, I recommend that defendants' motion be granted.

## IV. SUMMARY AND RECOMMENDATION

Plaintiff's remaining cause of action alleges that defendants Smith and Vevone applied excessive force against him on January 14, 2015. Although plaintiff alleges that he filed various written documents—including a grievance in accordance with the IGP—complaining of defendants' use of force, he admits that he did not pursue the matter through the IGP by seeking review of his grievance by the CORC, as required under the available grievance program. Accordingly, it is respectfully

**\*7** RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 29) be GRANTED and that plaintiff's complaint in this matter be DISMISSED.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. [10] FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993).

The clerk of the court is respectfully directed to serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

## All Citations

Not Reported in Fed. Supp., 2017 WL 986123

2017 WL 986123

## Footnotes

1    In light of the procedural posture of the case, the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in plaintiff's favor. *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

2    Plaintiff's first and second IFP applications were denied as incomplete. Dkt. Nos. 4, 7. Following those denials, plaintiff filed a third IFP motion, on or about April 2, 2015, which was then granted by Judge McAvoy. Dkt. Nos. 9, 11.

3    Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

4    The IGRC is comprised of "two voting inmates, two voting staff members, and a non-voting chairperson." 7 N.Y.C.R.R. § 701.4(a).

5    Depending on the type of matter complained of by the inmate, the superintendent has either seven or twenty days after receipt of an appeal to issue a decision. 7 N.Y.C.R.R. § 701.5(c)(3)(i), (ii).

6    According to the Second Circuit, "the three circumstances discussed in *Ross* do not appear to be exhaustive[.]" *Williams*, 829 F.3d at 123 n.2.

7    Aside from plaintiff's testimony at his deposition, there is no record evidence to support his allegation that he filed a grievance in accordance with the IGP. *See, e.g.,* Dkt. No. 29-3 at 4; Dkt. No. 29-4 at 2.

8    In or about 2014 the DOCCS Office of Special Investigations assumed the role previously played by the IG, including investigating complaints regarding prison conditions. *See* DOCCS Directive No. 0700, available at http://www.doccs.ny.gov/Directives/0700.pdf.

9    In any event, plaintiff's appeal of the disciplinary hearing determination does not complain of excessive force used by defendants Smith and Vevone. Dkt. No. 22 at 22-23. Instead, plaintiff argued on appeal that the hearing determination was based on insufficient evidence. *Id.* Accordingly, even assuming the appeal from the disciplinary hearing could act as a substitute for filing and pursuing a grievance through the IGP, plaintiff's appeal did not place prison officials on notice of his complaints of excessive force because he did not raise them in his appeal. *Id.*

10   If you are proceeding *pro se* and are served with this report and recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the report and recommendation was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. P. 6(a)(1)(C).

---

**End of Document**                                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Distinguished by McDonald v. Zerniak, N.D.N.Y., November 4, 2016

2014 WL 5475293
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Charles McALLISTER also known
as Charles McCallister, Plaintiff,
v.
Harold CALL, Vocational Supervisor,
Mohawk Correctional Facility, Defendant.

No. 9:10–CV–610 (FJS/CFH).
|
Signed Oct. 28, 2014.
|
Filed Oct. 29, 2014.

**Attorneys and Law Firms**

Charles McAllister, Westbury, NY, pro se.

Hon. Eric T. Schneiderman, Office of the New York State
Attorney General, The Capitol, Keith J. Starlin, AAG, of
Counsel, Albany, NY, for Defendant.

## ORDER

SCULLIN, Senior District Judge.

**\*1** Currently before the Court are Magistrate Judge
Hummel's October 9, 2014 Report–Recommendation and
Order, *see* Dkt. No. 81, and Plaintiffs objections thereto,
*see* Dkt. No. 83.

Plaintiff, a former inmate who was, at all relevant times, in
the custody of the New York Department of Corrections
and Community Supervision, commenced this action
pursuant to 42 U.S.C. § 1983. In his original complaint,
Plaintiff asserted claims against Brian Fischer, Lucien
J. LeClaire, Patricia LeConey, Carol Woughter, and
John and Jane Does. Defendants moved for summary
judgment. *See* Dkt. No. 49. By Report–Recommendation
and Order dated July 6, 2012, Magistrate Judge Homer
recommended that this Court dismiss all claims against
the named individuals and direct Plaintiff to join Harold
Call as a Defendant. *See* Dkt. No. 55. This Court accepted

the Report and Recommendation and Order in its entirety
and directed Plaintiff to file an amended complaint to
"include only one cause of action a procedural due process
claim in connection with his disciplinary hearing and one
Defendant hearing officer Call ." *See* Dkt. No. 58 at 4–5.

Plaintiff thereafter filed his amended complaint and
requested compensatory and punitive damages. *See* Dkt.
No. 64, Amended Complaint at 4. In this amended
complaint, Plaintiff alleged that Defendant violated
his constitutional rights under the First, Eighth and
Fourteenth Amendments. *See* Dkt. No. 64, Amended
Complaint at ¶¶ 33, 34, 43.

On May 9, 2014, Defendant filed a motion for summary
judgment pursuant to Rule 56 of the Federal Rules
of Civil Procedure. *See* Dkt. No. 74. In a Report–
Recommendation and Order dated October 9, 2014,
Magistrate Judge Hummel recommended that this Court
grant Defendant's motion in part and deny his motion in
part. *See* Dkt. No. 81 at 33. Plaintiff filed objections to
Magistrate Judge Hummel's recommendations. *See* Dkt.
No. 83.

Where a party makes specific objections to portions of a
magistrate judge's report and recommendation, the court
conducts a *de novo* review of those recommendations. *See*
*Trombley v. Oneill,* No. 8:11–CV–0569, 2011 WL 5881781,
\*2 (N.D.N.Y. Nov. 23, 2011) (citing Fed.R.Civ.P. 72(b)
(2); 28 U.S.C. § 636(b)(1)(C)). Where a party makes
no objections or makes only conclusory or general
objections, however, the court reviews the report and
recommendation for "clear error" only. *See Salmini v.
Astrue,* 3:06–CV–458, 2009 WL 1794741, \*1 (N.D.N.Y.
June 23, 2009) (quotation omitted). After conducting the
appropriate review, a district court may decide to accept,
reject, or modify those recommendations. *See Linares
v. Mahunik,* No. 9:05–CV–625, 2009 WL 3165660, \*10
(N.D.N.Y. Sept. 29, 2009) (quoting 28 U.S.C. § 636(b)(1)
(C)).

Although Plaintiff's objections are, in most respects,
general or conclusory, given his *pro se* status, the Court
has conducted a *de novo* review of Magistrate Judge
Hummel's Report–Recommendation and Order. Having
completed its review, the Court hereby

**\*2 ORDERS** that Magistrate Judge Hummel's
October 9, 2014 Report–Recommendation and Order is

**ACCEPTED in its entirety** for the reasons stated therein; and the Court further

**ORDERS** that Defendant's motion for summary judgment is **GRANTED in part** and **DENIED in part;** and the Court further

**ORDERS** that Plaintiff's First Amendment claims, his Eighth Amendment claims, and his challenge to the constitutionality of Directive 4913 are **DISMISSED;** and the Court further

**ORDERS** that, to the extent that Plaintiff has asserted claims against Defendant in his official capacity, those official-capacity claims are **DISMISSED;** and the Court further

**ORDERS** that Defendant's motion for summary judgment is **DENIED** with respect to Plaintiff's Fourteenth Amendment due process claims and with respect to Defendant's qualified immunity defense; and the Court further

**ORDERS** that this matter is referred to Magistrate Judge Hummel for all further pretrial matters; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

### REPORT–RECOMMENDATION AND ORDER [1]

CHRISTIAN F. HUMMEL, United States Magistrate Judge.

Plaintiff *pro se* Charles McAllister ("McAllister"), a former inmate who was, at all relevant times, in the custody of the New York Department of Corrections and Community Supervision ("DOCCS"), [2] brings this action pursuant to 42 U.S.C. § 1983 alleging that defendant Harold Call ("Call"), Vocational Supervisor, Mohawk Correctional Facility ("Mohawk"), violated his constitutional rights under the First, Eighth and Fourteenth Amendments. Am. Compl. (Dkt. No. 64) ¶¶ 33, 34; 4. McAllister initially commenced this civil

rights action against defendants Brian Fischer, Lucien J. LeClaire, Patricia LeConey, Carol Woughter, and John and Jane Does. Defendants moved for summary judgment. Dkt. No. 49. By report and recommendation dated July 6, 2012, (1) all claims against identified defendants were dismissed; and (2) defendant was directed to join Call, who was identified in the motion papers as a John Doe defendant. Dkt. No. 55; Dkt. No. 58. The report and recommendation was accepted in its entirety, and McAllister was directed to file an amended complaint to "include only one cause of action —a procedural due process claim in connection with his disciplinary hearing—and one Defendant—hearing officer Call." Dkt. No. 58 at 4. McAllister thereafter filed his amended complaint wherein he requested punitive and compensatory damages. Am. Compl. at 4. Presently pending is Call's motion for summary judgment on the amended complaint pursuant to Fed.R.Civ.P. 56. Dkt. No. 74. McAllister did not respond. For the following reasons, it is recommended that Call's motion be granted in part and denied in part.

### I. Failure to Respond

The Court notified McAllister of the response deadline and extended the deadline for his opposition papers on two occasions. Dkt. No. 75; Dkt. No. 77; Dkt. No. 80. Call also provided notice of the consequence of failing to respond to the motion for summary judgment in his motion papers. Dkt. No. 74–1. Despite these notices and extensions, McAllister did not respond.

**\*3** Summary judgment should not be entered by default against a *pro se* plaintiff who has not been given any notice that failure to respond will be deemed a default." *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996). Thus, "[t]he fact that there has been no response to a summary judgment motion does not ... mean that the motion is to be granted automatically." *Id.* at 486. Even in the absence of a response, defendants are entitled to judgment only if the material facts demonstrate their entitlement to judgment as a matter of law. *Id.;* FED. R. CIV. P. 56(c). "A verified complaint is to be treated as an affidavit ... and therefore will be considered in determining whether material issues of fact exist...." *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) (internal citations omitted); *see also Patterson v. Cnty. of Oneida, N.Y.,* 375 F.3d 206, 219 (2d Cir.2004) (same). The facts set forth in defendant's

Rule 7.1 Statement of Material Facts (Dkt. No. 74–2) are accepted as true as to those facts that are not disputed in McAllister's amended complaint. N.D.N.Y.L.R. 7.1(a)(3) ("The Court shall deem admitted any properly supported facts set forth in the Statement of Facts that the opposing party does not specifically controvert.").

## II. Background

The facts are reviewed in the light most favorable to McAllister as the non-moving party. *See* subsection III(A) *infra.* At all relevant times, McAllister was an inmate at Mohawk. Am. Compl. ¶ 3.

On or about July 15, 2009, nonparty Correction Officer Femia, pursuant to authorization from nonparty Captain Dauphin, searched McAllister's personal property while McAllister was confined in a secure housing unit ("SHU").[3] Dkt. No. 74–3, Exh. A, at 14; Am. Compl. ¶¶ 5–6. Femia confiscated approximately twenty documents from McAllister's locker, including five affidavits that were signed by other inmates. Dkt. No. 74–3, Exh. A, at 14. As a result of the search, Femia issued McAllister a Tier III misbehavior report, alleging violations of prison rules 113.15[4] (unauthorized exchange) and 180.17 (unauthorized assistance).[5] *Id.;* Am. Compl. ¶ 7.

McAllister was assigned as his inmate assistant nonparty Correction Officer A. Sullivan. Am. Compl. ¶ 7; Dkt. No. 74–3, Exh. A, at 11. McAllister requested five inmate witnesses, documents, prison directives 4933 and 4982, and a facility rule book. Am. Compl. ¶ 8; Dkt. No. 74–3, Exh. A, at 11. He also asked Sullivan for permission to retrieve documents from his personal property. *Id.* The requested witnesses were those inmates whose signatures were affixed to the five confiscated affidavits. Dkt. No. 74–3, Exh. A, at 14. Sullivan retrieved the requested materials, and all inmate witnesses agreed to testify. *Id.* at 11.

On or about July 21, 2009, a Tier III disciplinary hearing was held before Call, who served as the hearing officer. Am. Compl. ¶ 10. McAllister pleaded not guilty to both alleged violations. Dkt. No. 74–3, Exh. A, at 38. McAllister objected to the misbehavior report as violative of prison directive 4932 because the copy he was given (1) provided insufficient notice of the charges against him and

(2) differed from the report that Call read into the record. *Id.* at 39–41. McAllister stated that his copy did not list the names of the inmates to whom the confiscated affidavits allegedly belonged. *Id.* Call acknowledged the difference between the reports but concluded that the misbehavior report informed McAllister of the charges against him and the bases for the charges. *Id.* at 39, 41–42. McAllister also argued that his copy of the misbehavior report referred to confiscation of twenty documents from his cell, but did not identify the papers that were taken. *Id.* at 42. He contended that the misbehavior report's general reference to "legal work" was insufficient to provide him with notice of the documents to which the report was referring because he had several volumes of legal work. *Id.* at 42, 59. In response to this objection, Call recited the body of the misbehavior report, which described the confiscated documents as "[a]rticles of paper which appear to be legal work including some signed affidavits" and asked McAllister, "[t]hat didn't ring a bell for you? How much paperwork did you have that fit that description?" *Id.* at 42. Call also expressed his belief that the affidavits qualified as legal work. *Id.* at 45, 57–58.

**\*4** McAllister next argued that he did not provide unauthorized legal assistance to another inmate in violation of rule 180.17 because the inmate affidavits were used as evidence to prove that the Division of Parole had a "practice" of "fail[ing] to respond to appeals over the last four years .... " Dkt. No. 74–3, Exh. A at 45–49, 56. These inmates were aware that their affidavits were created for, and to be used solely in support of, McAllister's case and that they were receiving no legal benefit. *Id.* at 48–49. McAllister further contended that he did not need permission from prison personnel to collect the affidavits. *Id.* at 64.

McAllister also argued that rule 113.15 is ambiguous because it does not list the specific items which, if found in an inmate's possession, would violate the rule. Dkt. No. 74–3, Exh. A, at 54. Finally, to the extent it can be determined from the hearing transcript, McAllister objected to the SHU procedures for handling his personal property. *Id.* at 70.

At the conclusion of the hearing, Call informed McAllister that he would be considering testimony from a confidential witness. Dkt. No. 73–3, Exh. A, at 13, 38, 73. McAllister objected to consideration of confidential testimony without being informed of the contents. *Id.* at

74. Finally, McAllister declined to call the inmates that he had requested as witnesses. *Id.* at 37, 71.

Call found McAllister guilty of violating prison rules 113.15 and 180.17. Dkt. No. 74–3, Exh. A, at 8–9, 76. He imposed a penalty of three months in SHU and three months loss of privileges. *Id.* at 8. Call relied upon the misbehavior report, the confidential testimony, the packet of legal work containing the other inmates' affidavits, and McAllister's testimony and statements. *Id.* at 9.

The disciplinary determination was reversed upon administrative appeal on the ground that the evidence failed to support a finding of guilt. Dkt. No. 74–3, Exh. B, at 79; Exh. C, at 81. In May 2010, McAllister commenced this action pursuant to 42 U.S.C. § 1983.

## III. Discussion [6]

McAllister argues that Call violated his rights under (1) the First Amendment, by (a) retaliating against him by finding him guilty and (b) hindering his access to the courts; (2) the Eighth Amendment, by imposing a three-month SHU assignment, plus ten additional days following reversal of the disciplinary hearing; and (3) the Fourteenth Amendment, because (a) he was given insufficient notice of the charges against him, (b) he was denied advance notice of the use of a confidential witness, (c) he was forced to spend approximately fifty-two days in SHU as a result of the misbehavior report, (d) Call failed to follow certain DOCCS directives and prison regulations, (e) Call demonstrated bias against him during the Tier III hearing and prejudged his guilt, and (f) he was denied equal protection.

### A. Legal Standard

A motion for summary judgment may be granted if there is no genuine issue as to any material fact, it was supported by affidavits or other suitable evidence, and the moving party is entitled to judgment as a matter of law. The moving party has the burden to show the absence of disputed material facts by providing the court with portions of pleadings, depositions, and affidavits which support the motion. FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). All ambiguities are resolved and all reasonable inferences drawn in favor of the non-moving party. *Skubel v. Fuoroli,* 113 F.3d 330, 334 (2d Cir.1997).

**\*5** The party opposing the motion must set forth facts showing that there is a genuine issue for trial, and must do more than show that there is some doubt or speculation as to the true nature of the facts. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). For a court to grant a motion for summary judgment, it must be apparent that no rational finder of fact could find in favor of the non-moving party. *Gallo v. Prudential Residential Servs., Ltd. Partnership,* 22 F.3d 1219, 1223–24 (2d Cir.1994); *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988).

Where, as here, a party seeks judgment against a *pro se* litigant, a court must afford the non-movant special solicitude. *See Triestman v. Federal Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006). As the Second Circuit has stated,

> [t]here are many cases in which we have said that a pro se litigant is entitled to "special solicitude," ... that a pro se litigant's submissions must be construed "liberally," ... and that such submissions must be read to raise the strongest arguments that they "suggest," .... At the same time, our cases have also indicated that we cannot read into pro se submissions claims that are not "consistent" with the pro se litigant's allegations, ... or arguments that the submissions themselves do not "suggest," ... that we should not "excuse frivolous or vexatious filings by pro se litigants," ... and that pro se status "does not exempt a party from compliance with relevant rules of procedural and substantive law....

*Id.* (citations and footnote omitted); *see also Sealed Plaintiff v. Sealed Defendant,* 537 F.3d 185, 191–92 (2d Cir.2008).

### B. Eleventh Amendment

Call argues that he is entitled to Eleventh Amendment immunity relating to McAllister's claims for money damages against him in his official capacity. The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against

one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. AMEND. XI. "[D]espite the limited terms of the Eleventh Amendment, a federal court [cannot] entertain a suit brought by a citizen against his [or her] own State." *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 98 (1984) (citing *Hans v. Louisiana,* 134 U.S. 1, 21 (1890)). Regardless of the nature of the relief sought, in the absence of the State's consent or waiver of immunity, a suit against the State or one of its agencies or departments is proscribed by the Eleventh Amendment. *Halderman,* 465 U.S. at 100. Section 1983 claims do not abrogate the Eleventh Amendment immunity of the states. *See Quern v. Jordan,* 440 U.S. 332, 340–41 (1979).

A suit against a state official in his or her official capacity is a suit against the entity that employs the official. *Farid v. Smith,* 850 F.2d 917, 921 (2d Cir.1988) (citing *Edelman v. Jordan,* 415 U.S. 651, 663 (1974)). "Thus, while an award of damages against an official in his personal capacity can be executed only against the official's personal assets, a plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the government entity itself," rendering the latter suit for money damages barred even though asserted against the individual officer. *Kentucky v. Graham,* 473 U.S. 159, 166 (1985). Here, because McAllister seeks monetary damages against Call for acts occurring within the scope of his duties, the Eleventh Amendment bar applies.

**\*6** Accordingly, it is recommended that Call's motion on this ground be granted.

### C. Personal Involvement

"[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). Thus, supervisory officials may not be held liable merely because they held a position of authority. *Id.; Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). However, supervisory personnel may be considered personally involved if:

(1) [T]he defendant participated directly in the alleged constitutional violation;

(2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong;

(3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;

(4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or

(5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon,* 58 F.3d at 873 (citing *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986)). [7] Assertions of personal involvement that are merely speculative are insufficient to establish a triable issue of fact. *See e.g., Brown v. Artus,* 647 F.Supp.2d 190, 200 (N.D.N.Y.2009).

As to any constitutional claims beyond those surrounding the denial of due process at the Tier III hearing, the undersigned notes that evaluation of such is unnecessary as it is outside of the scope set forth in this Court's prior order. Dkt. No. 58 at 4. However, to the extent that Call acknowledges these claims and provides additional and alternative avenues for dismissal, McAllister fails to sufficiently allege Call's personal involvement in impeding his access to the courts, in violation of the First Amendment. McAllister argues that, as a result of Call's determination that he violated rules 113.15 and 180.17, his legal paperwork was confiscated, which impaired his ability to continue to represent himself in pending state and federal court claims. Am. Compl. ¶¶ 38–40. However, McAllister does not suggest that Call was personally involved in either the search and confiscation of paperwork that led to the filing of the misbehavior report nor the subsequent reduction in his paperwork pursuant to directive 4913. To the contrary, McAllister concedes that the paperwork was reduced pursuant to the directive.

McAllister also fails to sufficiently allege Call's personal involvement in the SHU procedures for storing property or in holding him in SHU for ten additional days following the reversal of the Tier III determination. Call stated that hr had no involvment with the storage of property in SHU. Dkt. No. 74–3, at 5. Call also contended that he "was not responsible for plaintiff's being held in SHU for

additional days following the August 26, 2009 reversal of the disciplinary hearing decision of July 22, 2009." *Id.* McAllister does not allege Call's involvement in this delay. McAllister's sole reference to the ten-day delay is his claim that he "was not released from Special Housing until September 4, 2009, approximately 10 days after the reversal" Am. Compl. ¶ 43. This conclusory statement is insufficient to demonstrate Call's personal involvement in an extension of his time in SHU following the reversal of the Tier III determination. *Brown,* 647 F.Supp.2d at 200.

**\*7** Accordingly, it is recommended that Call's motion be granted insofar as McAllister alleges that Call: denied him access to the courts in violation of the First Amendment, was at all involved with the storage of his property while he was in SHU, and caused him to be held an additional ten days in SHU following administrative reversal of the Tier III determination.

### D. First Amendment

McAllister appears to argue that, in retaliation for his filing of grievances and lawsuits, Call found him guilty of the misconduct in the Tier III hearing and imposed SHU time. He suggests that his transfer to SHU, as a result of the Tier III determination, triggered enforcement of his compliance with directive 4913, which impeded his ability to proceed with active legal matters and resulted in dismissals. Am. Compl. ¶ 41. Thus, McAllister also argues that he was denied access to the courts. Am. Compl. ¶ 38. As a preliminary matter, McAllister's First Amendment retaliation and access claims are beyond the scope of the prior order of this Court directing McAllister to limit his amended complaint "include only one cause of action—a procedural due process claim in connection with his disciplinary hearing." Dkt. No. 58, at 4. Regardless, McAllister fails to plausibly allege either retaliation or denial of access to the courts.

Courts are to "approach [First Amendment] retaliation claims by prisoners with skepticism and particular care." *See e.g., Davis v. Goord,* 320 F.3d 346, 352 (2d Cir.2003) (citing *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001), *overruled on other grounds by Swierkiewicz v. Sorema, NA,* 534 U.S. 506 (2002)). A retaliation claim under section 1983 may not be conclusory and must have some basis in specific facts that are not inherently implausible on their face. *Ashcroft,* 556 U.S. at 678; *South Cherry St.,*

*LLC v. Hennessee Group LLC,* 573 F.3d 98, 110 (2d Cir.2009). To survive a motion to dismiss, a plaintiff must show "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir.2001), *overruled on other grounds by Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002); *Taylor v. Fischer,* 841 F.Supp.2d 734, 737 (W.D.N.Y.2012). If the plaintiff meets this burden, the defendants must show, by a preponderance of the evidence, that they would have taken the adverse action against the plaintiff "even in the absence of the protected conduct." *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 (1977). "Types of circumstantial evidence that can show a causal connection between the protected conduct and the alleged retaliation include temporal proximity, prior good discipline, finding of not guilty at the disciplinary hearing, and statements by defendants as to their motives." *See Barclay v. New York,* 477 F.Supp.2d 546, 588 (N.D.N.Y.2007).

**\*8** Here, McAllister baldly states that Call's disciplinary determination was imposed in retaliation for his filing of grievances and lawsuits; however, McAllister does not identify these grievances and lawsuits nor does he claim that any of these were lodged against Call. *See generally Ciaprazi v. Goord,* No. 02–CV–915, 2005 WL 3531464, at \*9 (N.D.N.Y. Dec. 22, 2005) (dismissing the plaintiff's claim of retaliation where the plaintiff could "point to no complaints lodged by him against or implicating the conduct of [the] defendant ... who issued the disputed misbehavior report."). McAllister also provides no time frame for the apparent grievance and lawsuits. Thus, it cannot be discerned whether or how these unnamed grievances and lawsuits were a "motivating factor" in Call's Tier III determination. *Doyle,* 429 U.S. at 287 (internal quotation marks and citation omitted). McAllister's unsupported, conclusory claim fails to plausibly demonstrate that Call's determination was a product of retaliatory animus.

Undoubtedly, prisoners have a constitutional right to meaningful access to the courts. *Bounds v. Smith,* 430 U.S. 817, 824 (1977); *Lewis v. Casey,* 518 U.S. 343, 350 (1996) ("The right that *Bounds* acknowledged was the (already well-established) right of access to the courts."). This right is implicated when prison officials "actively interfer[e] with inmates' attempts to prepare legal documents[ ] or

file them." *Lewis,* 518 U.S. at 350 (internal citations omitted). To establish a denial of access to the courts claim, a plaintiff must satisfy two prongs. First, a plaintiff must show that the defendant acted deliberately and maliciously. *Davis v. Goord,* 320 F.3d 346, 351 (2d Cir.2003). Second, the plaintiff must demonstrate that he suffered an actual injury. *Id.; Monsky v. Moraghan,* 123 F.3d 243, 247 (2d Cir.1997) (internal citations, quotation marks, and alterations omitted) (quoting *Lewis,* 518 U.S. at 329) ("In order to establish a violation of access to courts, a plaintiff must demonstrate that a defendant caused actual injury, *i.e.,* took or was responsible for actions that hindered a plaintiff's effort to pursue a legal claim"). Thus, a plaintiff must allege that the defendant was "responsible for actions that hindered his efforts to pursue a legal claim." *Davis,* 320 F.3d at 351 (internal quotation marks omitted).

Here, there is insufficient evidence to give rise to a genuine dispute of fact regarding either element of a denial of court access claim. As noted, McAllister merely states that, as a result of the property reduction pursuant to directive 4913, his "ability to continue litigation in Federal and State court caused adverse decisions by the court and dismissals." Am. Compl. ¶ 41. This claim is insufficient to demonstrate that Call was responsible for actions that hindered his legal claims. Insofar as McAllister's claim could be read to suggest that Call denied him access to the courts by confiscating his legal documents, as noted *supra,* McAllister fails to present any plausible facts to support a finding that Call was involved in the initial search of his property or in the later reduction of his property or that it was maliciously imposed by Call. As noted, the initial cell search which led to the misbehavior report was executed by Captain Dauphin and executed by Correction Officer Femia. Similarly, McAllister concedes that his property was reduced pursuant to directive 4913. Although McAllister suggests that his transfer to SHU as a result of the Tier III hearing triggered the application of directive 4913, he was transferred to SHU on July 9, six days before the initial cell search occurred. *Id.* ¶ 5. Thus, if McAllister were forced to comply with directive 4913 because of his transfer to SHU, he failed to demonstrate that the compliance arose from the SHU term ordered by Call rather than the unknown incident that resulted in his transfer to SHU on July 9. Further, McAllister failed to establish any actual injury because he did not specify which cases were allegedly dismissed as a result of the property reduction. *See Monsky,* 123 F.3d at 247.

**\*9** Accordingly, it is recommended that Call's motion for summary judgment be granted on this ground.

### E. Eighth Amendment

In his amended complaint, McAllister references the Eighth Amendment. Am. Compl. ¶ 31. However, McAllister's only reference to the Eighth Amendment is his assertion that Call's use of a confidential witness violated his Eighth Amendment right to be free from cruel and unusual punishment. However, in support of this argument, McAllister states only that this right was violated when Call stated, "[s]o, um there is a lot of stuff going on through my paperwork and I want to bring it to your attention before we move on ..." *Id.* ¶ 33; Dkt. No. 74–3, at 73. When read in context, it becomes clear that Call made this statement immediately before informing McAllister of his consideration of confidential information. Dkt. No. 73–3, at 73. Although, in referencing this portion of the hearing transcript McAllister alleges that he was subject to cruel and unusual punishment, it appears that McAllister intended to assert that the use of a confidential witness was a due process violation. Even if McAllister had intended to argue that use of a confidential witness violates the prohibition of cruel and unusual punishment, such a claim would necessarily fail because the Eighth Amendment protects an inmate's right to be free from conditions of confinement that impose an excessive risk to an inmate's health or safety. *Farmer v. Brennan,* 511 U.S. 825, 834 & 837 (1994). As McAllister makes no claim that he faced conditions of confinement imposing a risk to his health or safety and instead focuses his argument on notice of a confidential witness, giving McAllister due solicitude, his claim regarding the use of a confidential witness will be incorporated as part of the due process analysis below.

### F. Fourteenth Amendment

#### 1. Due Process

Well-settled law provides that inmates retain due process rights in prison disciplinary hearings." *Hanrahan v. Doling,* 331 F.3d 93, 97 (2d Cir.2003) (per curiam) (citing cases). However, inmates do not enjoy "the full panoply of

rights" accorded to a defendant in a criminal prosecution. *Wolff v. McDonnell,* 418 U.S. 539, 556 (1974). For a plaintiff to state a claim that he was denied due process at a disciplinary hearing, the plaintiff "must establish (1) that he possessed a liberty interest and (2) that the defendant(s) deprived him of that interest as a result of insufficient process." *Ortiz v. McBride,* 380 F.3d 649, 654 (2d Cir.2004) (per curiam) (quoting *Giano v. Selsky,* 238 F.3d 223, 225 (2d Cir.2001)). To satisfy the first prong, a plaintiff must demonstrate that the deprivation of which he complains is an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 484 (1995). "A liberty interest may arise from the Constitution itself, ... or it may arise from an expectation or interest created by state laws or policies." *Wilkinson v. Austin,* 545 U.S. 209, 221 (2005) (citations omitted).

### a. **Denial of Liberty Interest**

**\*10** In assessing whether an inmate plaintiff was denied procedural due process, the court must first decide whether the plaintiff has a protected liberty interest in freedom from SHU confinement. *Bedoya v. Coughlin,* 91 F.3d 349, 351 (2d Cir.1996). If the plaintiff demonstrates the existence of a protected liberty interest, the court is then to determine whether the deprivation of this interest "occurred without due process of law." *Id.* at 351, citing *Kentucky Dept. of Corr. v. Thompson,* 490 U.S. 454, 460–61 (1989). Due process generally requires that a state afford an individual "some kind of hearing" prior to depriving them of a liberty or property interest. *DiBlasio v. Novello,* 344 F.3d 292, 302 (2d Cir.2003). Although not dispositive, duration of disciplinary confinement is a significant factor in determining atypicality. *Colon v. Howard,* 215 F.3d 227, 231 (2d Cir.2000); *Blackshear v. Woodward,* No. 13–CV–1165, 2014 WL 2967752 (N.D.N.Y. July 1, 2014).

McAllister suggests that his confinement in SHU for forty-two to fifty-two days is a sufficient deprivation that requires procedural protections. Freedom from SHU confinement may give rise to due process protections; however, the plaintiff must allege that the deprivation imposed "an atypical and significant hardship." *Sandin,* 515 U.S. at 484; *Gaston v. Coughlin,* 249 F.3d 156, 162 (2d Cir.2001) (concluding that SHU confinement does not give rise to due process protections where inmate failed to

demonstrate atypical hardship while confined). Although the Second Circuit has cautioned that "there is no bright-line rule regarding the length or type of sanction" that meets the *Sandin* standard (*Jenkins v. Haubert,* 179 F.3d 19, 28 (2d Cir.1999)), it has made clear that confinement in SHU for a period of one year constitutes atypical and significant restraint on inmates, deserving due process protections. *See e.g. Sims v. Artuz,* 230 F.3d 14, 23 (2d Cir.2000) (holding confinement in SHU exceeding 305 days was atypical); *Sealey v. Giltner,* 197 F.3d 578, 589 (2d Cir.1999) (concluding confinement for fewer than 101 days in SHU, plus unpleasant but not atypical conditions, insufficient to raise constitutional claim). Although the Second Circuit has generally held that confinement in SHU for 101 or fewer days without additional indicia of atypical conditions generally does not confer a liberty interest (*Smart v. Goord,* 441 F.Supp.2d 631, 641 (2d Cir.2006)), it has "explicitly noted that SHU confinements of fewer than 101 days could constitute atypical and significant hardships if the conditions were more severe than the normal SHU conditions of *Sealey* or a more fully developed record showed that even relatively brief confinements under normal SHU conditions were, in fact, atypical." *Palmer v. Richards,* 364 F.3d 60, 65 (2d. Cir.2004) (citing, *inter alia, Ortiz,* 323 F.3d at 195, n. 1).

The undersigned notes that it is unclear what portion of McAllister's relatively brief time in SHU is attributable to the Tier III determination, because it appears that McAllister was already in SHU when the instant disciplinary report was filed. Am. Comp. ¶ 5; Dkt. No. 74–3, Exh. A, at 14. The undersigned also notes that there is no indication that McAllister endured unusual SHU conditions. The only reference McAllister makes to his time in SHU is that, upon his transfer to SHU, several bags of his paperwork were confiscated pursuant to directive 4913. *Id.* ¶ 37. However, review of directive 4913 reveals that the personal and legal property limit set forth in directive 4913 applies to the general prison population and inmates in other forms of segregated confinement. Dkt. No. 49–2, at 5–19. Thus, the fact that McAllister was forced to comply with directive 4913 does not indicate that he was subjected to conditions more severe than the normal SHU conditions or conditions imposed on the general prison population. Dkt. No. 74–3, Exh. A, at 14.

**\*11** Although the record is largely absent of detail of the conditions McAllister faced in SHU, there is also nothing in the record comparing the time McAllister

was assigned and spent in disciplinary confinement with the deprivations endured by other prisoners "in the ordinary course of prison administration," which includes inmates in administrative segregation and the general prison population. *Welch v. Bartlett,* 196 F.3d 389, 394 (2d Cir.1999) (holding that, after *Sandin,* "the relevant comparison concerning duration is between the period of deprivation endured by the plaintiff and periods of comparable deprivation typically endured by other prisoners in the ordinary course of prison administration, including general population prisoners and those in various forms of administrative and protective custody"). Because "[t]he record does not reveal whether it is typical for inmates not being disciplined to spend similar periods of time in similar circumstances," Call's motion for summary judgment should be denied. *Id.* at 394 (citing *Brooks v. DiFasi,* 112 F.3d 46, 49 (2d Cir.1997)).

Accordingly, it is recommended that defendant's motion for summary judgment on this ground be denied.

### b. **Procedural Due Process**

Assuming a liberty interest exists, it must be determined whether McAllister was denied due process at his Tier III hearing. Where disciplinary hearings could result in SHU confinement or loss of good time credit, "[i]nmates are entitled to advance written notice of the charges; a fair and impartial hearing officer; a reasonable opportunity to call witnesses and present documentary evidence; and a written statement of the disposition, including supporting facts and reasons for the action taken." *Luna v. Pico,* 356 F.3d 481, 487 (2d Cir.2004) (citing *Kalwasinski v. Morse,* 201 F.3d 103, 108 (2d Cir.1999)); *see also Wolff,* 418 U.S. at 556; *Sira v. Morton,* 380 F.3d 57, 59 (2d Cir.2004).

### i. **Notice**

McAllister first appears to argue that he was denied procedural due process because the misbehavior report (1) violated unnamed DOCCS rules, regulations, and procedures, and (2) failed to provide him with adequate notice of the charges against him because it did not list the five inmates whose affidavits were confiscated and, thus, impacted his ability to prepare a defense to the charges. Am. Compl. ¶¶ 11–13, 16–17. Although inmates are entitled to advance written notice of the charges, "[t]his

is not to suggest that the Constitution demands notice that painstakingly details all facts relevant to the date, place, and manner of charged inmate misconduct ...." *Sira,* 380 F.3d at 72 (2d Cir.2004) (citing *Wolff,* 418 U.S. at 564). "[T]here must be sufficient factual specificity to permit a reasonable person to understand what conduct is at issue so that he may identify relevant evidence and present a defense." *Id.*

First, to the extent that McAllister's argues that the differing disciplinary reports violated unspecified DOCCS rules, regulations, and procedures (Am.Compl.¶¶ 12–13), this claim must fail. A section 1983 claim is not the "appropriate forum" in which to seek review of a violation of a prison regulation. *Rivera v. Wohlrab,* 232 F.Supp.2d 117, 123 (S.D.N.Y.2002) ("a § 1983 claim brought in federal court is not the appropriate forum to urge violations of prison regulation or state law ... the allegations asserted must constitute violations of constitutional due process standards."). Next, McAllister fails to plausibly allege the existence of a question of fact whether the difference between the misbehavior reports deprived him of the ability to identify relevant evidence so that he could prepare a defense. Although McAllister's copy of the report was missing the names of the inmates whose affidavits were confiscated, it informed McAllister of the date, time, and location of the alleged violations; the rules alleged to have been violated; and a description of the documents that were confiscated. *Johnson v. Goord,* 305 Fed. Appx. 815, 817 (2d Cir.2009) (concluding where the inmate's copy of misbehavior report included details of alleged violation and charges against him, a sentence missing from the inmate's copy of report did not violate the inmate's due process rights). It is clear that the discrepancy between the misbehavior reports did not affect McAllister's ability to prepare and present a defense. Prior to the hearing, McAllister requested as witnesses the five inmates whose affidavits were found during the property search. Indeed, the record demonstrates that McAllister was able to both identify the documents referenced in the misbehavior report and address them at the hearing. Dkt. No. 74–3, Exh. A at 45, 47–48.

**\*12** Thus, because he received sufficient notice of the charges against him and was able to prepare and present a defense on his behalf, McAllister fails to raise a question of fact as to whether he was denied sufficient notice of the charges against him.

## ii. Hearing Officer Bias/Pre-determination of Guilt

McAllister also contends that his procedural due process rights were violated because Call was biased against him and prejudged his guilt. The Fourteenth Amendment guarantees inmates the right to the appointment of an unbiased hearing officer to address a disciplinary charge. *Allen v. Cuomo,* 100 F.3d 253, 259 (2d Cir.1996). An impartial hearing officer "does not prejudge the evidence" and is not to say "how he would assess evidence he has not yet seen." *Patterson v. Coughlin,* 905 F.2d 564, 570 (2d Cir.1990); *see also Francis v. Coughlin,* 891 F.2d 43, 46 (2d Cir.1989) ("it would be improper for prison officials to decide the disposition of a case before it was heard"). However, "[i]t is well recognized that prison disciplinary hearing officers are not held to the same standard of neutrality as adjudicators in other contexts." *Russell v. Selsky,* 35 F.3d 55, 60 (2d Cir.1996). "A hearing officer may satisfy the standard of impartiality if there is 'some evidence in the record' to support the findings of the hearing." *Nelson v. Plumley,* No. 9:12–CV–422, 2014 WL 4659327, at *11 (N.D.N.Y. Sept. 17, 2014) (quoting *Allred v. Knowles,* No. 06–CV–0456, 2010 WL 3911414, at * 5 (W.D.N.Y. Oct. 5, 2010) (quoting *Waldpole v. Hill,* 472 U.S. 445, 455 (1985)). However, "the mere existence of 'some evidence' in the record to support a disciplinary determination does not resolve a prisoner's claim that he was denied due process by the presence of a biased hearing officer." *See Smith v. United States,* No. 09–CV–729, 2012 WL 4491538 at *8 (N.D.N.Y. July 5, 2012).

Prison officials serving as hearing officers "enjoy a rebuttable presumption that they are unbiased." *Allen,* 100 F.3d at 259. "Claims of a hearing officer bias are common in [inmate section] 1983 claims, and where they are based on purely conclusory allegations, they are routinely dismissed." *Washington v. Afify,* 968 F.Supp.2d 532, 541 (W.D.N.Y.2003) (citing cases). "An inmate's own subjective belief that the hearing officer was biased is insufficient to create a genuine issue of material fact." *Johnson v. Fernandez,* No. 09–CV–626 (FJS/ATB), 2011 WL 7629513, at *11 (N.D.N.Y. Mar. 1, 2011) (citing *Francis,* 891 F.2d at 46).

McAllister first argues that Call prejudged his guilt. He supports this contention by pointing to moments during the Tier III hearing where Call expressed his belief that McAllister's possession of affidavits signed by other inmates was sufficient to support a violation of prison rules 113.15 and 180.17. Am. Compl., ¶¶ 13, 15, 23–25, 36. Here, however the challenged affidavits were not evidence that Call prejudged because he had the opportunity to review the affidavits and did so at the hearing. Although McAllister disagreed with Call's opinion that possession of such documents would be a *per se* violation of the rules, Call's assertion of belief in this matter was an opinion he reached following his personal review of this evidence. *See Johnson v. Doling,* No. 05–CV–376, 2007 WL 3046701, at * 10 (N.D.N.Y. Oct. 17, 2007) (holding that where the "[p]laintiff was provided the opportunity to testify, [and] call and question witnesses .... [d]isagreement with rulings made by a hearing officer does not constitute bias"). Thus, it does not appear that Call prejudged this evidence.

**\*13** To support his claim that Call exhibited bias and partiality against him in the Tier III hearing, McAllister points out that, after he objected to the misbehavior report for failing to provide him sufficient notice of the documents confiscated, Call read the portion of the misbehavior report describing the documents as "[a]rticles of paper which appear to be legal work including some signed affidavits," and stated "that didn't ring a bell for you?" *Id.* ¶¶ 19, 32). When read in context, this statement does not establish bias on Call's part, rather it appears to be a genuine question. Though it may be said that Call could have couched this question in a kinder manner, this statement does not demonstrate bias. Moreover, that the Tier III determination was reversed on appeal, without more, is not evidence of bias or other due process violation. *Eng v. Therrien,* No. 04–CV–1146, 2008 WL 141794, at *2 (N.D.N.Y. Jan. 11, 2008).

Thus, McAllister fails to plausibly allege the existence of question of fact whether Call prejudged his guilt or was otherwise biased in the Tier III hearing.

## iii. Failure to Investigate

McAllister next suggests that he was denied procedural due process because Call declined to interview the law library officer. Am. Compl. ¶ 29. Call permitted McAllister to present testimony on his behalf and afforded him the opportunity call witnesses. Had McAllister wished to hear testimony from the law library officer, he could have requested the law library officer as a witness. *Wolff,* 418 U.S. at 566 (inmates have a right to call

witnesses in their defense at disciplinary hearings). That Call found it unnecessary to independently interview the law library officer—especially where McAllister did not demonstrate that his testimony would be relevant—does not result in a denial of due process because "[t]here is no requirement ... that a hearing officer assigned to preside over a disciplinary hearing conduct an independent investigation; that is simply not the role of a hearing officer." *Robinson v. Brown,* No. 9:11–CV–0758, 2012 WL 6799725, *5 (N.D.N.Y. Nov. 1, 2012).

Accordingly, McAllister fails plausibly raise a due process violation based on Call's alleged failure to investigate.

### iv. **Confidential Witness**

To the extent it can be discerned, McAllister contends that he was denied due process because Call relied on confidential witness testimony, yet failed to provide him with advance notice of the confidential witness and refused to inform him of his or her identity or the nature of the testimony. Am. Compl. ¶¶ 30–34. The Second Circuit has held that a hearing officer must perform an independent assessment of a confidential informant's credibility for such testimony to be considered reliable evidence of an inmate's guilt. *Sira,* 380 F.3d at 78 (noting that, "when sound discretion forecloses confrontation and cross-examination, the need for the hearing officer to conduct an independent assessment of informant credibility to ensure fairness to the accused inmate is heightened.").

*14 Here, the record provides no indication that Call independently assessed the credibility and reliability of the confidential witness. The confidential witness form merely states that Call "was provided confidential information relating to the misbehavior report ." Dkt. No. 74–3, at 13. Similarly, Call does not provide whether or how he performed an assessment of the witness's credibility. *Id.* at 4. Therefore, there exist questions of fact whether Call deprived McAllister of due process by relying on this testimony without an independent assessment of the witness's credibility.

To the extent that McAllister argues that he was denied due process by Call's decision to refuse to disclose the content of the confidential witness's testimony, the law in this circuit provides that where a prison official decides to keep certain witness testimony confidential, he or she "must offer a reasonable justification for their actions, if not contemporaneously, then when challenged in a court action." *Sira,* 380 F.3d at 75 (citing *Ponte v. Real,* 471 U.S. 491, 498 (1985)). Although "[c]ourts will not readily second guess the judgment of prison officials with respect to such matters ... the discretion to withhold evidence is not unreviewable...." *Id.* (citations omitted). Here, Call failed to provide his rationale for refraining to share the substance of this testimony, stating merely that McAllister could not be told the substance of the testimony because "it is by definition it is ... confidential." Dkt. No. 74–3, at 74. As Call presented no reason to justify withholding the identity or substance of the confidential witness's testimony, McAllister presents a viable due process claim based on the nondisclosure of this evidence. *Sira,* 380 F.3d at 76.

Accordingly, Call's motion for summary judgment should be denied on this ground.

### v. **Some Evidence**

"Once a court has decided that the procedural due process requirements have been met, its function is to determine whether there is some evidence which supports the decision of the [hearing officer]." *Freeman v. Rideout,* 808 F.2d 949, 954 (2d Cir.1986) (citations omitted). In considering whether a disciplinary determination is supported by some evidence of guilt, "the relevant question is whether there is any evidence in the record [before the disciplinary board] that could support the conclusion reached by the disciplinary board." *Superintendent v. Hill,* 472 U.S. 445, 455–56 (1985) (citations omitted); *Sira,* 380 F.3d at 69. The Second Circuit has interpreted the "some evidence" standard to require "reliable evidence" of guilt. *Luna,* 356 F.3d at 488.

In making his determination, Call relied upon McAllister's testimony and statements, testimony of a confidential witness, the misbehavior report, and the legal documents confiscated during the property search. Dkt. No. 74–3, at 4. As noted, based on the record provided, Call did not perform an independent assessment of the witness's credibility. Thus, Call's reliance on confidential testimony would be insufficient to support a finding of guilt. *Taylor v. Rodriguez,* 238 F.3d 188, 194 (2d Cir.2001) (determining that reliance on confidential informant's testimony

insufficient to provide "some evidence" of guilt where there was no independent examination of indicia relevant to informant's credibility). The remaining evidence relied upon—McAllister's testimony, the misbehavior report, and the affidavits—does not constitute some evidence of guilt, as required by the Due Process clause.

**\*15** The affidavits alone do not constitute some evidence of guilt because mere possession of affidavits signed by other inmates would not violate prison rules 113.15 and 180.17 were it true that these documents were McAllister's property and drafted solely for his benefit. Similarly, although a written misbehavior report may serve as some evidence of guilt, such is the case where the misbehavior report charges the plaintiff for behavior that the author of the misbehavior report personally witnessed. *Creech v. Schoellkoph,* 688 F.Supp.2d 205, 214 (W.D.N.Y.2010) (citations omitted) (misbehavior report drafted by officer who personally observed plaintiff possess and transfer pieces of sharpened metal to another inmate constituted some evidence of guilt). In this case, where a determination of guilt would appear to turn on knowledge of the ownership of the documents and an understanding of the circumstances under which the papers were drafted, a misbehavior report which merely states that papers appearing to be legal work signed by other inmates were found in McAllister's property, it does not establish a per se violation of rules 113.15 and 180.17. *See Hayes v. Coughlin,* No. 87 CIV. 7401, 1996 WL 453071, at \*3 (S.D.N.Y. Aug. 12, 1996) ("if a misbehavior report can serve as 'some evidence' for a hearing decision and thereby insulate a hearing from review, there would be little point in having a hearing"); *see also Williams v. Dubray,* No. 09–CV–1298, 2011 WL 3236681, at \*4 (N.D.N.Y. July 13, 2011) (holding that there were questions of fact whether the determination was based upon some evidence of guilt where the hearing officer relied on misbehavior report that was based on a corrections officer's unsupported accounts, without additional evidence to support its charges). Thus, absent additional evidence that these papers belonged to other inmates or that McAllister drafted the documents for other inmates' use, the fact that the misbehavior report identified these documents as being found in McAllister's secured property does not constitute reliable evidence of guilt.

Finally, McAllister's testimony does not constitute reliable evidence of guilt. In response to the charge of violating rule 113.15, McAllister testified that the affidavits were

his property because he drafted them solely as evidence in his personal litigation against the Department of Probation. Similarly, in defense of the charge for violating rule 180.17, McAllister repeatedly testified that he did not provide legal assistance to the inmates in question because the affidavits were written solely to serve as supporting evidence in his personal action, the inmates were aware that they would receive no legal benefit as a result, and he did not receive any compensation from the inmates. Regardless whether Call considered McAllister's testimony to be credible, without some other reliable evidence, such as, perhaps, a statement from one of the other inmates claiming that he signed the affidavit under the belief that McAllister would provide him with legal assistance, McAllister's testimony denying violations of the charged prison rules would not constitute some evidence of guilt.

**\*16** Accordingly, it is recommended that Call's motion for summary judgment be denied as to McAllister's procedural due process claim.

### c. **Directive 4913**

McAllister further argues that, as a result of the SHU placement, he suffered an unconstitutional deprivation of his legal and personal property because he was required to comply with the limits set forth in directive 4913. This Court has already ruled upon this claim when it was raised at earlier stages. In deciding Call's motion for summary judgment on the McAllister's first complaint, this Court held that the directive did not violate his Fourteenth Amendment rights:

> Directive # 4913 was reasonably related to valid institutional goals given DOCCS' responsibility to provide for the health and safety of its staff and inmates and the alternatives provided to inmates in being able to seek exceptions and choose which four or five draft bags of material would remain with them. Moreover, the rules were neutral and reasonably related to the ultimate goals of the facility, security and safety.

*McAllister v. Fischer,* 2012 WL 7681635, at *12 (N.D.N.Y. July 6, 2012) (Dkt. No. 55, at 22–23), *Report and Recommendation adopted by* 2013 WL 954961 (N.D.N.Y. Mar. 12, 2013) (Dkt. No. 58), *appeal dismissed* 2d Cir. 13–111 (Jan. 13.2014). Further, the Court concluded that directive 4913 "did not violate[ ] McAllister's Fourteen Amendment rights" and was "reasonably related to valid institutional goals." Dkt. No. 55, at 23–24; Dkt. No. 58. Thus, any such claim is barred by the law of the case. *Arizona v. California,* 460 U.S. 605, 618 (1983) (citations omitted); *see also United States v. Thorn,* 446 F.3d 378, 383 (2d Cir.2006) (internal quotation marks and citations omitted) ("The law of the case doctrine counsels against revisiting our prior rulings in subsequent stages of the same case absent cogent and compelling reasons ....")); *Arizona,* 460 U.S. at 618 (citations omitted); *Wright v. Cayan,* 817 F.2d 999, 1002 n. 3 (2d Cir.1987) (citations omitted) ("Even when cases are reassigned to a different judge, the law of the case dictates a general practice of refusing to reopen what has been decided.").

Accordingly, it is recommended that defendant's motion for summary judgment be granted on this ground.

## 2. Equal Protection

McAllister's only reference to an equal protection violation in the amended complaint is his conclusory claim that Call's reference to a confidential witness during the Tier III hearing was in violation of his right to equal protection. Am. Compl. ¶ 31. Further, in this Court's previous order, McAllister's equal protection claim was dismissed for failure to demonstrate, among other things, that he was part of a protected class or that he was treated differently from any similarly-situated inmates. Dkt. No. 58, at 4; Dkt. No. 55, at 24–25. Thus, any such claim would also be barred by the law of the case. *Thorn,* 446 F.3d at 383. Regardless, McAllister's equal protection claim must also fail for the reasons discussed *infra.*

 **\*17** To establish an equal protection violation, a plaintiff must show that "he was treated differently than others similarly situated as the result of intentional or purposeful discrimination." *Phillips v. Girdich,* 408 F.3d 124, 129 (2d Cir.2005). McAllister has not identified, nor does the record disclose, any basis for a reasonable fact-finder to conclude that he was treated differently from similarly-

situated individuals. Rather, plaintiffs only support for his equal protection claim is the following:

> Call, throughout the entire disciplinary hearing deprive [sic] plaintiff equal protection when he stated: "This is hearing officer Call, this is 2:21 as I was going through my paperwork I realized something that I wanted to point out to Mr. McAllister."

> Defendant Call discriminated against plaintiff when he stated: "I reviewed it this morning the 22nd when it was received again is confidential"

Am. Compl. ¶¶ 31–32. McAllister does not explain how these statements denied him equal protection. McAllister fails to plausibly suggest that he was treated differently from any similarly-situated individuals. Further, even if these statements demonstrate the existence of questions of fact regarding whether McAllister was treated differently from similarly-situated persons, he fails to identify disparity in the conditions "as a result of any purposeful discrimination directed at an identifiable suspect class." *See Dolberry v. Jakob,* No. 11–CV–1018, 2014 WL 1292225, at *12 (N.D.N.Y. Mar. 28, 2014).

Accordingly, it is recommended that defendant's motion on this ground should be granted.

## G. Qualified Immunity

Call contends that, even if McAllister's claims are substantiated, he is entitled to qualified immunity. The doctrine of qualified immunity is an affirmative defense which "shield[s] an officer from personal liability when an officer reasonably believes that his or her conduct complies with the law." *Pearson v. Callahan,* 555 U.S. 223, 244 (2009). Even if a disciplinary disposition is not supported by "some evidence," prison officials are entitled to qualified immunity if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Luna,* 356 F.3d at 490 (quoting *Wilson v. Layne,* 526 U.S. 603, 614 (1999)) (internal quotation marks omitted). This assessment is made "in light of the legal rules that were clearly established at the time it was taken." *Wilson,* 526 U.S. at 614; *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991). To determine whether a state official is entitled to qualified immunity for acts taken during the course of his or her employment, a reviewing court is to

determine: "(1) whether plaintiff has shown facts making out violation of a constitutional right; (2) if so, whether that right was clearly established; and (3) even if the right was clearly established, whether it was objectively reasonable for the [official] to believe the conduct at issue was lawful." *Phillips v. Wright,* 553 Fed. Appx. 16, 17 (2d Cir.2014) (citing *Gonzalez v. City of Schenectady,* 728 F.3d 149, 154 (2d Cir.2013)).

**\*18** First, as discussed, McAllister presented a viable due process claim that the determination was not based on some evidence of guilt because Call (1) relied on confidential witness testimony without making an independent assessment of the witness's credibility and (2) did not otherwise have sufficient reliable evidence to support his finding of guilt. McAllister has also raised issues of fact whether the remaining evidence relied upon —the misbehavior report, McAllister's testimony and statements, and the confiscated legal papers—provided reliable evidence of guilt.

Addressing the second prong of the analysis, there is a clearly-established right to procedural due process protections, including the right to have a disciplinary determination be based on some evidence of guilt. There is also a clearly-established right to an independent assessment of confidential witnesses performed where a hearing officer relies on the witness's testimony (*Vasquez v. Coughlin,* 726 F.Supp. 466, 472 (S.D.N.Y.1989) (right clearly established by 1986); see also *Sira,* 380 F.3d at 80). Further, although there is no bright-line for what suffices as "some evidence" in every prison disciplinary proceeding (*Woodard v. Shanley,* 505 Fed. Appdx. 55, 57 (2d Cir.2012)), there were questions of fact surrounding the allegedly reliable evidence demonstrating that McAllister was in possession of other inmates' legal documents or that he provided them with unauthorized legal assistance. *Cf. Turner v. Silver,* 104 F.3d 354, at \*3 (2d Cir.1996) (some evidence to support determination that the defendant violated rule against unauthorized legal assistance where documentary evidence indicated the plaintiff received payment from other inmates, author of misbehavior report testified regarding an interview with informant who implicated defendant, prison official testified that inmate told her he had been charged for law library services and inmate testified the same). Call both failed to perform an independent assessment of the confidential witness's credibility and provided no explanation for why both the identity of the witness and the substance of his or her

testimony could not be disclosed to McAllister. *Sira,* 380 F.3d at 75 (citing *Ponte,* 471 U.S. at 498).

Thus, given the state of the law regarding the rights to which an inmate is entitled in his disciplinary hearing, it was not objectively reasonable for Call to have believed that (1) he need not perform an independent assessment of the witness credibility or (2) the misbehavior report, confiscated affidavits, and McAllister's consistent testimony and statements, without more, sufficiently supported a determination that McAllister violated rules 113.15 and 180.17.

Accordingly, defendant's motion for summary judgment should be denied on this ground.

## IV. **Conclusion**

For the reasons stated above, it is hereby **RECOMMENDED** that defendant's motion for summary judgment (Dkt. No. 74) be

**\*19** 1. **GRANTED** insofar as:

  a. dismissing plaintiff's First Amendment claims;

  b. dismissing plaintiff's Eighth Amendment claims;

  c. dismissing plaintiff's challenge to the constitutionality of Directive 4913;

  d. defendant's Eleventh Amendment immunity defense;

2. **DENIED** as to:

  a. plaintiff's Fourteenth Amendment procedural due process claims;

  b. defendant's qualified immunity defense.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court "within fourteen (14) days after being served with a copy of the ... recommendation." N.Y.N.D.L.R. 72 .1(c) (citing 28 U.S.C. § 636(b)(1)(B)-(C)).

**FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d

McAllister v. Call, Not Reported in F.Supp.3d (2014)
2014 WL 5475293
Case 9:17-cv-00245-MAD-TWD   Document 36   Filed 11/21/18   Page 69 of 69

Cir.1993); *Small v. Sec'v of HHS,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72, 6(a), 6(e).

Dated: October 9, 2014.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 5475293

**Footnotes**

1   This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

2   McAllister is no longer incarcerated and is currently under the supervision of DOCCS.

3   SHUs exist in all maximum and certain medium security facilities. The units "consist of single-occupancy cells grouped so as to provide separation from the general population ...." N .Y. COMP.CODES R. & REGS. tit 7, § 300.2(b) (1999). Inmates are confined in a SHU as discipline, pending resolution of misconduct charges, for administrative or security reasons, or in other circumstances as required. *Id.* at pt. 301.

4   Rule 113.15 provides that "[a]n inmate shall not purchase, sell, loan, give or exchange a personally owned article without authorization." 7 NYCRR 270.2.

5   Rule 180.17 provides that "[a]n inmate may not provide legal assistance to another inmate without prior approval of the superintendent or designee. An inmate shall not receive any form of compensation for providing legal assistance." 7 NYCRR 270.2.

6   All unpublished decisions referenced herein are appended to this report and recommendation.

7   Various courts in the Second Circuit have postulated how, if at all, the Iqbal decision affected the five Colon factors which were traditionally used to determine personal involvement. *Pearce v. Estate of Longo,* 766 F.Supp.2d 367, 376 (N.D.N.Y.2011), *rev'd in part on other grounds sub nom. Pearce v. Labella,* 473 F. App'x 16 (2d Cir.2012) (recognizing that several district courts in the Second Circuit have debated Iqbal's impact on the five Colon factors); *Kleehammer v. Monroe Cnty.,* 743 F.Supp.2d 175 (W.D.N .Y.2010) (holding that "[o]nly the first and part of the third Colon categories pass Iqbal's muster ...."); *D'Olimpio v. Crisafi,* 718 F.Supp.2d 340, 347 (S.D.N.Y.2010) (disagreeing that Iqbal eliminated Colon's personal involvement standard).

---

**End of Document**                                              © 2018 Thomson Reuters. No claim to original U.S. Government Works.